Andrea Mazingo, SBN 300824
LUMEN LAW CENTER, P.C.
8605 Santa Monica Blvd PMB 832031
West Hollywood, CA 90069
Telephone: (310) 269-6739
Email: andi@lumenlawcenter.com

Barbara E. Cowan, SBN 251942
WORKPLACE ADVOCATES, P.C.
9431 Haven Avenue, Suite 100
Rancho Cucamonga, CA 91730
Telephone: (909) 983-4102
Email: brandi@wpa.law

Rebecca Houlding (*pro hac vice* pending)
HOULDING LAW PC
431 Classon Avenue, Suite 1B
Brooklyn, NY 11238
Telephone: (646) 561-9119
Email: rebecca@houldinglaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| DOES 1 THROUGH 26 ,<br><br>         Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>         Defendant. | Case No. 4:26-cv-07122<br><br>**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF IN AID OF ARBITRATION AND FOR DAMAGES**<br><br>*Filed concurrently with: Notice of Motion and Motion for Preliminary Injunction and Memorandum of Points and Authorities; Application for Temporary Restraining Order; Declarations and exhibits thereto; and [Proposed] Order*<br><br>**DEMAND FOR JURY TRIAL**<br>*on all claims so triable* |

## I.    NATURE OF THE ACTION

1. On May 20, 2026, Defendant Meta Platforms, Inc. ("Meta") began notifying approximately ten percent of its workforce that they had been selected for termination in a mass reduction in force (the "RIF"). Meta did not assemble the termination list through the considered judgment of managers who knew the work. Instead, Meta used a constellation of internal artificial-intelligence systems—including a system referred to internally as "Metamate," employee-trained "second-brain" agents, keystroke- and activity-monitoring data, AI-token-usage dashboards, and algorithmically assisted performance ranking and calibration—to score, rank, and select employees for inclusion on the list.

2. Those tools draw on inputs—performance ratings, calibration scores, productivity and output metrics, "AI-native" ratings, and AI-token consumption—that, by design, cannot be accumulated by an employee who is on protected medical or family leave, or whose output is reduced by a disability. On information and belief, Meta did not neutralize those inputs for protected leave; did not exclude protected-leave-takers or accommodation-seekers from the selection cohort; and did not pause the system for the individualized, leave- and accommodation-neutral review that the law requires.  The result was that employees who took protected leaves were disproportionately selected for layoff, based on scoring that not only failed to account for their protected leaves, but in effect penalized the employees for exercising their legal rights to these leaves.

3. Plaintiffs are twenty-six current and former Meta employees, each of whom Meta selected for separation in the RIF, and each of whom—within the twenty-four months preceding the RIF—took, requested, or was approved to take statutorily protected leave;

attempted to take protected leave and suffered interference; or requested or received a reasonable accommodation for a disability. Their accounts span Meta's ████████ ████████████████████████████████ organizations, in California, Illinois, Washington, New York, the District of Columbia, Pennsylvania, and Florida. A ███ scientist was selected while on approved pre-birth pregnancy leave—the day before her water broke, and just two days before she gave birth. A ██████ manager's own performance review documents that his demotion followed his return from medical leave; he was selected sixteen days into a second medical leave. A █████ engineer's manager tied his lowered rating directly to the "broken time" when an injury prevented him from working. A ████ researcher received the first "Meets Most" rating of her career about a week after disclosing an ██████ diagnosis and requesting accommodations.

4.  Federal and state law forbid these practices. The Family and Medical Leave Act prohibits employers from using protected leave as a "negative factor" in any employment decision, including selection for a reduction in force. 29 C.F.R. § 825.220(c); *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124–25 (9th Cir. 2001). The California Family Rights Act imposes the same prohibition. Cal. Gov't Code § 12945.2(k)(1), (q). The California Fair Employment and Housing Act, including California's newly effective regulations governing automated-decision systems, forbids the use of an automated-decision system that produces disparate-impact discrimination on the basis of disability or sex, including pregnancy. 2 Cal. Code Regs. §§ 11008, 11008.1, 11017, 11020 (eff. Oct. 1, 2025). Title VII has long required that facially neutral selection criteria not produce unjustified disparate impacts. 42 U.S.C. § 2000e-2(k); *Griggs v. Duke Power Co.*, 401 U.S. 424

(1971). Parallel protections apply under the laws of Illinois, Washington, New York, the District of Columbia, Pennsylvania, and Florida.

5. Meta conditions employment on a Mutual Arbitration Agreement containing class-, collective-, and representative-action waivers. Plaintiffs therefore do not seek to adjudicate the merits of their claims on a classwide basis. They proceed as individually named, properly joined Plaintiffs under Federal Rule of Civil Procedure 20, and seek from this Court only the status-quo-preserving provisional relief that Meta's own agreement expressly reserves to "a court of competent jurisdiction." Specifically, Plaintiffs seek a preliminary injunction maintaining the status quo of their employment—preventing Meta from finalizing their separations, and from altering their compensation, benefits, equity vesting, or protected-leave status—pending an independent audit of the algorithmically assisted selection process and resolution of the merits of their claims in arbitration. Once these terminations are finalized, the harm to Plaintiffs cannot be undone by money damages alone. Indeed, for those employees presently on a leave, every day that goes by constitutes additional harm, in that Meta is taking away the entire purpose of a protected leave—to heal, to care for family, and to have protected time away from work to do so—and instead condensing and conflating protected leave with the layoff notice period under the WARN Act, where employees can take time to try and find alternative work. An employee undergoing significant medical treatment, or caring for a days or weeks old newborn, or providing around the clock care for a family member—*i.e.,* exercising their rights to the purposes of these protected leaves—cannot also be told that during this exact same time period they must look for new work. The entire purpose of the statutes both Congress and every single state has

passed to enact and protect these leaves is thwarted if Meta's reduction in force is not paused.

## II.    JURISDICTION AND VENUE

6. This Court has subject-matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331, because they arise under the laws of the United States, including the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.*; Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e *et seq.*; the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*; and the Pregnant Workers Fairness Act, 42 U.S.C. §§ 2000gg *et seq.*

7. This Court has supplemental jurisdiction over Plaintiffs' state-law claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to the federal claims that they form part of the same case or controversy.

8. This Court has authority to grant the provisional injunctive relief requested pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, Federal Rule of Civil Procedure 65, and the express terms of the parties' Mutual Arbitration Agreement, which excludes from arbitration "claims for temporary or preliminary injunctive relief (including a temporary restraining order) in aid of arbitration or to maintain the status quo pending arbitration, in a court of competent jurisdiction in accordance with applicable law." *See* Section IV, *infra*.

9. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant Meta maintains its principal place of business in this District and a substantial part of the events giving rise to Plaintiffs' claims—including the design, calibration, and

---

implementation of the algorithmically assisted selection process challenged here—occurred in this District. Intradistrict assignment to the San Francisco or Oakland Division is proper under Civil Local Rule 3-2(c)–(d), because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in San Mateo County, where Meta is headquartered, and civil actions arising in San Mateo County are assigned to the San Francisco or Oakland Division.

## III.    PARTIES

### A.    Plaintiffs

10. Plaintiff Doe 1 is a ████████████ Manager ██ in Meta's ████████ ████████████ organization, who worked remotely from ████████, Florida. Her protected activity: she took protected maternity leave, on which she remained at the time of her selection for termination as part of the May 2026 reduction-in-force, following a ████████████ pregnancy.

11. Plaintiff Doe 2 is a ██ Engineer ██ in the ████████████████ ████████ team within Meta's ██ organization, who worked in ████████ California. His protected activity: he took two periods of protected parental leave in 2025 and 2026.

12. Plaintiff Doe 3 is a ████ Engineer ██ on the ████ team in Meta's ████ organization, who worked remotely from ████████ Pennsylvania. His protected activity: he took protected parental leave in 2025 and is on protected medical leave for a serious health condition, on which he remained at the time of his selection for termination; he also has a disability for which Meta previously provided an accommodation.

13. Plaintiff Doe 4 is a ▮▮▮ Scientist in Meta's ▮▮▮▮▮▮▮▮▮▮ organization, who worked in ▮▮▮▮▮ California. His protected activity: he took protected paternity leave, on which he remained at the time of his selection for termination.

14. Plaintiff Doe 5 is a ▮▮▮ Manager ▮▮ in Meta's ▮▮▮▮▮▮▮▮ organization, who worked in ▮▮▮▮▮▮ and resides in Virginia. Her protected activity: she took protected pregnancy-related disability leave, on which she remained at the time of her selection for termination, and was entitled to accommodation under the Pregnant Workers Fairness Act.

15. Plaintiff Doe 6 is a ▮▮▮▮▮ Engineer ▮▮ in Meta's ▮▮▮▮▮ ▮▮▮▮ organization, who worked in ▮▮▮▮ California. His protected activity: he took protected medical leave following two ▮▮▮▮ which Meta administered as a reasonable accommodation after deeming him ineligible for FMLA leave.

16. Plaintiff Doe 7 is a ▮▮▮▮ Manager ▮▮ in Meta's ▮▮▮▮▮▮ organization, on the ▮▮▮▮▮▮▮▮▮ team supporting ▮▮▮▮▮, who worked from Meta's ▮▮▮▮ California office and later remotely from her home in California. Her protected activity: she disclosed a ▮▮▮ pregnancy and filed for maternity leave shortly before her selection for termination, and she had taken prior approved medical and bereavement leaves for serious health conditions.

17. Plaintiff Doe 8 is a ▮▮▮ Designer ▮▮ in Meta's ▮▮▮▮▮▮▮ organization, who worked remotely from ▮▮▮▮▮, California. Her protected activity:

she took protected maternity leave, on which she remained, with a ██ -week-old child at home, at the time of her selection for termination.

18. Plaintiff Doe 9 is a ████████ Designer ███ in Meta's ██████████ organization, who worked in ████████ California. Her protected activity: she took protected medical leave for a disability from December 2025 through March 2026, and returned to work under an approved work-from-home accommodation that remained in effect at the time of her selection for termination.

19. Plaintiff Doe 10 is an ███████████ Lead in Meta's ██████████ organization, who worked in ████████, New York. His protected activity: he took protected medical leave for a disability, on which he remained at the time of his selection for termination.

20. Plaintiff Doe 11 is a ███████████ Manager ██ in Meta's ████████ ███████████████████████ organization, who worked in █████ Illinois. His protected activity: he took protected FMLA and medical leave for a disability and returned to work under an approved work-from-home accommodation that remained in effect at the time of his selection for termination.

21. Plaintiff Doe 12 is a ████████ Manager ███ on the ███████████ team who worked in ██████, New York. Her protected activity: she took protected maternity leave, administered as New York Paid Family Leave, on which she remained at the time of her selection for termination.

22. Plaintiff Doe 13 is an ████████ Manager ██████ in Meta's ██████████ ███████ organization, who worked in ████████, California. His protected activity: he

took protected FMLA medical leave in mid-2025 to recover from a serious health condition ████████, and is an individual with a disability within the meaning of the ADA and FEHA.

23. Plaintiff Doe 14 is a ████████ Engineer ████ in Meta's ████████ organization, who worked in New York. His protected activity: he took protected parental/paternity leave (FMLA and New York Paid Family Leave), on which he remained at the time of his selection for termination, and had taken prior parental leave.

24. Plaintiff Doe 15 is a ████████ Engineer, ████████ in Meta's ████████ organization, on the ████████ team, who worked in ████ Washington. His protected activity: he disclosed a serious health condition and disability—████████—to his manager in March 2026 and sought protected medical leave, which two providers through Meta's own ████ provider had approved, but was discouraged and deterred from taking that leave by a manager who warned that doing so would result in his selection for the anticipated reduction in force; Meta neither offered any accommodation for his disability nor engaged in any interactive process.

25. Plaintiff Doe 16 is a ████████ Researcher ████ in Meta's ████████ organization, who worked in ████ Washington. Her protected activity: she disclosed diagnoses of ████████ and requested reasonable accommodations for her disabilities in early 2026.

26. Plaintiff Doe 17 is a ████ Scientist ████ in Meta's ████████ organization, who worked in ████ Washington. Her protected activity: she took protected

pregnancy-related medical leave and was on approved maternity leave at the time of her selection for termination, giving birth two days later.

27. Plaintiff Doe 18 is a ████ Director, ████████████████████████, who worked in ████ Washington. His protected activity: he was discouraged and deterred from taking FMLA leave that his treating provider had recommended, out of a well-founded and objective concern from a manager that such a leave would be held against him in the RIF.

28. Plaintiff Doe 19 is a ███████ Manager ████ in Meta's Marketing organization, who worked in ██████, New York, and beginning in 2025, remotely from ██████ California, where he resided at the time of selection. His protected activity: he took protected medical leave, on which he remained at the time of his selection for termination, and is an individual with a disability ██████ for which he received no accommodation.

29. Plaintiff Doe 20 is a █████ Designer ████ in Meta's ███████████ organization, who worked in █████, Washington. Her protected activity: she took protected medical leave for a serious health condition (████████████████), on which she remained at the time of her selection for termination, and is an individual with a disability.

30. Plaintiff Doe 21 is a █████ Engineer ████ in Meta's █████ organization, who worked in ███████, California. Her protected activity: she took protected pregnancy-disability and maternity leave, on which she remained at the time of her selection for termination, and is an individual with a disability.

31. Plaintiff Doe 22 is a ███████████ Manager ███ in the ███████████ Group within Meta's ██████████ organization, who worked in the ██████ Washington area. His protected activity: he took protected medical leave and had returned to work under an approved disability accommodation that remained in effect at the time of his selection for termination.

32. Plaintiff Doe 23 is a ████ Scientist ████ on Meta's Facebook Search team, who worked in ██████ California. Her protected activity: she took protected medical leave for a disability and had returned to work under an approved disability accommodation two days before her selection for termination.

33. Plaintiff Doe 24 is a ██████ Engineer (E6) in Meta's ████████████ ██████ organization, who worked remotely from ██████ California. Her protected activity: she took protected medical leave, on which she remained at the time of her selection for termination; she is an individual with a disability.

34. Plaintiff Doe 25 is a ████████ Manager in Meta's ███████████ organization, who worked in ██████ California. Her protected activity: she took protected family-care leave to care for a ██████ family member in late 2025 and early 2026, and bereavement leave ████████, and is an individual with a disability.

35. Plaintiff Doe 26 is a ████ Scientist ████ on Meta's ████████████ team, who worked from Meta's ██████ New York office. Her protected activity: she took protected maternity and parental leave for the birth of her child, from which she had

returned less than ▮ weeks before her selection for termination as part of the May 2026 reduction-in-force.

## B.   Defendant

36. Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation with its principal place of business at 1 Meta Way, Menlo Park, California 94025 (San Mateo County). Meta is one of the world's largest technology companies, operating the Facebook, Instagram, WhatsApp, Messenger, and Threads platforms, along with its Reality Labs and artificial-intelligence divisions, and it employs tens of thousands of people across the United States. Meta employed each Plaintiff and is an "employer" within the meaning of each of the statutes invoked herein. At all relevant times, Meta acted by and through its officers, directors, managers, agents, and employees, and through the automated-decision systems and third-party vendors it deployed, all acting within the course and scope of their authority or agency.

## IV.   THE MUTUAL ARBITRATION AGREEMENT AND THE BASIS FOR PROVISIONAL JUDICIAL RELIEF

37. As a condition of employment, Meta requires each employee to execute, through Meta's electronic-signature onboarding system, a Mutual Arbitration Agreement that contains class-, collective-, and representative-action waivers. A true and correct copy of a representative executed Mutual Arbitration Agreement is attached to the concurrently filed Declaration of Doe 16 as an exhibit.

38. The Mutual Arbitration Agreement expressly excludes from arbitration, and reserves to the courts, "claims for temporary or preliminary injunctive relief (including a temporary restraining order) in aid of arbitration or to maintain the status quo pending arbitration, in

a court of competent jurisdiction in accordance with applicable law." The relief Plaintiffs seek from this Court—preservation of the pre-May 20, 2026 status quo of their employment pending arbitration of the merits—falls squarely within that exclusion.

39. The Mutual Arbitration Agreement further commits any question concerning the validity of its class-, collective-, or representative-action waiver exclusively to "a court of law," and not to an arbitrator.

40. Accordingly, Plaintiffs do not ask this Court to adjudicate the merits of their claims. Plaintiffs intend to pursue the merits of their individual claims in arbitration, unless exempted from arbitration by the Ending Forced Arbitration of Sexual Assault and Sexual Harassment Act of 2021 ("EFAA"), 9 U.S.C. §§ 401–402. For all other Plaintiffs and claims, Plaintiffs respectfully request that, after entering the provisional relief sought herein, the Court compel arbitration of the merits under 9 U.S.C. § 4 and stay further proceedings under 9 U.S.C. § 3, retaining jurisdiction to enforce the status-quo injunction pending the arbitrators' decision. Plaintiffs plead their substantive claims below to establish their likelihood of success on the merits for purposes of the requested provisional relief and to preserve those claims for the arbitral forum.

## V.      JOINDER ALLEGATIONS (FED. R. CIV. P. 20)

41. Plaintiffs are properly joined under Federal Rule of Civil Procedure 20(a)(1). Their claims arise out of the same transaction, occurrence, or series of transactions or occurrences: a single, company-wide reduction in force, announced and executed on a common timetable—notification on May 20, 2026, with separations scheduled to be finalized on or about July 22, 2026 (and on or about August 20, 2026 for New York Plaintiffs and July 31, 2026 for the Washington Plaintiff then on Washington Paid Family

Leave)—through a common, artificial-intelligence-assisted selection methodology applied uniformly across organizations, levels, and geographic locations.

42. Plaintiffs' claims present questions of law and fact common to all of them, including: whether Meta's selection process used protected-leave status, accommodation status, or proxies for either as a negative factor; whether Meta tested the process for disparate impact on protected groups; and whether the process produced an unjustified disparate impact. That common course of conduct and those common questions make joinder proper.

43. Because Meta's Mutual Arbitration Agreement contains class-, collective-, and representative-action waivers, Plaintiffs do not seek classwide adjudication of the merits. They proceed as individually named, properly joined Plaintiffs and seek only the status-quo-preserving provisional relief that Meta's own agreement reserves to this Court.

44. As used herein: (a) the "California Plaintiffs" are Plaintiffs Doe 2, Doe 4, Doe 6, Doe 7, Doe 8, Doe 9, Doe 13, Doe 19, Doe 21, Doe 23, Doe 24, and Doe 25; (b) the "Washington Plaintiffs" are Plaintiffs Doe 16, Doe 15, Doe 17, Doe 18, Doe 20, and Doe 22; (c) the "New York Plaintiffs" are Plaintiffs Doe 12, Doe 10, Doe 14, and Doe 26; (d) the "Pregnancy- and Sex-Discrimination Plaintiffs" are Plaintiffs Doe 1, Doe 12, Doe 4, Doe 5, Doe 7, Doe 8, Doe 14, Doe 17, Doe 21, and Doe 26; and (e) the "FMLA-Eligible Plaintiffs" are those identified in Count I.

## VI.   COMMON FACTUAL ALLEGATIONS

**A. Meta's May 2026 Reduction in Force**

45. In April 2026, Meta announced that approximately 8,000 employees—roughly ten percent of its workforce—would be laid off on May 20, 2026, and that several thousand additional employees would be reassigned to new artificial-intelligence initiatives, as Meta sought to remake itself into an "A.I.-first" company. Meta announced these cuts even as it reported record revenue the prior month and committed to spending between $125 billion and $145 billion—more than double its 2025 expenditure—on artificial intelligence in 2026, prompting employees to question why the job cuts were necessary.[1]

46. On May 20, 2026, Meta began notifying the selected employees by email, beginning with offices in Singapore at 4:00 a.m. local time and proceeding to the United Kingdom, the United States, and elsewhere in each region's early-morning hours. Plaintiffs received their notifications as early as approximately 4:00 a.m. in their respective time zones. Doe 13 Decl. ¶9; Doe 25 Decl. ¶17; Doe 21 Decl. ¶17.

**B.   Meta's Use of Algorithmic Systems to Aid in Selecting Employees for Termination**

47. On information and belief, Meta used a constellation of internal artificial-intelligence-assisted systems to score, rank, and select employees for inclusion on the termination list. These systems include: "Metamate," an internal large-language-model assistant; employee-trained "second brain" agents that ingest each employee's communications and documents to replicate the employee's output; algorithmic productivity scoring drawn from keystroke, screen-content, mouse, browser-history, messaging, and email data captured continuously from Meta-issued

---

[1] *See* Eli Tan, Kalley Huang & Mike Isaac, *Meta Lays Off 8,000 Employees, as A.I. Casualties Mount*, N.Y. Times (May 20, 2026), https://www.nytimes.com/2026/05/19/technology/meta-layoffs-ai.html.

devices; internal dashboards displaying employee-level AI-token consumption; and AI-assisted performance-review and calibration tools that have substantially supplanted the prior manager-driven calibration process. Doe 19 Decl. ¶¶ 20-21; Doe 8 Decl. ¶¶ 13–14; Doe 18 Decl. ¶¶ 19-20, 22-23; *see also* Doe 13 Decl. ¶¶ 11–12, 14; Doe 2 Decl. ¶¶ 11–12; Doe 21 Decl. ¶¶ 15-16; Doe 9 Decl. ¶¶ 11–13; Doe 17 Decl. ¶¶ 17–18; Doe 25 Decl. ¶¶ 14, 15.

48. On information and belief, the inputs to the selection process included each employee's rolling twelve-month performance rating; the Year-End 2025 calibration outcome; an "AI-native" rating drawn from AI-token-usage dashboards; output volume and code-commit data; and manager-sponsorship and roadmap-adjacency signals. Meta maintained dashboards and company-wide leaderboards displaying each employee's artificial-intelligence-tool usage and token consumption, compared against peers; Meta restricted access to that information after it was reported in the press; and Meta's Chief Executive Officer stated at an all-hands meeting that performance reviews would, going forward, take into account employees' use of artificial intelligence.

49. A director confirms the mechanism from the inside: he attests that Meta announced an AI-enabled performance program called "Checkpoint" under which "employee AI adoption was going to be a core assessment metric," that Meta withheld the details of Checkpoint from employees "until after the May 20, 2026 reduction in force," and that he monitored his organization's AI-adoption dashboards "almost daily"—dashboards that "failed to distinguish employees' leave from lack of engagement." Doe 18 Decl. ¶ 22; *see also* Doe 25 Decl. ¶13; Doe 6 Decl. ¶10; Doe 18 Decl. ¶¶ 11. Numerous other employees noticed that their own scores had dropped dramatically upon returning from

vacation and protected leaves, and that there was no effort made by Meta to "pause" a person's scoring when they were away from work based on excused, and even legally protected, absences. Doe 2 Decl. ¶ 11; Doe 25 Decl. ¶ 13; Doe 17 Decl. ¶¶ 17, 18; Doe 6 Decl. ¶¶ 10, 15; Doe 9 Decl. ¶11; *see also* Doe 8 Decl. ¶ 13; Doe 12 Decl. ¶¶ 9, 17.

**C. Meta's Workforce-Wide Monitoring and Compelled AI Training Created the Inputs the RIF Algorithmically Assisted Process Used**

50. In early 2026, Meta deployed a workforce-wide monitoring program capturing, on Meta-issued devices, keystrokes, screen content, mouse and activity data, browser history, messaging, email, and (for at least some employee populations) voice, video, and location data, later announced formally in April 2026 as the "Model Capability Initiative" (MCI).[2] On information and belief, the program was announced through a low-visibility internal post—made by an engineer rather than a senior leader, in a secondary group rather than Meta's official employee-notice channel—with little notice and no consent or click-through acknowledgment; on at least some teams, employees received no consent or acknowledgment prompt at all, and, at least initially, there was no way to opt out. Doe 12 Decl. ¶¶ 19; Doe 3 Decl. ¶ 12; Doe 5 Decl. ¶¶12; Doe 16 Decl. ¶¶ 26; Doe 4 Decl. ¶ 11; Doe 6 Decl. ¶¶ 19; Doe 10 Decl. ¶¶ 17; Doe 17 Decl. ¶¶ 19; Doe 2 Decl. ¶¶ 12; Doe 19 Decl. ¶¶ 23; Doe 26 Decl. ¶¶ 12. Meta's deployment of the employee-tracking program to feed its artificial-intelligence systems generated significant internal opposition. More than 1,000 employees signed a petition demanding that Meta stop collecting employee data to train its A.I. models, and petition fliers were posted in Meta offices, including its Burlingame, California office.[3] Meta's own Chief Technology

---

[2] Charles Rollet & Pranav Dixit, *Meta Pauses an AI Training Program That Tracks Employees' Keystrokes After an Internal Leak*, Bus. Insider (June 22, 2026), https://www.businessinsider.com/meta-ai-training-data-leak-exposed-employee-activity-across-company-2026-6.
[3] *See* Tan et al., *supra*. note 1.

Officer, Andrew Bosworth, acknowledged in a question-and-answer session that a "tremendous number of employees [were] feeling anxieties about their futures," adding: "It's all bad. I'm not going to try to sugarcoat that."[4] The data gathered through the employee-tracking program was used to build A.I. tools, including by a new engineering organization to which employees were reassigned on a non-optional basis.[5]

51. In parallel, Meta deployed an internal expectation that employees train a personal AI agent commonly called a "second brain" that ingests the employee's communications and documents to replicate the employee's output, and required employees to integrate Meta's internal AI tools into their work. Doe 12 Decl. ¶ 18; Doe 16 Decl. ¶ 27; Doe 24 Decl. ¶ 13; Doe 4 Decl. ¶ 10; Doe 8 Decl. ¶ 13; Doe 6 Decl. ¶ 20;  Doe 17 Decl. ¶ 17; Doe 18 Decl. ¶  23; Doe 25 Decl.  ¶15. On information and belief, at least some senior leaders trained second-brain agents in advance of going on leave, including maternity leave, so that Meta could continue to draw on the employee's output during the absence. Some employees were *required* to turn in at least one  "skill," which was a deliverable provided to Meta where they had created an AI agent trained to perform at least one of their own job duties. Doe 4 Decl. ¶ 10.

52. These captured data are the inputs the RIF selection process uses. An employee on protected leave cannot generate them, and the absence of that data is recorded by the system as reduced performance. Many employees had no separate personal devices and in any event, many used their monitored Meta systems for personal and confidential matters, including personal banking, health-insurance and mental-health-treatment portals, communications with Meta's leave administrator, Lincoln Financial, and the

---

[4] *Id.*
[5] *Id.*

transmission of medical documentation supporting leave and accommodation requests. Doe 19 Decl. ¶¶23; Doe 16 Decl. ¶ 26; Doe 12 Decl. ¶¶ 19; Doe 22 Decl. ¶¶ 11; Doe 6 Decl. ¶¶ 19; Doe 4 Decl. ¶¶ 11. The monitoring program—announced internally as the "Model Capability Initiative"—thus captured not only employees' work output but also their protected-leave and medical activity. On June 22, 2026, it was publicly reported that Meta had paused the program after an internal security incident left employees' private conversations, performance data, and transcriptions accessible across the entire company—an incident Meta classified as a "SEV 2" on an internal severity scale on which zero is the most severe, and which a Meta spokesperson confirmed. On information and belief, the exposed data included the same categories of monitoring-derived performance data that fed the RIF selection process; Meta's inability to secure that data underscores both the breadth of what it collected and the absence of the safeguards that would have been required to prevent protected-leave and disability information from influencing selection.[6]

## D. Meta Did Not Neutralize Protected Leave

53. On information and belief, Meta did not neutralize any of the foregoing inputs for protected leave. An employee on twelve weeks of FMLA, CFRA, pregnancy-disability, or family leave during the measurement window cannot, by the system's design, accumulate code commits, AI-token consumption, output volume, or "strategic alignment" signals at the rate of a continuously present peer. Meta did not adjust for this, did not exclude protected-leave time from any throughput metric, and did not flag protected-leave-takers or accommodation-seekers for individualized human review. Meta

---

[6] *See* Rollet et al., *supra*. note 2.

could have neutralized the protected-leave window from each input metric and evaluated leave-takers as if continuously present; its failure to do so caused protected leave and disability to be recorded as underperformance.

### E. Meta's Capital-Reallocation Framing and the Timing of the RIF

54. Meta framed the RIF internally as a reallocation of capital toward artificial-intelligence investment. A senior finance leader within Meta's Infrastructure organization, who led financial planning and analysis for Meta's AI capital-expenditure program, attests that Meta incorporated into its financial forecasts a planned reduction of approximately $10 billion attributable to the layoffs, and that Meta's human resources stated that information regarding an artificial-intelligence-enabled system referred to as "Checkpoint" would not be shared with employees until after the May 20 reduction in force. Doe 18 Decl. ¶¶21, 22.

55. A scheduled equity-vesting event occurred on or about May 15, 2026—just days before the May 20 termination notifications—while the next scheduled vesting event would not occur until after the RIF and its associated notice period. This timing supports the inference that the RIF was structured to capture employee labor through the prior vesting event while denying employees the next.

## VII. PLAINTIFF-SPECIFIC ALLEGATIONS

**Doe 15**

56. Doe 15 is a ███████ Engineer, ████████████████ in Meta's ████████  organization, on the ████████████████████████ team, who began at Meta on ████████████ and worked in ████████ Washington. His performance was consistently strong—ratings at or above "Meets All," including "Exceeds Expectations,"

a promotion in August 2025, and an ███████████████████ award—until his Year-End 2025 review, when he received the first "Meets Most" rating of his tenure. His manager, who had assumed the role in September 2025 and had never previously raised a performance concern, told him when the rating issued that "the decision was already made even before the self-review was submitted," suggested the rating suffered because Doe 15 had been stressed and his "anxiety was noticeable to others," and pointed to a three-day period of approved paid time off he had taken in August 2025—before that manager supervised him, and drawn from an accrued balance at the company maximum. His manager also said that, with seven engineers, he had applied "stack ranking" for "team health," and that lowering Doe 15's rating was the only way another engineer—who had joined Meta approximately six months earlier—could be promoted.

57. On March 18, 2026, Doe 15 was diagnosed with ████████████████ by a ███████████████ he was also experiencing ██████████. In late March 2026, he disclosed his diagnosis and symptoms to his manager, who dismissed the condition—telling him it was "probably just in your mind" and suggesting he "take the weekend"—and neither offered any accommodation, referred him to Meta's accommodations process, nor engaged in any interactive process. In mid-April 2026, after two providers—█████████████████████████████—evaluated him and within approximately one week signed off on twelve to sixteen weeks of medical leave, Doe 15 gave his manager the courtesy notification that Meta's internal leave wiki instructs employees to provide before submitting a leave application through Meta's Lincoln Financial-administered leave tool. His manager became furious and threatened him: the team could not "afford to lose another person to leave"; given his rating, taking

leave would mean senior leadership "will definitely" terminate him or nominate him for the anticipated layoffs; and if he proceeded, the manager would "share with the HRBP to initiate performance management to remove me from Meta." The manager proposed what he called a "win-win"—an exceptionally positive first-half performance letter to the HR business partner, but only if Doe 15 dropped the leave—refused to put his threats in writing to "avoid a paper trail," yet immediately sent the positive performance letter, which Doe 15 received and retains, and instructed him not to discuss the matter with the HR business partner, his director, or his teammates. Fearing the consequences his manager described—and because his ████████████████████ is tied to his continued employment—Doe 15 never submitted the leave application, and he also stopped the ███████████████ treatment that had been arranged for him, because ████ direct connections to Lincoln Financial and Meta made him fear that continuing treatment would expose his leave plans and trigger the threatened retaliation.

58. Doe 15 was the only one of the approximately ████ members of his team selected for termination in the May 2026 reduction in force; his separation is scheduled for July 22, 2026. After the reduction in force, his manager was "flattened" from manager to an individual-contributor role—the very outcome the manager had told him he feared if the team lost another member to leave. Later on May 20, the manager messaged him: "Sorry the company's move is just 1 month before we can mark your great performance into the system," and voluntarily posted a recommendation referencing his recent ████████ award. When Doe 15 had earlier observed that Washington law protects employees who take or seek family or medical leave from adverse action in a layoff, his manager responded that "this is Meta," and "if the company wants something they make it

happen." Since his selection, Meta has designated him ineligible for rehire and, on information and belief, declined to permit another Meta team to rehire him. He holds substantial unvested restricted stock units that he will forfeit upon termination, and his ███████████████████████████ depends on his continued employment. Doe 15 Decl. ¶¶ 3–14, 16–29.

**Doe 7**

59. Doe 7 is a ██████ Manager ████ in Meta's ████████████ organization, on the ██████████████████████ team supporting advertiser support, who began at Meta on March 7, 2022 and worked from Meta's ████████ California office and later remotely from her home in California. Over approximately four years she was promoted from IC4 to IC5 after a 2023 year-end cycle in which she "Greatly Exceeded Expectations," was rated at or above "Meets All" expectations in every review cycle—including "Consistently Met Expectations" for both 2024 and 2025—received an organization-level award, and was never placed on a performance improvement plan, coaching plan, or written warning. Her 2025 review noted strong results "despite being out on medical leave for 8 weeks in H2".

60. Doe 7 took several periods of approved, protected leave during her employment: bereavement leave in November 2024, and medical leave for ██████ in January and February 2025 and again from October to November 2025, each for a serious health condition and each approved by Meta. In March 2026, she learned she was pregnant, with ████████████████ In late March 2026—after her manager and skip-level manager had themselves been laid off in Meta's March 2026 reduction in force—she disclosed her pregnancy and expected due date to the director to whom she then reported and to the

colleague informally managing her team, both of whom expressed support. In April 2026, she filed her intent to take maternity leave through Meta's leave-administration system, and her upcoming leave was reflected in Meta's internal, employee-visible calendar tool; the leave was planned to run from approximately October 2026 through June 2027, combining maternity and parental leave, a long-service "recharge" leave for which she would qualify upon reaching her five-year milestone in March 2027, and accrued paid time off. Her ▮▮▮ delivery is scheduled for ▮▮▮ 2026.

61. On May 20, 2026—weeks after she disclosed her pregnancy and filed for maternity leave—Doe 7 received an email from Meta leadership notifying her that she had been selected for termination, and her system access was revoked the same day; her separation is scheduled for July 22, 2026. Of the approximately ▮▮▮ members of her team, only two were selected: Doe 7 and a ▮▮▮-based colleague at her level who, like her, was approaching the ▮▮-year service milestone and eligibility for "recharge" leave; other program managers at her level were retained. Meta's activity-monitoring software ran on her Meta systems, capturing data including keystrokes, screen content, mouse and activity data, browsing history, messaging, email, and voice, video, and location data. Doe 7 holds unvested restricted stock units valued at more than $▮▮▮ which she will forfeit upon termination, and she and her family rely on the employer-sponsored health coverage—on which her ▮▮▮ pregnancy care and ▮▮▮▮▮ delivery depend—that will end upon her separation. Doe 7 Decl. ¶¶ 3, 6-15

## Doe 17

62. Doe 17 is a ▮▮▮▮▮ in Meta's ▮▮▮▮ organization with approximately ▮▮▮▮▮ years of tenure. She received "Exceeds Expectations" ratings in 2023 and

2024, and her manager's contemporaneous one-on-one notes reflected active discussions of her promotion to the ▉ level.

63. Doe 17 took protected medical leave in late 2025 ▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉, of which her manager, skip-level manager, and human resources were aware, and later began approved pre-birth maternity leave. While she was on approved pre-birth leave, on May 20, 2026, she was notified that her role had been "eliminated." Her water broke the following day, and she gave birth on May 22, 2026.

64. Within her skip-level manager's organization of approximately ▉▉▉▉ employees, three were selected for termination; two of the three—including Doe 17—were on leave related to pregnancy or the birth of a child. On information and belief, her sole lower rating, in 2025, was affected by the pregnancy-related leave she had taken. Doe 17 Decl. ¶¶ 4, 6, 7, 10, 12, 14, 16.

**Doe 8**

65. Doe 8 is a ▉▉▉ Designer ▉▉▉ in Meta's ▉▉▉▉▉▉▉▉▉▉▉▉ organization with approximately ▉▉ years of tenure. She received "Meets All" or "Exceeds Expectations" ratings throughout her tenure, including "Exceeds Expectations" from 2022 through the first half of 2025, and had no negative feedback before her leave.

66. Doe 8 notified her manager of her upcoming maternity leave at the end of September 2025. Her maternity leave was approved to run from February 28, 2026 through September 14, 2026, and was confirmed in writing by Meta's leave administrator; her child was born March 27, 2026. While she was on approved maternity leave, with an infant at home, she was notified on May 20, 2026 of her selection. She was the only

member of her team who was on maternity leave, and other team members who had protected or scheduled time away from work were also selected—including a colleague whose medical leave was scheduled to begin the following week and colleagues who had approved but untaken "Recharge" sabbatical leave, which is a benefit provided to Meta employees upon their five year anniversary, and is thirty days of paid time off. Doe 8 herself had accrued an approved "Recharge," which was forfeited as a result of her selection. Doe 8 Decl. ¶¶ 3, 4, 6-12.

**Doe 12**

67. Doe 12 is a ▮▮▮▮▮ Manager ▮▮ on the ▮▮▮▮▮▮▮ team, managing ▮▮▮▮▮▮▮ She was on approved maternity leave, administered through New York Paid Family Leave, when she was notified on May 20, 2026 of her selection. Approximately two months of her leave balance were extinguished by the WARN notice period.

68. During her leave, Doe 12's manager was changed without her input. The only member of her team who was retained was a male direct report; the members of her team who were selected for termination, including Doe 12, were all women, and her responsibilities were reassigned to ▮▮▮▮, a male former peer under whom she had been layered, without notice, during her leave. Earlier, her manager had encouraged her to delay her pre-birth leave because it overlapped with the performance-review window, and as a result, based on the beliefs of both herself and her manager that this would negatively impact her review, she took only half of that leave. Doe 12 Decl. ¶¶ 3, 6, 8-10, 12, 15, 14-17.

---

**Doe 5**

69. Doe 5 is a ▓▓▓ Manager ▓▓ in Meta's ▓▓▓▓▓▓▓▓▓▓▓▓▓ organization. She disclosed her pregnancy in mid-February 2026, to a positive reception, and her pre-birth short-term-disability leave began on May 18, 2026. On May 20, 2026—two days into her leave and while she was on approved pregnancy-related disability leave—she was notified of her selection for termination; she has since given birth. She was the only one of ▓▓ members of her team selected; the one teammate who was also out of the office, on an unrelated personal leave rather than a pregnancy- or medical-related leave, was not selected; and her skip-level manager expressed surprise at her selection.

70. Because Doe 5 had less than one year of tenure, she was not eligible for FMLA leave. Her protections arise under statutes that impose no minimum-tenure threshold, including the Pregnant Workers Fairness Act, the Pregnancy Discrimination Act, the Americans with Disabilities Act, and the D.C. Human Rights Act, in addition to federal WARN. Doe 5 Decl. ¶¶ 2, 3, 7-10.

**Doe 19**

71. Doe 19 is a ▓▓▓▓▓ Manager with approximately ▓▓▓▓▓▓ years of tenure who received "Exceeds Expectations" ratings for his first four years and was promoted from the ▓▓ to the ▓▓▓▓▓▓▓▓▓ level. He took approved medical leave in 2024 for a serious health condition. His medical clearance to return was October 2, 2024; five days later, on October 7, 2024, while he was still on bridging leave and had not yet returned to work, his manager removed him from his management role and reduced him from a

manager ▮▮ level to an individual-contributor ▮▮ level, reassigning his team—including to a more junior subordinate who had not taken protected medical leave. His 2024 performance review documents that this transition occurred upon his return from leave, stating he "met expectations as [he] transitioned to IC . . . when [he] returned from leave in Q4'24." His ratings then declined for the first time in his tenure, from "Exceeds Expectations" to "Consistently Meets" for 2024 and to "Meets Most" for 2025.

72. Doe 19 repeatedly disclosed that he is ▮▮ and requested reasonable accommodations, such as additional time to ▮▮; he received no accommodation and was assigned to a ▮▮-intensive technical initiative, then penalized in his 2025 review for work that his manager characterized as "time-consuming." He began a second approved medical leave on May 4, 2026, scheduled to end July 26, 2026. On May 20, 2026—sixteen days into that leave—he was selected for termination, with a separation date of July 22, 2026, four days before his leave was scheduled to end and 24 days before an August 15, 2026 vesting date. Doe 19 Decl. ¶¶ 3, 4, 7, 9-15, 17-18.

**Doe 6**

73. Doe 6 is a ▮▮ Engineer ▮▮ in Meta's ▮▮ organization. He sustained a serious physical injury in May 2025 requiring two ▮▮ and an extended period away from work to recover, which Meta treated as a reasonable accommodation rather than as FMLA leave (for which Meta deemed him ineligible by tenure). He was on that approved medical leave from late May 2025 until he returned to work on or about December 15, 2025.

74. While Doe 6 was still on leave, his manager tied his performance rating directly to his injury-related absence. In written messages in early July 2025, she told him there had not been "enough signals to gauge [him] operating at ic levels with [his] broken time," that this "does not count as leave of absence," and that "unlucky leaves happen," and later told him the rating was "impossible" to change but that "it is what it is." Meta then issued him a "Below Expectations" rating for the mid-year 2025 cycle on or about August 1, 2025—while he remained on leave—with no written rationale or actionable feedback. The mid-July 2025 complaint he submitted to human resources regarding the disability-based rating was never resolved. After returning to work, Doe 6 served as the sole engineer on ███████████████████████████ and, by a measure of engineering output used on his team, ranked approximately fourth of fourteen engineers by volume of significant coding changes; he took a single day off in the five months before the reduction in force. A few weeks before the reduction in force, he informed his manager that he would likely need ████████████████ and a short leave in late 2026 or early 2027. He was selected for termination on May 20, 2026, effective July 22, 2026, and holds substantial unvested equity—a new-hire grant plus refresh valued at more than $████ over four years, vesting quarterly—that he will forfeit upon termination, including units scheduled to vest in the period around his termination date. Doe 6's spouse is pregnant, with a child due in ██████ 2026, which he refrained from disclosing to Meta because he was aware that employees who took paternity leave had been laid off in February 2025. Doe 6 Decl. ¶¶ 3, 4, 7-17, 21, 26.

**Doe 16**

75. Doe 16 is a ███████████ Researcher ████ in Meta's ██████████████ organization, with contractor and full-time tenure dating to ████ In early 2026, her manager assigned an undocumented "strategic roadmap" expectation; although Doe 16 completed and submitted the roadmap within roughly a week and a half, her manager then announced an involuntary reassignment, attributing it to the perceived inadequacy of the roadmap, while later acknowledging the expectation had not been put in writing.

76. On February 20, 2026, Doe 16 disclosed her recent diagnoses of ██████████████ to her manager and explained that she was pursuing reasonable-accommodation requests. Approximately eleven days later, she received the first "Meets Most" rating of her Meta tenure, even as her manager acknowledged that the quality of her research work was "excellent." Doe 16 submitted a formal accommodation request—principally for clear, written expectations and feedback—on March 30, 2026, but Meta did not act on it for approximately five weeks, approving it only in early May 2026 after human resources became involved; the approval was limited to a three-month window through June 30, 2026, for what is a permanent disability, and included caveats narrowing what she had requested. On or about May 11, 2026—the week after she submitted a formal complaint of disability discrimination and retaliation on May 5, 2026—her manager issued written feedback, for the first time, stating that she was "trending below expectations." She was selected for termination on May 20, 2026, approximately two weeks after her complaint. Doe 16 Decl. ¶¶ 3, 6-9, 12, 15, 17-18, 20, 22-23.

**Doe 18**

77. Doe 18 is a ▇▇ Director ▇▇ in Meta's ▇▇▇▇▇▇▇▇▇ organization, where he led the ▇▇▇▇▇▇▇▇ team responsible for ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇; Meta classified his role at the ▇▇ ▇▇▇▇ management level in its internal systems. His performance was consistently rated as meeting expectations, and in an August 2025 coaching session his manager recorded that he was "doing extremely well," had "grown leaps and bounds," "brought in a lot of process excellence," and was "recruiting great talent," and that the infrastructure business leaders he supported were "very comfortable and confident" in him.

78. When Doe 18 disclosed in November 2025 that his health was in crisis, neither his manager nor Meta's human resources advised him of his right to FMLA leave or offered any accommodation. His treating provider recommended medical leave in or about March 2026; Doe 18 investigated his eligibility with Meta's leave administrator but deferred taking leave out of concern—borne out by the May 20 selections—that an absence would be penalized. By failing to advise him of his FMLA rights and discouraging their exercise, Meta interfered with those rights within the meaning of 29 C.F.R. § 825.220(b). As a senior finance leader in Meta's Infrastructure organization, Doe 18 also has direct knowledge of Meta's capital-reallocation framing of the reduction in force and of the selection mechanics described above. Doe 18 Decl. ¶¶ 3, 4, 6, 8-11, 21-22, 25.

**Doe 24**

79. Doe 24 is a ▆▆▆ Engineer ▆▆ and ▆▆▆▆▆ in Meta's ▆▆▆▆▆▆ organization, within the group responsible for ▆▆▆▆▆▆▆▆, with approximately ▆▆ years of tenure and a record of "Exceeds Expectations" and "Greatly Exceeds Expectations" ratings. Shortly before the year-end 2025 review cycle, a reorganization left Doe 24 without a manager familiar with her then-current work to advocate for a commensurate rating, and she received the first "Meets Most" rating of her nine-year career—a rating that rested on a single evaluation area and on factual assertions, including a performance metric, that she identified as inaccurate in a written correction request. Doe 24 disputed the rating through Meta's human-resources process; her skip-level manager acknowledged that at least one correction was warranted but stated the locked rating could not be changed, and employee relations ultimately deferred to management without correcting the review.

80. In the weeks after that review, Doe 24's health declined, and on or about March 10, 2026 a licensed provider diagnosed a serious health condition and directed immediate medical leave, which Meta approved from on or about March 23, 2026 through June 14, 2026; she remains in active ▆▆▆▆ treatment. About a week after she was notified of her selection for termination, Meta shortened her approved leave to end May 19, 2026—the day before the reduction in force—even though her physician supported her continuing on leave. Doe 24 holds unvested RSUs valued at approximately $▆▆▆▆ including approximately $▆▆▆▆ scheduled to vest on August 15 and November 15, 2026, after her separation date, all of which she will forfeit upon termination. Doe 24 Decl. ¶¶ 3-11, 16, 18.

**Doe 4**

81. Doe 4 is a ▮▮▮▮▮ on the ▮▮▮▮▮ team within Meta's ▮▮▮▮▮ organization, whose work also supported Meta's generative-AI products. He informed his manager and team of his upcoming parental leave in early 2026 and has been on approved parental leave, caring for his newborn, since April 6, 2026. His projects were transitioned to a covering employee who was not selected in the reduction in force. On May 20, 2026, while on leave, he was notified of his selection. His performance was consistently strong—earlier "Greatly Exceeds" and "Exceeds Expectations" ratings, a promotion, and a most-recent rating reflecting that he was meeting expectations—and no concern about his performance had ever been raised, providing no performance basis for his selection. Of the more than ▮▮ employees reporting to his manager, Doe 4 was the only one selected, and the only one who was on parental leave at the time. Doe 4 Decl. ¶¶3-9.

**Doe 1**

82. Doe 1 is a ▮▮▮▮▮ Manager ▮▮ in Meta's ▮▮▮▮▮ organization, on the ▮▮▮▮▮ team, where she led ▮▮▮▮▮ for Meta's ▮▮▮ ▮▮▮▮▮. She has been on approved maternity and family leave since December 2025, following a ▮▮▮▮ pregnancy requiring ▮▮▮▮▮ ▮▮▮▮; her leave was scheduled to end September 29, 2026. She had received strong performance feedback—a "strong 'meets all'" at mid-year 2025, with an indication she was on track for the same at year-end—but after she requested a pregnancy-related accommodation in July 2025 and then gave notice of her maternity leave, her treatment changed: her scope was reduced and deprioritized, feedback and collaboration cycles her

peers received were shortened or withheld from her, and her draft work was circulated to senior management prematurely. While she was on leave, her year-end 2025 review was lowered on the basis of collaboration and communication criticisms that contradicted her contemporaneous cross-functional feedback; her former manager told her she found the account hard to believe, that Doe 1 had been treated unfairly and that she had been "targeted due to leave," and that she should take legal action. She was notified of her selection on May 20, 2026 while on leave, with a separation date of July 30, 2026.  Doe 1 Decl. ¶¶3-12.

**Doe 2**

83. Doe 2 is a ▮▮ Engineer ▮▮ in the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ team within Meta's ▮▮ organization. He took approved parental leave for his child in multiple periods between April 2025 and February 2026. During his leave, Meta required him to perform work: his manager had him return in December 2025 to prepare the team's first-half roadmap, and his tech lead had him complete work another engineer had been assigned to cover, interrupting the leave he had expected to devote to his newborn. Upon his return in February 2026, he found that roughly half of the scope he had owned before his leave had been reassigned to another team and that another engineer had taken over part of his function, leaving him largely with lower-priority work. His year-end 2025 rating, covering the period spanning his leave, was "Consistently Met Expectations"—down from the "Exceeds Expectations" ratings he had received earlier—while a closely comparable colleague received "Exceeds Expectations" for the same period. He was selected for termination on May 20, 2026, approximately

three months after returning from leave; of the approximately ███████ people on his team, four, including Doe 2, were selected.  Doe 2 Decl. ¶¶ 3-10

**Doe 20**

84. Doe 20 is a ████ Designer ████ in Meta's ██████████ organization, who worked in ██████ Washington, and began at Meta on August 5, 2024. She received an "Exceeds Expectations" rating for 2025, was never placed on a performance plan, and had not been told her employment was at risk before March 2026. Beginning in approximately March 2026, Doe 20 sought treatment through ████████████ ██████████ for symptoms of a serious health condition, and she received a diagnosis that month.

85. In early March 2026, Doe 20 began experiencing symptoms of a serious health condition. On March 6, 2026, during a design review, her skip-level manager—who appeared not to have reviewed the prepared materials—gave her critical feedback directed at her "communication style" rather than the substance of her work, and her manager separately relayed that leadership viewed her as "defensive." These communication-based concerns were new, subjective, and inconsistent with her prior performance history. When her skip-level manager later faulted her for proceeding with a design without approval, Doe 20 produced documentation showing she had sought the skip-level manager's approval, received no response, and obtained her manager's approval before proceeding.

86. Doe 20 submitted a request for medical leave on March 25, 2026 and began approved leave on March 26, 2026 for a serious health condition for which she remains under a provider's care. On the morning her leave began, she received a notification that her manager had just entered written feedback about the March 6 design review into their

shared one-on-one document—documentation that, to her knowledge, had not previously existed in writing and that appeared only after she submitted her leave request. Her leave was approved and extended through August 11, 2026, and she remained continuously on approved leave when, on May 20, 2026, she was notified of her selection. Of the approximately ▉ people on her immediate team, about half were selected, including Doe 20 and another employee who was also on leave. Doe 20 Decl. ¶¶ 3, 5–6, 8–13, 15.

**Doe 3**

87. Doe 3 is a ▉ Engineer ▉ on the ▉ team within Meta's ▉ organization, who began at Meta in November 2015 and worked remotely from ▉ Pennsylvania. Over more than a decade, he advanced from the ▉ to the ▉ level and received "Exceeds Expectations" and "Greatly Exceeds Expectations" ratings, including three additional top-tier-performance equity grants; he never received a rating below "Meets All" until his Year-End 2025 review and was never subject to a performance plan or discipline.

88. Doe 3 took approved parental leave from approximately March to June 2025 following the birth of his second child, having taken a similar leave for his first child in 2023. The Year-End 2025 review he received after returning from that leave was a "Meets Most"—his first rating below "Meets All" in ten years—resting on a single area of assessment, with no prior concern having been raised.

89. Doe 3 is an individual with a disability and also has a longstanding ▉ ▉, for which Meta provided an accommodation beginning in 2023. After he told his manager in the second half of 2025 that he was experiencing ▉ ▉ amid a high team workload, he began approved medical leave for a serious health

condition on February 24, 2026; he had requested FMLA leave, which Meta declined to approve as such but approved as short-term disability leave. He remains on leave. On May 20, 2026, while on leave, he was selected for termination, with a separation date of July 22, 2026; he was the only member of his approximately ███-person team selected. Doe 3 Decl. ¶¶ 3, 5-11.

**Doe 10**

90. Doe 10 began at Meta in approximately January 2025 as an ███████████ Strategist ████ in the ███████████████ organization and, in approximately July 2025, moved into a lead role over a ████████████████ team of ███ individual contributors, reporting to ███████████. His mid-year 2025 rating was "Above Expectations." After he moved into the lead role, his team's expectations shifted materially while its capacity was reduced by two departures, and over approximately four to five months he received frequent, shifting feedback. During this period he told his manager, and later Meta's human-resources personnel, that he was overwhelmed and struggling with the team's conditions and needed a more sustainable path.

91. During that same period, Doe 10 began experiencing significant symptoms later attributable to a disability—████████████████████—including substantial sleep disruption and difficulty concentrating. He did not receive significant documented feedback that he was materially off track until late November 2025, and then received a Year-End 2025 rating of "Meets Most," the first rating below "Meets All" he had received at Meta. By approximately March 2026 his symptoms had escalated; he notified his manager on April 16, 2026 that he needed medical leave and began approved medical leave on April 21, 2026, approved through approximately August 11, 2026. Before his

leave, Meta's human-resources personnel told him his leave time would be treated as neutral for performance-evaluation purposes and would not count against him. While he was on that approved medical leave for a disability, he was notified on May 20, 2026 of his selection for termination; of the members of his team, the two selected were the two who were on leave at the time—Doe 10 and a colleague who was on maternity leave. Doe 10 Decl. ¶¶ 3-8, 13-16.

**Doe 22**

92. Doe 22 began at Meta in approximately March 2013 and, over approximately ████ years, was promoted from ████ engineer to ████████████ Manager ██ ████████, most recently leading an ████████ team in the ████████ ████ within ████████. His performance was consistently strong—"Exceeds Expectations" and "Greatly Exceeds Expectations," multiple promotions, and one-time equity grants—and he was never subject to a performance plan or discipline.

93. Doe 22 has a disability arising from a serious health condition, the nature of which was disclosed to Meta's accommodation personnel. He took approved medical leave beginning on approximately March 26, 2025, administered as short-term and then long-term disability leave, and returned in stages under disability accommodations Meta approved: three days per week from approximately September 2025, four days per week from approximately February 2026, and full-time under an approved remote-work accommodation on April 6, 2026, which remained in effect through his termination.

94. While working under those accommodations, Doe 22 and his management had documented, by approximately March 2026, a plan to convert him from his management

role to an individual-contributor role, because—according to his manager and Human Resources—part-time work was not considered sustainable for an ▮ manager role and he was uncertain how long his part-time accommodation would be needed; he understood the advance planning to make it less likely he would be affected by any layoffs. The announcement of the conversion was paused because of the coming reduction in force. To his knowledge, he was the only manager in his group selected for termination rather than converted to an individual-contributor role; the direct report who had been designated to cover his responsibilities was retained and permitted to convert to IC, and his manager, who absorbed his duties, was not selected. On May 20, 2026, while his approved remote-work accommodation was in effect, he was notified of his selection.

95. Meta's internal dashboards classified employees by their stage of adoption of its artificial-intelligence tools, using categories such as "AI Native," "AI First," and "AI Enabled." Doe 22 was told that performance evaluation and calibration would be based in part on these classifications, and he understood that an employee's artificial-intelligence-usage score would decline during periods when the employee was on leave or otherwise out of the office—as he had been, on disability leave, for much of the year preceding the reduction in force. Doe 22 Decl. ¶¶ 3-10, 13.

**Doe 23**

96. Doe 23 began at Meta in May 2024 as a ▮ in ▮, working first on the ▮ team and, from approximately May 2025, on the ▮ team. Her performance was strong—"Exceeds Expectations" at Year-End 2024 and "At or Above Expectations" at mid-year 2025—with no performance concern raised or documented before her leave.

97. Beginning in approximately mid-2025, Doe 23 experienced a serious health condition for which she began ▮▮▮▮▮▮▮ in July 2025. In late October 2025 she informed her manager and skip-level manager, both of whom were aware of her condition and her need for leave before her formal leave process began. She applied for FMLA and short-term disability leave on approximately October 30, 2025, and began approved medical leave on November 10, 2025—covered by the FMLA for the first twelve weeks and as short-term disability leave, extended twice on medical documentation—remaining on continuous leave through May 17, 2026.

98. While Doe 23 was on leave, her reporting line was changed in a reorganization, and in approximately February or early March 2026 she received a Year-End 2025 rating of "Meets Most"—the first such rating of her employment—authored by a manager who had not supervised her day-to-day work, with feedback referencing her efficiency during a period overlapping the onset of her condition. She returned to work under an approved disability accommodation two days before being notified, on May 20, 2026, of her selection for termination.  Doe 23 Decl. ¶¶ 3, 5-12.

**Doe 11**

99. Doe 11 is a ▮▮▮▮▮▮▮ Manager ▮▮ in Meta's ▮▮▮▮▮▮▮ organization for ▮▮▮▮▮▮▮▮▮▮, who began at Meta in ▮▮▮▮▮ and worked in ▮▮▮▮ Illinois. Over approximately eight years, he never received a rating below "Meets All" expectations, and his ratings for 2023, 2024, and 2025 were each "Exceeds Expectations"—including his 2025 rating, which Meta issued while he was out on leave and unable to participate in the review.

100.    Beginning in approximately October or November 2025, Doe 11 developed a serious health condition——that by December 2025 prevented him from working. He informed his manager, took protected leave under the FMLA, which he exhausted in approximately April 2026, and continued on approved short-term disability leave from January through early May 2026, all of which Meta approved and of which Meta was aware. He returned to work on May 3, 2026 under an approved work-from-home accommodation, having returned specifically in an effort to avoid the anticipated reduction in force.

101.    On May 20, 2026—seventeen days after Doe 11 returned from leave under his accommodation—Meta selected him for termination. On information and belief, he was one of only two employees, out of approximately ▮▮ in his ▮▮ ▮▮ organization, selected in the RIF, and one of the only managers at his level not retained or converted to an individual-contributor role; the other selected employee, to Doe 11's knowledge, had neither taken protected leave nor requested an accommodation. When Doe 11, on returning from leave, asked his director whether he should return to the office sooner in light of the layoff, the director represented that he had no visibility into the layoff selections, even the day before notifications issued. Doe 11 Decl. ¶¶ 2, 4-11, 13-15.

**Doe 14**

102.    Doe 14 is a ▮▮ Engineer ▮▮ in Meta's ▮▮ organization who began at Meta in August 2019 and worked from Meta's ▮▮ office. Through 2023, his performance ratings were "Meets All" expectations or above, and he was promoted to IC5 in mid-2023. His ratings then declined to "Meets Most" for

both Year-End 2024 and Year-End 2025—a decline that began after the birth of his first child and his first parental leave.

103.    Doe 14's first child was born in 2024, and he had told his manager he was expecting before he took FMLA parental leave from April 8 to May 6, 2024. For the Year-End 2024 cycle, he received the first "Meets Most" rating of his career. He took additional FMLA parental leave from January 9 to March 5, 2025, followed by approved recharge leave, such that his first-half-2025 rating reflected his leave of absence; when he returned, his team and scope had changed, knowledge transfer had occurred without him, and he was assigned a collection of products that had no established team or owner. For the Year-End 2025 cycle, fearing further damage to his trajectory, he did not disclose that he and his wife were expecting a second child—yet he received a "Meets Most" rating again.

104.    Doe 14 informed his manager in March 2026 that he would take parental leave for his second child; he raised it the day news of the impending layoffs leaked, and his manager responded that he "cannot promise anything." Doe 14 began approved parental leave on April 27, 2026, approved through August 30, 2026, and continued working to complete his projects even while on leave. On May 20, 2026—while he was on that approved parental leave—Meta selected him for termination, with a separation date of August 20, 2026 that cut his approved leave short. Of approximately ███ engineers reporting to his manager, he was one of two selected. That Doe 14 was among the top two percent of Meta's artificial-intelligence tool adopters by the end of 2025—and used tools including Claude Code and Metamate in his work—undercuts any suggestion that his selection reflected insufficient engagement with Meta's AI priorities. Doe 14 Decl. ¶¶ 3, 4, 6-12, 14, 15.

**Doe 9**

105.   Doe 9 is a ███████ Designer ██ in Meta's ████████████ organization with approximately ██ years of tenure, having begun at Meta in June 2022. She received "Exceeds Expectations" ratings for both 2024 and 2025 and had never received a rating below "Meets All"; her own manager expressed surprise that she had been selected, given her strong performance.

106.   In late 2025, Doe 9 required ██████ for a ██████ condition. She notified her manager in approximately mid-to-late November 2025 and took approved medical leave from December 1, 2025 through March 2, 2026—a leave initially expected to last one month that was extended to approximately three months on medical advice. Before returning, she requested a work-from-home accommodation, which Meta granted and which remained in effect at the time of her selection. While she was out, Doe 9's measured usage of Meta's AI tools—displayed on an internal dashboard comparing employees against their peers—placed her in the middle-to-lower range rather than the top, a ranking her months-long leave necessarily depressed because Meta chose not to calibrate these systems to account for protected leaves. On May 20, 2026, Meta selected Doe 9 for termination. Of the approximately ██████ employees in her manager's organization, six were selected. Doe 9 was the only person reporting directly to her manager who was selected, and she was, to her knowledge, one of only two employees in that organization who had taken medical leave or returned to work under a disability accommodation—and the other, who had recently returned from maternity leave, was also selected. Doe 9 Decl. ¶¶ 3, 5, 7, 9, 10, 11, 14–16.

**Doe 13**

107.    Doe 13 is an ███████ Manager ██████ in Meta's ████████████████ organization with approximately ███ years of tenure, having begun at Meta in March 2021. In approximately June or July 2025, he suffered ██████ and took approximately one month of FMLA medical leave to recover, returning to work without restrictions. He is an individual with a disability within the meaning of the ADA and FEHA, and has a record of such disability.

108.    At Year-End 2025—several months after his medical leave—Doe 13 received a "Below Expectations" rating, the basis for which is contradicted by Meta's own contemporaneous data: his manager-effectiveness score on Meta's semi-annual Pulse survey was among the highest on his team, and the low team sentiment that cycle was attributable to the unglamorous nature of the project the team had been assigned, not to his management. On May 20, 2026, Doe 13 was selected for termination. He was the only manager in his group selected; on information and belief, other managers who had also received "Below Expectations" ratings were not. His own manager told him, the day before notifications issued, that he had no knowledge of who would be affected, and that the selection decisions had been made at the vice-president level without input from the managers who knew the work—supporting the inference that the selection was driven by centralized, data-derived scoring rather than managerial judgment. Doe 13 Decl. ¶¶ 3, 5-11.

**Doe 26**

109.   Doe 26 is a ███ Scientist ████ on Meta's ███████████████ team who began at Meta in January 2025 and worked from Meta's ███████ office. Her performance was strong—"Meets All" at mid-year 2025 and "Consistently Met Expectations" for year-end 2025—and she was never placed on a performance improvement plan, coaching plan, or written warning, and never received negative performance feedback. In approximately August or September 2025, she told her then-manager, ███████, that she was pregnant and expecting a child in November; her manager was supportive.

110.   In approximately October 2025, shortly before her leave began, Doe 26's reporting chain was reorganized: her manager changed to ████████████, and a new technical lead, ████████—who had joined Meta after Doe 26—was placed between her and her manager, reducing her visibility within the organization even though her title and level did not change. She took maternity and parental leave, together with short-term disability leave, from November 10, 2025 through May 7, 2026, and returned to work on May 8, 2026. Less than two weeks later, on May 20, 2026, she received an email from "Meta Leadership" notifying her that she had been selected for termination, and her system access was revoked the same day; her intended separation date is August 20, 2026. Of the approximately eight people on her team, including her manager, three were selected for termination.

111.   Doe 26's ████████████ depends on her employment: she was working under an ██████████████ by Meta, and her separation would leave her only a short grace

period in which to find new sponsored employment, change her status, or leave the country. She holds approximately ▮ unvested restricted stock units that she will forfeit upon termination. Doe 26 Decl. ¶¶ 3-10, 14, 15.

**Doe 21**

112.  Doe 21 is a ▮▮▮ Engineer ▮▮ in ▮▮▮▮ organization with approximately ▮▮ years of tenure, having begun at Meta in ▮▮▮. Her performance history was strong—"Exceeds Expectations" in most cycles, including 2024—until Year-End 2025, when, after Meta was aware of her pregnancy, she received the first "Meets Most" rating of her career. Her manager told her that "high productivity does not link to a good rating–it is impact based"—even though her projects were having demonstrable impact, including features highlighted on Meta's ▮▮ blog and multiple company-wide awards. After her pregnancy became known, two projects she had originated or tech-led were reassigned to other engineers—including the Facebook Professional Dashboard she had led since 2024—neither of whom, to her knowledge, was pregnant or had taken pregnancy or family leave, and her contributions to that work were not reflected in her review.

113.  Doe 21 was on continuous, approved pregnancy-related leave that spanned the RIF: pre-birth leave beginning February 24, 2026; eight weeks of postpartum maternity leave following a ▮▮▮ birth; and a four-week pregnancy-disability extension running from May 18 through June 12, 2026. She is also an individual with a disability. At the time of her selection she had substantial protected-leave and paid-time-off balances remaining, including an approved "Recharge" leave, which cumulatively would have run through December 7, 2026, all of which she stands to forfeit. On May 20, 2026, she was one of

only two employees selected, to her knowledge, across the ▮ teams—approximately ▮ people—reporting to her skip-level manager, and she was on approved pregnancy leave at the time. Doe 21 holds ▮ unvested restricted stock units valued at approximately $▮ including a tranche of approximately ▮ units valued at approximately $▮ scheduled to vest on August 15, 2026—after her July 22, 2026 separation date—that she will forfeit. Upon information and belief, Meta's activity-monitoring software was applied to her devices and continued to run during her leave, without her having consented to it. Doe 21 Decl. ¶¶ 2, 3, 5, 8–9, 12–13, 16–18, 20.

**Doe 25**

114.    Doe 25 is a ▮ Manager in Meta's ▮ organization with approximately ▮ years of tenure, having begun at Meta in ▮. She is an individual with a disability—a ▮ with diagnosed ▮ ▮, which she disclosed to her team. She received "Exceeds Expectations" ratings for the past five years, was promoted to ▮ in 2024, and received a rare additional equity grant from her vice president in recognition of her performance; she served as a leader of Meta's employee resource groups for ▮+ employees, and women.

115.    In late 2025 and early 2026, Doe 25 took protected leave to care for her ▮ brother, and bereavement leave following his ▮ in January 2026, preparing her year-end self-assessment while she was on that leave. She then received a year-end 2025 rating of "Consistently Met Expectations"—her first rating below "Exceeds Expectations" in over five years; her manager told her she had earned an "Exceeds Expectations" rating but had been moved down to satisfy a forced distribution, or "bell

curve." Doe 25 also observed that her scores on Meta's internal AI-adoption dashboards, on which she had usually been rated in the top categories, dropped after her leave, because the system recorded her protected time away as a gap rather than excluding it from the measurement; Meta separately announced that, going forward, its AI tools would generate the first drafts of employees' performance reviews. On May 20, 2026, Doe 25 was selected for termination, receiving her notification by email at approximately 4:00 a.m.; her employment is scheduled to end on July 22, 2026. Doe 25 Decl. ¶¶ 3, 6-14, 17-18.

## VIII. CAUSES OF ACTION

### COUNT I
### FMLA Interference — Use of Protected Leave as a Negative Factor (29 U.S.C. § 2615(a)(1); 29 C.F.R. § 825.220(b)–(c))

*(By the FMLA-Eligible Plaintiffs Against Defendant)*

116.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

117.    The FMLA entitles eligible employees to up to twelve workweeks of leave per year for qualifying medical and family reasons and to restoration to the same or an equivalent position upon return. 29 U.S.C. §§ 2612(a), 2614(a), 2615(a)(1). Department of Labor regulations provide that "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions," 29 C.F.R. § 825.220(c), and that employers may not "discourag[e] an employee from using such leave," *id.* § 825.220(b). The Ninth Circuit adopted the negative-factor rule as controlling in *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124–25 (9th Cir. 2001).

118.    Meta's algorithmic selection process used protected FMLA leave as a negative factor. By design, the system penalized employees who produced less output during the measurement window and rewarded those who accumulated AI-token consumption, calibration sponsorship, roadmap ownership, and "strategic alignment" signals—signals an employee on FMLA leave cannot accumulate at the rate of a continuously present peer. Meta did not neutralize the protected-leave window from any input metric. *See, e.g.*, *Walker v. Verizon Pa. LLC*, 2017 WL 3675384 (E.D. Pa. Aug. 25, 2017), *appeal dismissed sub nom. Walker v. Verizon Servs. Corp.*, No. 17-3091, 2018 WL 11445452 (3d Cir. May 1, 2018); *Pagel v. TIN, Inc.*, 695 F.3d 622, 629 (7th Cir. 2012).

119.    Meta's own records reflect the penalty. Doe 6's manager attributed his lowered rating to the "broken time" when his injury prevented him from working; Doe 19's 2024 review documents his demotion upon return from medical leave; and Doe 24, Doe 17, Doe 20, Doe 13, Doe 9, and Doe 21 received the first lower ratings of their careers in cycles covering their protected leave. Meta also discouraged Doe 18 and Doe 15 from exercising their FMLA rights, in violation of § 825.220(b)—in Doe 15's case, after two providers through Meta's own mental-health provider had approved his leave, when his manager warned that submitting the leave application would result in his selection for the anticipated reduction in force. Doe 11, who exhausted his FMLA leave and remained on disability leave before returning under a work-from-home accommodation just seventeen days before the RIF, was selected despite eight years without a rating below "Meets All" and three consecutive years of "Exceeds Expectations."

120.    As a direct and proximate result, the FMLA-Eligible Plaintiffs have been and will be injured. Each Plaintiff who brings this Count—Plaintiffs Doe 1, Doe 2, Doe 3, Doe 4,

Doe 7, Doe 8, Doe 9, Doe 10, Doe 11, Doe 13, Doe 14, Doe 15, Doe 17, Doe 18, Doe 19, Doe 20, Doe 21, Doe 22, Doe 23, Doe 24, and Doe 25 (collectively, the "FMLA-Eligible Plaintiffs")—was employed by Meta for at least twelve months, had worked at least 1,250 hours during the preceding twelve-month period, and worked at a worksite at which Meta employed fifty or more employees within seventy-five miles, and was therefore an eligible employee under 29 U.S.C. § 2611(2). Plaintiffs Doe 5 and Doe 12, who had fewer than twelve months of tenure when they took or sought protected leave; Plaintiff Doe 6, whom Meta deemed ineligible for FMLA leave on the basis of tenure; and Plaintiff Doe 26, whose leave commenced before she had accrued twelve months of tenure, do not bring this Count and instead proceed under the statutes pleaded below that impose no minimum-tenure requirement. Plaintiff Doe 16, whose protected activity consists of disability disclosure and accommodation requests rather than protected leave, likewise proceeds under the disability statutes pleaded below.

## COUNT II
## FMLA Retaliation (29 U.S.C. § 2615(a)(2))

*(By the FMLA-Eligible Plaintiffs Who Took or Requested Leave Against Defendant)*

121.  Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

122.  The FMLA prohibits an employer from discharging or otherwise discriminating against an employee for exercising or attempting to exercise FMLA rights. 29 U.S.C. § 2615(a)(2). The temporal proximity between Plaintiffs' protected leave—in several instances, selection while still on approved leave—and their selection for termination supports an inference of retaliatory causation. Plaintiffs were performing satisfactorily,

suffered an adverse action, and the adverse action was causally connected to their protected activity.

## COUNT III
### Title VII / Pregnancy Discrimination Act — Disparate Treatment (42 U.S.C. §§ 2000e-2(a), 2000e(k))

*(By the Pregnancy- and Sex-Discrimination Plaintiffs Against Defendant)*

123.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

124.    Title VII, as amended by the Pregnancy Discrimination Act, prohibits discrimination on the basis of sex, including pregnancy, childbirth, and related medical conditions. 42 U.S.C. §§ 2000e-2(a), 2000e(k). Doe 17 was selected while on pre-birth leave, one of three selected within an organization of approximately ████████, two of whom were on pregnancy- or birth-related leave; Doe 12 and every other woman on her team were selected while the sole man was retained, and her duties were reassigned to a male former peer; Doe 5, the only team member selected, was pregnant and on leave; and Doe 8 and Doe 1 were selected while on maternity leave. Doe 21 was selected while on approved pregnancy-disability leave. Doe 7 was selected weeks after she disclosed a ██████ pregnancy and filed her intent to take maternity leave through Meta's leave-administration system. Doe 26 was selected less than two weeks after returning from maternity and parental leave. These facts establish a prima facie case of intentional sex and pregnancy discrimination under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Doe 4's selection while on paternity leave, alongside another male caregiver, and Doe 14's selection while on parental leave for his second child—his ratings having

declined only after he became a father and took leave—support a sex-stereotyping and caregiver-discrimination theory under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

## COUNT IV
### Title VII / Pregnancy Discrimination Act — Disparate Impact (42 U.S.C. §§ 2000e-2(k), 2000e(k))

*(By the Pregnancy- and Sex-Discrimination Plaintiffs Against Defendant)*

125.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

126.    Title VII prohibits facially neutral employment practices that produce a disparate impact on the basis of sex, including pregnancy, that is not justified by business necessity. 42 U.S.C. § 2000e-2(k); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971); *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 990-91 (1988). Pregnancy-disability leave is taken exclusively by women, and pregnancy-related and caregiving absences are taken disproportionately by women. Meta's algorithmically assisted selection process, by systematically recording such absences as reduced performance, falls more heavily on women than on men. A less-discriminatory alternative—neutralizing protected-leave windows from each input metric—was available and would have served any legitimate headcount-reduction interest. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975).

## COUNT V
### Pregnant Workers Fairness Act (42 U.S.C. §§ 2000gg et seq.)

*(By Plaintiffs Doe 5, Doe 1, Doe 17, Doe 7, Doe 21, and Doe 26 Against Defendant)*

127.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

128.    The Pregnant Workers Fairness Act requires covered employers to provide reasonable accommodations for known limitations related to pregnancy, childbirth, or related medical conditions, and prohibits taking adverse action against an employee for needing such accommodation. 42 U.S.C. §§ 2000gg-1, 2000gg-2. The PWFA imposes no minimum-tenure threshold and therefore independently protects Doe 5, who had less than one year of tenure. Meta failed to accommodate, and took adverse action against, these Plaintiffs in connection with pregnancy-related limitations and leave. The PWFA's absence of a tenure threshold likewise independently protects Doe 26, whose maternity leave commenced before she accrued twelve months of tenure and who was selected less than two weeks after returning from childbirth-related leave.

### COUNT VI
### ADA — Disability Discrimination, Failure to Accommodate, and Retaliation (42 U.S.C. §§ 12112(a), (b)(5); 12203)

*(By Plaintiffs Doe 16, Doe 6, Doe 24, Doe 1, Doe 11, Doe 9, Doe 13, Doe 15, Doe 20, Doe 21, Doe 19, Doe 3, Doe 10, Doe 22, Doe 23, and Doe 25 Against Defendant)*

129.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

130.    The ADA prohibits discrimination against qualified individuals with disabilities, requires reasonable accommodation, and prohibits retaliation for requesting accommodation or opposing discrimination. 42 U.S.C. §§ 12112(a), (b)(5), 12203. Meta's monitoring-driven selection system recorded disability-related variations in work-pattern signals as reduced productivity, producing a disparate impact on employees with disabilities, as illustrated by Doe 6. Doe 16's first-ever "Meets Most" rating approximately one week after disclosing her ▮▮▮ and ▮▮▮ diagnoses, the

three-month time-limited accommodation for a permanent disability, and her selection roughly two weeks after a formal discrimination complaint, establish disparate treatment, failure to accommodate, and retaliation. Doe 15 disclosed a disability—███████—to his manager in March 2026; Meta neither offered any accommodation nor engaged in any interactive process, and instead his manager discouraged him from seeking leave and selected him for termination approximately two months later. Doe 11, who returned from FMLA and disability leave under an approved work-from-home accommodation that remained in effect, was selected notwithstanding an unbroken record of strong performance, reflecting the same disability-penalizing operation of the selection system. The same disability-penalizing operation of the selection system also harmed additional Plaintiffs with disabilities, including Doe 9 and Doe 13—each selected after disability-related medical leave—as well as Doe 20, Doe 21, Doe 22, Doe 23, Doe 3, Doe 10, Doe 19, and Doe 25.

## COUNT VII
### FEHA — Disability Discrimination, Failure to Accommodate, and Failure to Engage in the Interactive Process (Cal. Gov't Code § 12940(a), (m), (n))

*(By the California Plaintiffs with Disabilities Against Defendant)*

131.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

132.    FEHA prohibits disability discrimination and requires reasonable accommodation and a good-faith interactive process. Cal. Gov't Code § 12940(a), (m), (n). Meta's algorithmically assisted selection process discriminated against the California Plaintiffs with disabilities, including Doe 6, Doe 24, Doe 9, Doe 13, Doe 19, Doe 21, Doe 25, and Doe 23, by recording disability-related reductions in measured output as

underperformance, and Meta failed to provide reasonable accommodation or to engage in the interactive process required by law.

## COUNT VIII
**FEHA — Sex and Pregnancy Discrimination and Unlawful Use of an Automated-Decision System (Cal. Gov't Code § 12940(a); 2 Cal. Code Regs. §§ 11008, 11008.1, 11017, 11020)**

*(By the California Plaintiffs Against Defendant)*

133.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

134.    FEHA prohibits discrimination on the basis of sex (including pregnancy) and disability, reaching both intentional discrimination and facially neutral criteria that produce an unjustified disparate impact. Cal. Gov't Code § 12940(a); *Jumaane v. City of Los Angeles*, 241 Cal. App. 4th 1390, 1404–05 (2015). Effective October 1, 2025, the Civil Rights Council's employment regulations governing automated-decision systems make explicit that an employer may not use an automated-decision system that produces unlawful discrimination, including disparate-impact discrimination, and identify the use of "proxies" for protected characteristics and the failure to conduct adequate anti-bias testing as bases for liability. 2 Cal. Code Regs. §§ 11008(l), 11017(e), 11020(b).

135.    Meta's constellation of internal AI systems is an automated-decision system within the meaning of § 11008.1(a). It used protected-leave time, output reductions correlated with pregnancy and disability, and other proxies as inputs; Meta did not adequately test the system for disparate impact on pregnant employees, leave-takers, or caregivers; and Meta relied on third-party ranking, calibration, and "second-brain" vendors that are agents under § 11008(a). The system produced an unjustified disparate impact on the

---

California Plaintiffs, and a less-discriminatory alternative was available. *Mobley v. Workday, Inc.*, 740 F. Supp. 3d 796 (N.D. Cal. 2024).

## COUNT IX
### CFRA — Interference and Retaliation (Cal. Gov't Code § 12945.2)

*(By the California Plaintiffs Who Took or Requested CFRA Leave Against Defendant)*

136.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

137.    The California Family Rights Act prohibits discharge or discrimination because of the exercise of CFRA leave rights and applies the same negative-factor framework as the FMLA. Cal. Gov't Code § 12945.2(k)(1), (q); *Soria v. Univision Radio L.A., Inc.*, 5 Cal. App. 5th 570, 601 (2016). For the reasons alleged above, Meta's selection process used protected CFRA leave as a negative factor against the California Plaintiffs who took or requested such leave, including Doe 7, Doe 8, Doe 24, Doe 4, Doe 2, Doe 9, Doe 13, Doe 19, Doe 21, and Doe 23—in addition to Doe 25, who cared for a ███████ sibling, an enumerated family member under the CFRA, Cal. Gov't Code § 12945.2(b).

## COUNT X
### California Pregnancy Disability Leave Law — Interference and Retaliation (Cal. Gov't Code § 12945)

*(By the California Pregnancy-Leave Plaintiffs Against Defendant)*

138.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

139.    The California Pregnancy Disability Leave Law entitles an employee disabled by pregnancy, childbirth, or a related medical condition to take leave for a reasonable period

not to exceed four months and to be reinstated to the same position on return, and it requires the employer to maintain group health coverage for the duration of the leave. Cal. Gov't Code § 12945(a)(1), (a)(2). It is an unlawful employment practice to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under the PDLL. *Id.* § 12945(a)(4); *Malloy v. Superior Court*, 83 Cal. App. 5th 543 (2022). The PDLL recognizes both interference claims and retaliation claims for adverse action taken because an employee exercised her pregnancy-disability-leave rights, and its remedies augment rather than supplant those elsewhere in FEHA. *Moore v. Regents of Univ. of Cal.*, 248 Cal. App. 4th 216 (2016); *Sanchez v. Swissport, Inc.*, 213 Cal. App. 4th 1331 (2013).

140.    Meta selected California Plaintiffs, including Doe 8 and Doe 21, while they were on or in connection with protected pregnancy-disability leave, through an algorithmically assisted selection process that recorded their protected-leave time as reduced output. Meta further interfered with Doe 7's attempt to exercise her rights under the PDLL, § 12945(a)(4), by selecting her for termination weeks after she filed her intent to take pregnancy-related leave for a ███████ pregnancy with a scheduled ███████████ delivery. Meta thereby interfered with, restrained, and denied the exercise of their PDLL rights, § 12945(a)(4), retaliated against them for exercising those rights, and, by terminating them, refused to maintain the group health coverage the statute guarantees for the duration of the leave, § 12945(a)(2).

## COUNT XI
### Washington Law Against Discrimination (RCW ch. 49.60)

*(By the Washington Plaintiffs Against Defendant)*

141.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

142.    The Washington Law Against Discrimination prohibits discrimination, and the failure to accommodate, on the basis of any sensory, mental, or physical disability, sex, pregnancy, and other protected characteristics, RCW 49.60.180, and the Washington Legislature has directed that the chapter "be construed liberally for the accomplishment of the purposes thereof," RCW 49.60.020. Washington courts accordingly construe the WLAD's protections broadly, confine its exceptions narrowly, and construe the statute more broadly than its federal counterparts. *Hegwine v. Longview Fibre Co.*, 132 Wash. App. 546 (2006); *Kumar v. Gate Gourmet, Inc.*, 180 Wash. 2d 481 (2014). The WLAD imposes on employers an affirmative and continuing duty to reasonably accommodate an employee's disability through a flexible interactive process, and an employer's failure to do so is itself discrimination unless the employer proves undue hardship. *Lindblad v. Boeing Co.*, 108 Wash. App. 198 (2001); *Johnson v. Chevron U.S.A., Inc.*, 159 Wash. App. 18 (2010); *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wash. App. 765 (2011); *Gibson v. Costco Wholesale, Inc.*, 17 Wash. App. 2d 543 (2021). Meta's algorithmically assisted selection process discriminated against the Washington Plaintiffs—Doe 16, Doe 15, Doe 17, Doe 18, Doe 20, and Doe 22—on the basis of disability, sex, and pregnancy; and Meta failed to reasonably accommodate the disabilities of the Washington Plaintiffs with disabilities, including Doe 16, Doe 15, Doe 20, and Doe 22, and failed to engage in the good-faith interactive process the WLAD requires.

**COUNT XII**
**Washington Paid Family and Medical Leave — Retaliation, Interference, and Unlawful Inclusion in Mass Layoff Order (RCW 50A.40.010, 50A.35.010; RCW 49.45.060)**

*(By the Washington Paid-Leave Plaintiffs Against Defendant)*

143.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

144.    Washington's Paid Family and Medical Leave Act makes it unlawful for an employer to "[i]nterfere with, restrain, or deny the exercise of, or the attempt to exercise, any valid right provided under" Title 50A. RCW 50A.40.010(1)(a); *see also* RCW 50A.40.040 (private right of action and enforcement); RCW 50A.05.125(2) (Title 50A governs employer conduct occurring on or after January 1, 2020). This protection continues the prohibition formerly codified at RCW 49.78.300, under which Washington courts recognized leave-based retaliation and discrimination claims parallel to the federal FMLA and held that an employer may not use an employee's protected leave as a negative factor in an employment decision. *Espindola v. Apple King, LLC*, 6 Wash. App. 2d 244, 254–57, 430 P.3d 663 (2018) (adopting the negative-factor standard of *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112, 1124–25 (9th Cir. 2001)), review denied, 193 Wn.2d 1004 (2019). Meta interfered with, restrained, and denied the exercise and attempted exercise of these rights: it selected Washington Plaintiffs, including Doe 17, for termination while they were on, or in connection with, protected Washington paid family and medical leave, and it discouraged and deterred Doe 15 and Doe 18 from attempting to exercise their rights under the program—using protected leave and the attempted exercise of leave rights as negative factors in its selection process.

---

145. Meta's conduct toward the Washington Plaintiffs who took protected leave independently violated Washington's mini-WARN statute and Title 50A's employment-restoration guarantee. RCW 49.45.060 provides that, except in the cases exempted under RCW 49.45.030(1)(b) through (d), an employer may not include an employee in an order of a mass layoff if the employee is currently on paid family or medical leave under Title 50A RCW. No exemption applies. Meta included Doe 17 and Doe 20 in its May 20, 2026 mass layoff order while each was currently on protected leave under Title 50A RCW: Doe 17 was on approved pre-birth medical leave at the time of the layoff order and gave birth two days later, Doe 17 Decl. ¶¶ 2, 10–12; and Doe 20 had been on protected medical leave since March 26, 2026—leave subsequently extended through August 11, 2026—and remained on leave when the order issued, Doe 20 Decl. ¶¶ 2, 11, 13. Each violation was complete upon the employee's inclusion in the layoff order while on protected leave. Meta's deferral of formal separation dates cured nothing: it neither undid the unlawful inclusions nor provided the employment restoration to which each employee was entitled upon return from leave under RCW 50A.35.010, because none was restored to their position or permitted to resume or complete their leave.

## COUNT XIII
### New York State Human Rights Law (N.Y. Exec. Law § 296)

*(By the New York Plaintiffs Against Defendant)*

146. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

147. The New York State Human Rights Law makes it an unlawful discriminatory practice for an employer, because of an individual's sex or disability, to discharge or otherwise

discriminate against the individual in compensation or in the terms, conditions, or privileges of employment. N.Y. Exec. Law § 296(1)(a). The standards governing discrimination claims under § 296 require liberal construction beyond federal law. N.Y. Exec. Law § 300 (reflecting amendment to NYSHRL as construing state anti-discrimination law "liberally for the accomplishment of the remedial purposes thereof" even when provisions worded similarly to federal law); *Syeed v. Bloomberg L.P.*, 41 N.Y.3d 446, 451-52 (2024) (reaffirming need to construe the Human Rights Laws "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible," *quoting Albunio v. City of New York*, 16 N.Y.3d 472, 477–78 (2011)).

148. Meta's algorithmically assisted selection process discriminated against the New York Plaintiffs on the basis of sex, pregnancy, and disability, and used their protected leave and their requested or approved disability accommodations as a negative factor in selecting them for termination, in violation of § 296(1)(a).

149. The New York Plaintiffs are Doe 12, Doe 10, Doe 14, and Doe 26. Because the NYSHRL reaches the entire State, it protects each of them regardless of whether the worksite lay within New York City; the four who worked at New York City worksites—Doe 12, Doe 10, Doe 14, and Doe 26—additionally assert claims under the New York City Human Rights Law (Count XIV).

**COUNT XIV**
**New York City Human Rights Law (N.Y.C. Admin. Code § 8-107)**

*(By the New York City Plaintiffs Against Defendant)*

150.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

151.    For New York City worksites, the New York City Human Rights Law prohibits discrimination on the basis of sex, pregnancy, caregiver status, and disability. N.Y.C. Admin. Code § 8-107(1)(a); *Golston-Green v. City of New York*, 184 A.D.3d 24 (2d Dep't 2020) (pregnancy discrimination is a form of gender discrimination). The NYCHRL must be construed independently from, and more liberally than, its state and federal counterparts, which serve only as a floor below which the City law cannot fall. *Russell v. New York Univ.*, 204 A.D.3d 577 (1st Dep't 2022).

152.    The NYCHRL further provides an express cause of action for facially neutral policies or practices that produce an unjustified disparate impact on a protected group. N.Y.C. Admin. Code § 8-107(17); *Levin v. Yeshiva Univ.*, 96 N.Y.2d 484 (2001). Meta's algorithmically assisted selection process—which recorded protected-leave time and pregnancy- and disability-related output reductions as underperformance, and which Meta did not test for disparate impact—produced an unjustified disparate impact on the basis of sex, pregnancy, and disability, in violation of § 8-107(17), independent of any showing of discriminatory intent.

153.    Meta discriminated against the New York City Plaintiffs—Doe 12, Doe 10, Doe 14 and Doe 26, each of whom worked at a Meta worksite within ██████████—through the algorithmically assisted selection process described above.

## COUNT XV
## New York Paid Family Leave — Retaliation (N.Y. Workers' Comp. Law §§ 203-a, 203-b)

*(By Plaintiffs Doe 12, Doe 14, and Doe 26 Against Defendant)*

154.  Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

155.  New York Paid Family Leave protects employees who take family leave from retaliation and guarantees reinstatement on return. Section 203-a makes the anti-retaliation protections of Section 120 applicable to family leave, prohibiting an employer from discharging or otherwise discriminating against an employee because the employee has taken or attempted to take such leave. N.Y. Workers' Comp. Law § 203-a. Section 203-b entitles an employee who takes family leave, on return, to be restored to the position held when leave commenced or to a comparable position, and provides that taking leave shall not result in the loss of any employment benefit accrued before the leave. *Id.* § 203-b.

156.  Doe 12 was on approved maternity leave administered through New York Paid Family Leave when Meta selected her on May 20, 2026; her duties were reassigned to a male colleague, and approximately two months of her leave balance were extinguished by the WARN notice period. Doe 14 was on approved parental leave for the bonding and care of his second child when Meta selected him, with a separation date that cut his approved leave short. Meta's selection of these Plaintiffs while on protected family leave, through a process that recorded their leave time as reduced output rather than neutralizing it, used protected family leave as a negative factor against them and denied them the reinstatement and benefit protections the statute guarantees. Doe 26 took maternity and

parental leave, together with short-term disability leave, from November 10, 2025 through May 7, 2026, and returned to work on May 8, 2026. Twelve days later, on May 20, 2026, Meta notified her of her selection and revoked her access to Meta's systems that same day—nullifying the restoration to her position that § 203-b had guaranteed and stripping her of benefits accrued before her leave, including approximately ▇ unvested RSUs. Doe 26 Decl. ¶¶ 2, 8–9, 14.

## COUNT XVI
## D.C. Human Rights Act (D.C. Code § 2-1402.11)

*(By Plaintiff Doe 5 Against Defendant)*

157.   Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

158.   The D.C. Human Rights Act makes it an unlawful discriminatory practice to discharge or otherwise discriminate against an individual, wholly or partially for a discriminatory reason based on sex or disability, including family responsibilities. D.C. Code § 2-1402.11(a). The Act reaches both disparate treatment and disparate impact, and the D.C. Council intended it to go above and beyond the protections of Title VII; its provisions are construed liberally in favor of the Act's sweeping statement of intent. *Estenos v. PAHO/WHO Fed. Credit Union*, 952 A.2d 878 (D.C. 2008), 887. The Act imposes no minimum-tenure threshold.

159.   Meta discriminated against Doe 5, who worked in Washington, D.C., by selecting her for termination while she was pregnant and on protected pregnancy-related leave, through an algorithmically assisted selection process that recorded her protected-leave time as reduced output. Because Doe 5 had less than one year of tenure and was not

FMLA-eligible, the DCHRA—which carries no tenure requirement—is among her principal protections.

## COUNT XVII
### Florida Civil Rights Act (Fla. Stat. § 760.10)

*(By Plaintiff Doe 1 Against Defendant)*

160.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

161.    The Florida Civil Rights Act makes it an unlawful employment practice to discharge or otherwise discriminate against an individual with respect to the terms, conditions, or privileges of employment because of sex, pregnancy, or handicap. Fla. Stat. § 760.10(1)(a). The Act's prohibition on sex discrimination reaches discrimination on the basis of pregnancy, *Delva v. Continental Group, Inc.*, 137 So. 3d 371 (Fla. 2014), and, because the FCRA is patterned after Title VII, it is given the same construction as its federal counterpart. *Carsillo v. City of Lake Worth*, 995 So. 2d 1118 (Fla. 4th DCA 2008).

162.    Meta discriminated against Doe 1, who worked remotely from Florida, by selecting her for termination while she was on maternity leave following a medically complicated pregnancy, through an algorithmically assisted selection process that recorded her protected-leave time as reduced output. Doe 1 is also an individual with a handicap within the meaning of the Act, and Meta's selection of her on that basis independently violates § 760.10(1)(a).

## COUNT XVIII
### Illinois Human Rights Act — Disability Discrimination and Failure to Accommodate (775 ILCS 5/1-101 et seq.; id. 5/2-102)

*(By Plaintiff Doe 11 Against Defendant)*

163. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

164. The Illinois Human Rights Act prohibits discrimination against employees on the basis of disability and requires employers to provide reasonable accommodations for disabilities, and prohibits the use of disability—or of disability-related absences—as a basis for an adverse employment action. 775 ILCS 5/1-101 *et seq.*; *id.* 5/2-102. The IHRA makes it a civil rights violation to fail to provide a reasonable accommodation for a qualifying employee's disability absent undue hardship, and requires a timely, good-faith interactive process, with the employer bearing the burden of proving undue hardship. 775 ILCS 5/2-102; *see Kreczko v. Triangle Package Mach. Co.*, 2016 IL App (1st) 151762 (burden-shifting framework); *Stachler v. Bd. of Educ. of City of Chicago*, 2023 IL App (1st) 221092 (reasonable-accommodation standard). Doe 11, who worked in Chicago, Illinois, took protected FMLA and disability leave and returned under an approved work-from-home accommodation that remained in effect; Meta nonetheless selected him in the RIF through a process that, on information and belief, recorded his protected-leave-related absence and disability as reduced output, in violation of the Act.

**COUNT XIX**
**Pennsylvania Human Relations Act — Disability Discrimination, Failure to Accommodate, and Failure to Engage in the Interactive Process (43 P.S. § 951 et seq.)**

*(By Plaintiff Doe 3 Against Defendant)*

165.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

166.    The Pennsylvania Human Relations Act prohibits an employer from discriminating against an employee on the basis of a non-job-related handicap or disability. 43 P.S. § 955(a). Pennsylvania courts and the Third Circuit interpret the PHRA's disability provisions coextensively with the Americans with Disabilities Act, including its reasonable-accommodation and good-faith interactive-process requirements. *Kelly v. Drexel Univ.*, 94 F.3d 102 (3d Cir. 1996); *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375 (3d Cir. 2002); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999); *Castellani v. Bucks County*, 351 F. App'x 774 (3d Cir. 2009). Doe 3, who worked remotely from ███████ Pennsylvania, is an individual with a handicap or disability within the meaning of the PHRA, including a longstanding ████████████████ which Meta provided an accommodation beginning in 2023, and he took protected medical leave for a serious health condition that Meta approved as short-term disability leave and on which he remained at the time of his selection. Meta's algorithmically assisted selection process discriminated against Doe 3 on the basis of disability by recording his disability- and leave-related reductions in measured output as underperformance—reflected in the first below-"Meets All" rating of his nearly decade-long tenure, issued after his return from protected leave—and Meta failed to

reasonably accommodate his disability and failed to engage in the good-faith interactive process the PHRA requires, in violation of the Act.

## COUNT XX
### Declaratory Relief (28 U.S.C. §§ 2201–2202)

*(By All Plaintiffs Against Defendant)*

167. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

168. An actual controversy exists between Plaintiffs and Meta concerning the legality of Meta's algorithmically assisted selection process and the parties' rights and obligations under the statutes invoked herein and under the Mutual Arbitration Agreement. Plaintiffs are entitled to a declaration that Meta's use of protected-leave and accommodation status, and proxies therefor, as inputs to its selection process is unlawful, and that this Court is the proper forum for the provisional injunctive relief sought, pending arbitration of the merits.

## COUNT XXI
### Preliminary and Permanent Injunctive Relief in Aid of Arbitration — To Maintain the Status Quo (Fed. R. Civ. P. 65; 9 U.S.C. §§ 1–4; Mutual Arbitration Agreement)

*(By All Plaintiffs Against Defendant)*

169. Plaintiffs reallege and incorporate by reference each and every allegation set forth in the foregoing paragraphs as though fully set forth herein.

170. The Mutual Arbitration Agreement expressly reserves to a court of competent jurisdiction claims for preliminary injunctive relief to maintain the status quo pending arbitration. Plaintiffs are entitled to a preliminary and permanent injunction preserving

the status quo of their employment—enjoining Meta from separating, terminating, or altering the compensation, benefits, equity vesting, or protected-leave status of the named Plaintiffs—pending an independent audit of the algorithmically assisted selection process and resolution of the merits in arbitration. Plaintiffs are likely to succeed on the merits; will suffer irreparable harm absent relief, including the loss of employer-sponsored health coverage and the disruption of continuity of care during ongoing pregnancies, postpartum recovery, and active medical treatment, the loss of time-bound statutory leave—whether for bonding, medical recovery, family care, or other protected purpose—and of reinstatement rights that cannot be restored by later monetary judgment, the forfeiture of unvested equity, and the practical inability to undo a mass algorithmically assisted termination once finalized; the balance of equities tips sharply in their favor; and an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A. Issue a preliminary injunction, and thereafter a permanent injunction, preserving the status quo by enjoining Meta from separating, terminating, or altering the compensation, benefits, equity vesting, or protected-leave status of the named Plaintiffs, pending an independent audit of the algorithmically assisted selection process and resolution of the merits of Plaintiffs' claims in arbitration;

B. Order that, during the pendency of that relief, an independent auditor approved by the Court (i) examine the inputs, weights, and outputs of the selection process; (ii) determine whether protected-leave status, accommodation status, or any proxy was used as an input;

---

(iii) recompute selection scores using leave- and accommodation-neutralized inputs; and

(iv) identify any named Plaintiff whose selection cannot be justified on leave- and accommodation-neutral grounds;

C. Order Meta to preserve all data, models, training data, decision logs, calibration materials, workforce-planning documents, monitoring data, second-brain training inputs and outputs, AI-token-usage dashboards, and communications relating to the RIF and the algorithmically assisted selection process;

D. Compel arbitration of the merits of Plaintiffs' individual claims pursuant to 9 U.S.C. § 4, and stay further proceedings pursuant to 9 U.S.C. § 3, while retaining jurisdiction to enforce the status-quo injunction;

E. Declare the parties' rights and obligations as set forth above pursuant to 28 U.S.C. §§ 2201–2202;

F. Waive the bond requirement under Federal Rule of Civil Procedure 65(c), or require only a nominal bond;

G. Reserve to the arbitral forum all relief on the merits, including but not limited to reinstatement, back pay, front pay, lost equity and benefits, compensatory and emotional-distress damages, statutory and liquidated damages, punitive damages, prejudgment interest, and attorneys' fees and costs, as available under the statutes invoked herein; and

H. Grant such other and further relief as the Court deems just and proper.

DATED: July 12, 2026

Respectfully submitted,

---

LUMEN LAW CENTER, P.C.
WORKPLACE ADVOCATES, P.C.
HOULDING LAW PC

By: _Andrea Mazingo_____
Andrea Mazingo
Barbara E. Cowan
Rebecca Houlding (*pro hac vice* pending)

*Attorneys for Plaintiffs*