Andrea Mazingo, SBN 300824
LUMEN LAW CENTER, P.C.
8605 Santa Monica Blvd PMB 832031
West Hollywood, CA 90069
Telephone: (310) 269-6739
Email: andi@lumenlawcenter.com

Barbara E. Cowan, SBN 251942
WORKPLACE ADVOCATES, P.C.
9431 Haven Avenue, Suite 100
Rancho Cucamonga, CA 91730
Telephone: (909) 983-4102
Email: brandi@wpa.law

Rebecca Houlding (*pro hac vice* pending)
HOULDING LAW PC
431 Classon Avenue, Suite 1B
Brooklyn, NY 11238
Telephone: (646) 561-9119
Email: rebecca@houldinglaw.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| DOES 1 THROUGH 26,<br><br>               Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>               Defendant. | Case No. 4:26-cv-07122<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>*Filed concurrently with: Complaint; Application for Temporary Restraining Order; Declarations and exhibits thereto; and [Proposed] Temporary Restraining Order and Order to Show Cause* |

**NOTICE OF MOTION AND MOTION**

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on _____, at _____, or as soon thereafter as the matter may be heard, in _____ of the above-entitled Court, located at 1301 Clay Street, Oakland, CA 94612, Plaintiffs will and hereby do move this Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.

This Motion is made on the grounds that Defendant Meta Platforms, Inc. ("Meta") has announced and begun implementing a mass reduction in force ("the RIF") using an artificial-intelligence-assisted selection process that (i) systematically penalizes employees who took, requested, or were approved for protected leave under the federal Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); the California Family Rights Act, Cal. Gov't Code § 12945.2 ("CFRA"); and the California Pregnancy Disability Leave Law, Cal. Gov't Code § 12945 ("PDL"); (ii) discriminates against, and fails to accommodate, employees with disabilities and pregnancy-related conditions in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"); the California Fair Employment and Housing Act, Cal. Gov't Code §§ 12900 *et seq.* ("FEHA"); and the Pregnant Workers Fairness Act, 42 U.S.C. §§ 2000gg *et seq.* ("PWFA"); and (iii) produces an unjustified disparate impact on the basis of sex, including pregnancy, and disability, in violation of Title VII of the Civil Rights Act of 1964, as amended by the Pregnancy Discrimination Act, 42 U.S.C. §§ 2000e *et seq.* ("Title VII"), FEHA, and the California Civil Rights Council's automated-decision-system regulations, 2 Cal. Code Regs. §§ 11008, 11008.1, 11017, 11020 (eff. Oct. 1, 2025). The same conduct violates the parallel protected-leave and antidiscrimination statutes of the jurisdictions in which the non-California Plaintiffs worked, including the Washington Law Against Discrimination, RCW ch. 49.60, and the Washington Paid Family and Medical Leave Act, RCW Title 50A; the New York State Human Rights Law, N.Y. Exec. Law § 296, the New York City Human Rights Law,

N.Y.C. Admin. Code § 8-107, and New York Paid Family Leave, N.Y. Workers' Comp. Law §§ 203-a, 203-b; the D.C. Human Rights Act, D.C. Code § 2-1402.11; the Florida Civil Rights Act, Fla. Stat. § 760.10; the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.*; and the Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.*, 5/2-102.

Plaintiffs seek an order:

(1) As primary relief, preserving the status quo by enjoining Meta, pending an independent audit of the selection process and pending resolution of Plaintiffs' claims in their proper forum, from separating, terminating, or altering the compensation, benefits, equity-vesting, or protected-leave status of the named Plaintiffs;

(2) In the alternative, and on behalf of a provisionally certified Rule 23(b)(2) injunctive class (see Section IV.F), enjoining Meta from finalizing the separation of any employee who, at any point in the preceding twenty-four (24) months, took, requested, or was approved for FMLA, CFRA, pregnancy-disability, or other statutorily protected leave, or who requested or received a reasonable accommodation for a disability, pending such audit and a Court-supervised leave- and accommodation-neutralization process;

(3) Requiring Meta to preserve all data, models, training data, decision logs, calibration materials, workforce-planning documents, monitoring data, second-brain training inputs and outputs, AI-token-usage dashboards, and communications relating to the RIF and the algorithmic selection process; and

(4) Granting such further relief as the Court deems just and proper.

This Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the concurrently filed Complaint, the supporting Declarations and all exhibits thereto, all matters of which the Court may take judicial notice, the pleadings and papers on file, and such further evidence and argument as may be presented at or before the hearing.

DATED: July __, 2026

Respectfully submitted,

**LUMEN LAW CENTER, P.C.**
**WORKPLACE ADVOCATES, P.C.**
**HOULDING LAW PC**

By: _____
Andrea Mazingo
Barbara E. Cowan
Rebecca Houlding (*pro hac vice* pending)

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

I.      INTRODUCTION                                                                         1

II.     STATEMENT OF FACTS                                                           3

    A.  Meta's May 2026 Reduction in Force                                         3

    B.  Meta's Use of Algorithmic Systems in Selecting Employees for Termination    4

    C.  Meta's Workforce-Wide Keystroke Monitoring and Compelled AI Training Created
        Inputs Available for the RIF Selection Process                          6

    D.  The Selection Process's Effect on Specific Employees Illustrates the Pattern  7

    E.  The Plaintiffs and the Basis for Their Joinder                            11

III.    LEGAL STANDARD                                                                13

IV.     ARGUMENT                                                                        15

    A.  Plaintiffs Are Likely to Succeed on the Merits                            15

        1.  FMLA interference: Meta used protected FMLA leave as a negative factor in
            its termination decisions                                         15

        2.  FEHA disparate impact: Meta's algorithmic selection violates the newly
            effective ADS regulations                                         18

        3.  Additional independent grounds for relief                           20

        4.  The federal theories reach every Plaintiff; the non-California Plaintiffs are
            independently protected by their own States' law                   22

    B.  Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief         24

    C.  The Balance of Equities Tips Sharply in Plaintiffs' Favor                  30

    D.  An Injunction Is in the Public Interest                                    31

    E.  The Scope of the Requested Relief Is Properly Tailored                     32

    F.  The Named Plaintiffs Are Properly Joined; In the Alternative, Provisional
        Injunctive-Class Certification is Warranted for the Disparate-Impact Claim  33

V.      THE COURT SHOULD WAIVE OR MINIMIZE THE BOND REQUIREMENT    34

VI.     CONCLUSION                                                                      36

## TABLE OF AUTHORITIES

*Cases*

*Adams v. Freedom Forge Corp.,* 204 F.3d 475 (3d Cir. 2000) — 25

*Albemarle Paper Co. v. Moody,* 422 U.S. 405 (1975) — 20

*All. for the Wild Rockies v. Cottrell,* 632 F.3d 1127 (9th Cir. 2011) — 13

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. & Budget,* 807 F. Supp. 3d 1004 (N.D. Cal. 2025) — 24

*Anderson v. United States,* 612 F.2d 1112 (9th Cir. 1980) — 20

*Bachelder v. Am. W. Airlines, Inc.,* 259 F.3d 1112 (9th Cir. 2001) — 2, 15

*Barahona-Gomez v. Reno,* 167 F.3d 1228 (9th Cir. 1999) — 35

*Chalk v. United States Dist. Ct.,* 840 F.2d 701 (9th Cir. 1988) — 13, 24, 26, 31

*Chauca v. Abraham,* 30 N.Y.3d 325 (2017) — 23

*Cutcher v. Kmart Corp.,* 364 F. App'x 183 (6th Cir. 2010) — 16

*Diaz v. Brewer,* 656 F.3d 1008 (9th Cir. 2011) — 25

*Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.,* 630 F.3d 1153 (9th Cir. 2011) — 13

*Flores v. AT&T Corp.,* 2019 WL 5785095 (W.D. Tex. Nov. 6, 2019) — 16

*Frisino v. Seattle Sch. Dist. No. 1,* 160 Wash. App. 765, 249 P.3d 1044 (2011) — 22

*Gostola v. Charter Commc'ns, LLC,* 72 F. Supp. 3d 796 (E.D. Mich. 2014) — 16

*GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199 (9th Cir. 2000) — 35

*Griggs v. Duke Power Co.,* 401 U.S. 424 (1971) — 3, 18

*IBM v. Bajorek,* 191 F.3d 1033 (9th Cir. 1999) — 27

*Johnson v. Couturier,* 572 F.3d 1067 (9th Cir. 2009) — 13, 34

*Jordan v. Duff & Phelps, Inc.,* 815 F.2d 429 (7th Cir. 1987) — 28

*Jorgensen v. Cassiday,* 320 F.3d 906 (9th Cir. 2003) — 35

*Jumaane v. City of Los Angeles,* 241 Cal. App. 4th 1390 (2015) — 18

*Kelly v. Stamps.com Inc.,* 135 Cal. App. 4th 1088 (2005) — 28

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.,* 571 F.3d 873 (9th Cir. 2009) — 13

*McCollum v. Xcare.net, Inc.,* 212 F. Supp. 2d 1142 (N.D. Cal. 2002) — 28

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) — 21

*Meyer v. Portfolio Recovery Assocs., LLC,* 707 F.3d 1036 (9th Cir. 2012) — 34

*Mobley v. Workday, Inc.,* 740 F. Supp. 3d 796 (N.D. Cal. 2024) — 19

*Mobley v. Workday, Inc.,* 2025 WL 1424347 (N.D. Cal. May 16, 2025)     19

*Pagel v. TIN, Inc.,* 695 F.3d 622 (7th Cir. 2012)     16

*Pecora v. ADP, LLC,* 232 F. Supp. 3d 1213 (M.D. Fla. 2017)     16

*People ex rel. Van de Kamp v. Tahoe Reg'l Plan. Agency,* 766 F.2d 1319 (9th Cir. 1985)     35

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.,* 944 F.2d 597 (9th Cir. 1991)     24

*Rodriguez v. Hayes,* 591 F.3d 1105 (9th Cir. 2010)     34

*Rodriguez v. Robbins,* 715 F.3d 1127 (9th Cir. 2013)     30

*Sampson v. Murray,* 415 U.S. 61 (1974)     24

*Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113 (9th Cir. 2005)     35

*Schachter v. Citigroup, Inc.,* 47 Cal. 4th 610 (2009)     27

*Soria v. Univision Radio L.A., Inc.,* 5 Cal. App. 5th 570 (2016)     20

*State v. City of Sunnyside,* 550 P.3d 31 (Wash. 2024)     22

*Stormans, Inc. v. Selecky,* 586 F.3d 1109 (9th Cir. 2009)     31

*Syeed v. Bloomberg L.P.,* 41 N.Y.3d 446 (2024)     23

*Walker v. Verizon Pa. LLC,* 2017 WL 3675384 (E.D. Pa. Aug. 25, 2017), appeal dismissed sub nom. *Walker v. Verizon Servs. Corp.*, No. 17-3091, 2018 WL 11445452 (3d Cir. May 1, 2018)     15

*Watson v. Fort Worth Bank & Tr.,* 487 U.S. 977 (1988)     21

*Whitfield v. Noem,* No. 2:25-cv-04499-HDV-PDx (C.D. Cal. July 2, 2026)     25

*Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7 (2008)     13, 30

*Young v. United Parcel Serv., Inc.,* 575 U.S. 206 (2015)     19

*Z Channel Ltd. P'ship v. Home Box Office, Inc.,* 931 F.2d 1338 (9th Cir. 1991)     30

**Federal Statutes**

29 U.S.C. § 2601(b)(2)     26, 31

29 U.S.C. § 2612(a)     15

29 U.S.C. § 2612(a)(1)     26

29 U.S.C. § 2614(a)     15, 27, 28, 29

29 U.S.C. § 2615(a)(1)     15

42 U.S.C. § 2000e-2(a)     21

42 U.S.C. § 2000e-2(k)     3, 21

42 U.S.C. § 2000e(k)     21

42 U.S.C. §§ 2000gg et seq.     22

42 U.S.C. §§ 12112(a), (b)(5)                                           20

*State Statutes*

Cal. Gov't Code § 12926(m), (r)                                         19

Cal. Gov't Code § 12940(a)                                           18, 20

Cal. Gov't Code § 12940(m)                                              20

Cal. Gov't Code § 12945                                              19, 26

Cal. Gov't Code § 12945.2                                               26

Cal. Gov't Code § 12945.2(a)                                            26

Cal. Gov't Code § 12945.2(b)                                            20

Cal. Gov't Code § 12945.2(k)(1), (q)                                   2, 20

D.C. Code § 2-1402.11                                                   23

Fla. Stat. § 760.10                                                     24

N.Y. Exec. Law § 296                                                    23

N.Y. Exec. Law § 300                                                    23

N.Y.C. Admin. Code § 8-107                                             23

N.Y.C. Admin. Code § 8-107(17)                                         23

N.Y. Workers' Comp. Law § 120                                         23

N.Y. Workers' Comp. Law § 203-a                                       23

N.Y. Workers' Comp. Law § 203-b                                       23

RCW ch. 49.60                                                          22

RCW 49.45.060                                                         22

RCW 49.60.180                                                         22

RCW 50A.05.125                                                        22

RCW 50A.40.010(1)(a)                                                  22

RCW 50A.40.035                                                        22

RCW 50A.40.040                                                        22

43 P.S. § 951 et seq., § 955(a)                                        24

775 ILCS 5/1-101 et seq., 5/2-102                                      24

*Regulations*

8 C.F.R. § 214.1(l)(2)                                                 28

29 C.F.R. § 825.220(c)                                               2, 15

2 Cal. Code Regs. § 11008                                            3, 18

2 Cal. Code Regs. § 11008(a), (e)(3)                                    20

2 Cal. Code Regs. § 11008(h)                                           18

2 Cal. Code Regs. § 11008(i)                                           18

2 Cal. Code Regs. § 11008(l)                                           19

2 Cal. Code Regs. § 11008.1                                         3, 18

2 Cal. Code Regs. § 11008.1(a)                                         18

2 Cal. Code Regs. § 11017                                           3, 18

2 Cal. Code Regs. § 11017(e)                                           18

2 Cal. Code Regs. § 11020                                           3, 18

2 Cal. Code Regs. § 11020(b)(i)                                     19, 20

2 Cal. Code Regs. § 11090(d)                                           26

### Rules

Fed. R. Civ. P. 20                                                 12, 14

Fed. R. Civ. P. 20(a)(1)                                               12

Fed. R. Civ. P. 23(a)                                                  34

Fed. R. Civ. P. 23(b)(2)                                               33

Fed. R. Civ. P. 65                                                   1, 2

Fed. R. Civ. P. 65(c)                                                  34

Fed. R. Civ. P. 65(d)                                                  33

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

On May 20, 2026, Meta Platforms, Inc. began notifying approximately ten percent of its workforce that they have been selected for termination. Meta did not assemble the termination list through the considered judgment of managers who knew the work. Instead, Meta used a hybrid of leadership judgment aided by a constellation of internal artificial-intelligence systems, including a system referred to internally as "Metamate," an internal performance program called "Checkpoint," employee-trained "second-brain" agents, keystroke-monitoring data, AI-token-usage dashboards, and AI-assisted performance reviews, to assemble the list. Those tools draw on inputs—performance ratings, calibration scores, productivity metrics, "AI-native" ratings, AI-token consumption—that by design cannot be accumulated by an employee on protected medical or family leave or with reduced output from a disability. Meta did not neutralize those inputs for protected leave; did not exclude leave-takers or accommodation-seekers from the selection cohort; and did not pause the system for the kind of individualized, leave-neutral review the law requires.

Plaintiffs' pre-filing investigation confirms the pattern. A ▮▮ scientist was selected for termination while she was on approved pre-birth pregnancy leave—the day before her water broke and two days before she gave birth—after her manager's own notes had documented that she was on track for promotion to the next level. Doe 17 Decl. ¶¶ 2, 6, 11–12. A ▮▮▮▮ manager's own performance review records that his demotion followed his return from medical leave; he was later selected for termination sixteen days into a second medical leave. Doe 19 Decl. ¶¶ 4, 15, 17–18. A ▮▮▮ engineer's manager tied his lowered performance rating directly to the "broken time" when a physical injury prevented him from working, telling him "it is what it is." Doe 6 Decl. ¶¶ 10–11. A ▮▮ researcher who disclosed an ▮▮▮ diagnosis received her

first-ever "Meets Most" rating about a week later, resulting in her selection. Doe 16 Decl. ¶¶ 9, 12. A director confirms the mechanism from the inside: he attests that Meta announced an AI-enabled performance program called "Checkpoint" under which "employee AI adoption was going to be a core assessment metric," that Meta withheld the details of Checkpoint from employees "until after the May 20, 2026 reduction in force," and that he monitored his organization's AI-adoption dashboards "almost daily"—dashboards that "failed to distinguish employees' leave from lack of engagement." Doe 18 Decl. ¶ 22. And when a ███████████ engineer sought to take provider-approved medical leave, his manager admitted the connection outright: taking the leave would mean senior leadership "will definitely" terminate him or nominate him for the anticipated layoffs and stated "this is Meta—if the company wants something, they make it happen." Doe 15 Decl. ¶ 19, 21. These are not isolated accounts; the same pattern recurs across the named Plaintiffs, who span Meta's ██████████████████ █████████████████████████ organizations and who worked in California, Washington, New York, the District of Columbia, Illinois, Florida, and Pennsylvania.

Federal, California, and other states' laws forbid these practices. The FMLA prohibits employers from using protected leave as a "negative factor" in any employment decision, including selection for a reduction in force. 29 C.F.R. § 825.220(c); *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001). The CFRA imposes the same prohibition. Cal. Gov't Code § 12945.2(k)(1), (q). FEHA forbids automated-decision systems that produce disparate-impact discrimination on the basis of disability or sex, including pregnancy; California's newly effective Automated Decision System ("ADS") regulations make that prohibition explicit. 2 Cal. Code Regs. §§ 11008, 11008.1, 11017, 11020 (eff. Oct. 1, 2025). Title

VII has long required that facially neutral criteria not produce unjustified disparate impacts. 42 U.S.C. § 2000e-2(k); *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971).

Once these terminations are finalized, the harm is not redressable by damages alone. Plaintiffs will lose health coverage for ongoing pregnancies, physical, and mental-health treatment, unvested equity, statutory leave-reinstatement rights, immigration status, the protected leave time itself, and the practical ability to challenge a mass termination event after it has been completed. Plaintiffs therefore request a preliminary injunction preserving the status quo as to the named Plaintiffs pending an independent audit of the selection process and resolution of their claims in the proper forum, or, in the alternative, and on behalf of a Rule 23(b)(2) injunctive class, an injunction barring separation of any employee who took protected leave or requested an accommodation in the prior twenty-four months pending audit and neutralization. Either form of relief preserves the status quo and requires Meta to do nothing more than the law already requires.

## II. STATEMENT OF FACTS

### A. Meta's May 2026 Reduction in Force.

Meta Platforms, Inc. is a Delaware corporation headquartered in Menlo Park, California. On its first-quarter 2026 earnings call on April 29, 2026, Meta confirmed that it would reduce its workforce in May 2026, not in response to any financial distress, but alongside strong results—first-quarter revenue of $56.3 billion, up 33% year over year—and to offset projected 2026 capital expenditures to a range of $125 to $145 billion.[1] In an internal town hall the next day, Meta made clear to employees that the mechanics of the selection process would be kept from them. As reported, Chief Executive Officer Mark Zuckerberg indicated that Meta would

---

[1] Transcript of Meta Platforms, Inc. Q1 2026 Earnings Conference Call, at 4, 8 (Apr. 29, 2026), https://s21.q4cdn.com/399680738/files/doc_financials/2026/q1/META-Q1-2026-Earnings-Call-Transcript.pdf.

deliberately withhold information about how the layoff selections were made so that it would not leak—confirming that the company intentionally kept employees in the dark about the process behind the reduction in force.[2]

On May 20, 2026, Meta began issuing separation notices to approximately ten percent of its workforce, with payroll separation and termination of employer-sponsored health coverage to follow within weeks. *See e.g.*, Doe 12 Decl. ¶¶ 2, 16, 21; Doe 5 Decl. ¶¶ 13, 15, 16; Doe 6 Decl. ¶¶ 17, 22; Doe 16 Decl. ¶¶ 23, 29; Doe 18 Decl. ¶¶ 15, 26. Meta's WARN-related EDD filings reflect approximately 3,468 affected employees in California alone.[3]

### B. Meta's Use of Algorithmic Systems in Selecting Employees for Termination.

On information and belief, Meta used a constellation of internal artificial-intelligence-assisted systems to score, rank, and select employees for inclusion on the termination list. These include: "Metamate," an internal large-language-model assistant; employee-trained "second brain" agents that ingest each employee's communications and documents to replicate the employee's output; algorithmic productivity scoring drawn from keystroke, screen-content, mouse, browser-history, messaging, and email data captured continuously from Meta-issued devices; internal dashboards displaying employee-level AI-token consumption; and AI-assisted performance review and calibration tools that have substantially supplanted the prior manager-driven calibration process. Doe 19 Decl. ¶¶ 20-21; Doe 8 Decl. ¶¶ 13–14; Doe 18 Decl. ¶¶ 19-20, 22-23; *see also* Doe 13 Decl. ¶¶ 11–12, 14; Doe 2 Decl. ¶¶

---

[2] *In Leaked Audio from Meta Townhall, CEO Mark Zuckerberg Tells Employees Meta Intentionally Kept Staff in the Dark…*, Times of India (last visited June 30, 2026), https://timesofindia.indiatimes.com/technology/tech-news/in-leaked-audio-from-meta-townhall-ceo-mark-zuckerberg-tells-employees-meta-intentionally-kept-staff-in-the-dark-because/articleshow/131225558.cms ("'It is not strategically in your interest for us to communicate everything in all the detail that we normally would on this,' Zuckerberg said.").

[3] Meta Layoffs, CaliforniaWARN, https://californiawarn.com/companies/meta (last visited June 30, 2026).

---

11–12; Doe 21 Decl. ¶¶ 15-16; Doe 9 Decl. ¶¶ 11–13; Doe 17 Decl. ¶¶ 17–18; Doe 25 Decl. ¶¶ 14, 15.

On information and belief, inputs to leadership's selection process included each employee's rolling twelve-month performance rating; the Year-End 2025 calibration outcome; an "AI-native" rating drawn from AI-token-usage dashboards; output volume and code-commit data; and manager-sponsorship and roadmap-adjacency signals. Doe 19 Decl. ¶¶ 20–21; Doe 8 Decl. ¶¶ 13–14; Doe 18 Decl. ¶¶ 19–20, 22–23; *see also* Doe 22 Decl. ¶ 13 (AI-adoption stage categories); Doe 9 Decl. ¶¶ 15–16 (usage dashboard vs. peers); Doe 25 Decl. ¶ 13. Meta maintained dashboards and company-wide leaderboards, displaying each employee's artificial-intelligence-tool usage and token consumption, compared against the employee's peers; Meta restricted access to this information after it was reported in the press, and at an all-hands meeting Meta's Chief Executive Officer stated that performance reviews would, going forward, take into account employees' use of artificial intelligence. Doe 19 Decl. ¶¶ 21; Doe 8 Decl. ¶ 13. Meta's artificial intelligence adoption dashboards, which managers and directors monitor regularly, do not account for when an employee is out of office, even if the employee is on leave, causing scores to decline during protected leave.  Doe 18 ¶ 22; Doe 22 Decl. ¶¶ 3, 10; *see also* Doe 2 Decl. ¶ 11; Doe 25 Decl.  ¶ 13; Doe 17 Decl. ¶¶ 17, 18; Doe 6 Decl. ¶¶ 10, 15; Doe 9 Decl. ¶11; Doe 8 Decl. ¶ 13; Doe 12 Decl. ¶¶ 9, 17. And while Meta leadership used AI to draft performance reviews, they did not undergo a calibration process for this RIF to ensure leave neutralization. Doe 13 Decl. ¶ 11, 14; Doe 18 Decl. ¶¶ 19–20. On information and belief, Meta did not neutralize any of these inputs for protected leave. An employee on twelve weeks of FMLA leave during the measurement window cannot, by the system's design, accumulate code commits, AI-token consumption, or "strategic alignment" signals at the rate of a

continuously-present peer. The system did not adjust for this, did not exclude protected-leave time from any throughput metric, and did not flag protected-leave-takers or accommodation-seekers for individualized human review. Doe 18 Decl. ¶¶ 11, 19, 20.

### C. Meta's Workforce-Wide Keystroke Monitoring and Compelled AI Training Created Inputs Available for the RIF Selection Process.

In early 2026, Meta deployed a workforce-wide monitoring program capturing, on Meta-issued devices, keystrokes, screen content, mouse and activity data, browser history, messaging, email, and (for at least some employee populations) voice, video, and location. Doe 19 Decl. ¶ 23; Doe 17 Decl. ¶ 19; Doe 6 Decl. ¶ 19; *see also* Doe 3 Decl. ¶ 12; Doe 4 Decl. ¶ 11; Doe 10 Decl. ¶ 17; Doe 2 Decl. ¶ 12; Doe 26 Decl. ¶ 12. The program was announced through a low-visibility Workplace post—made by an engineer rather than a senior leader, in a secondary group rather than Meta's official employee-notice channel—with short notice and no consent or click-through acknowledgment; on at least some teams, employees received no consent or acknowledgment prompt at all, and there was no way to opt out. Doe 12 Decl. ¶ 19; Doe 5 Decl. ¶ 12; Doe 16 Decl. ¶ 26; Doe 6 Decl. ¶ 19. On information and belief, Chief Technology Officer Andrew Bosworth defended the program in the comment thread, characterizing objectors as "being very rude." In parallel, Meta deployed an internal expectation that employees train a personal AI agent commonly called a "second brain" that ingests the employee's communications to replicate the employee's output, and required employees to integrate Meta's internal AI tools into their work, including through a month-long, required AI training in March 2026. Doe 18 Decl. ¶ 23; Doe 8 Decl. ¶ 13; *see also* Doe 12 Decl. ¶ 18; Doe 16 Decl. ¶ 27; Doe 24 Decl. ¶ 13; Doe 4 Decl. ¶ 10; Doe 6 Decl. ¶ 20; Doe 17 Decl. ¶ 17; Doe 25 Decl. ¶ 15. At least some employees prepared, in advance of a leave and at management's request, plans to integrate their work into Meta's internal artificial-intelligence tools so that their responsibilities

could be covered during the absence. Doe 5 Decl. ¶¶ 7, 11. Employees who had no separate personal devices used their monitored Meta systems for personal matters, including health-insurance and mental-health-treatment portals, leave-administration communications, and personal banking. Doe 19 Decl. ¶ 23; Doe 16 Decl. ¶ 26; Doe 12 Decl. ¶ 19; Doe 6 Decl. ¶ 19; *see also* Doe 22 Decl. ¶ 11; Doe 4 Decl. ¶ 11. On information and belief, these data were used in the RIF selection process; an employee on protected leave cannot generate them, and the absence of that data is recorded by the system as reduced performance.

### D. The Selection Process's Effect on Specific Employees Illustrates the Pattern.

The experiences of the named Plaintiffs—corroborated by witnesses inside Meta, including at the director level—demonstrate the same structural pattern.

### 1. A ▆▆ scientist selected while on pregnancy leave, two days before she gave birth.

A female ▆▆▆▆ at the ▆ level in Meta's ▆▆▆▆ organization, with approximately four and a half years of tenure, took protected medical leave under the FMLA in late 2025 for a pregnancy-related condition and later began approved pre-birth maternity leave. She had received "Exceeds Expectations" ratings in 2023 and 2024, and her manager's contemporaneous one-on-one notes reflected active discussions of her promotion to the ▆ level. While she was on approved pre-birth leave, on May 20, 2026, she was notified that her role had been "eliminated"; her water broke the next day, and she gave birth to her child just two days later, on May 22, 2026. Within her skip-level manager's organization of approximately twenty-five employees, three were selected for termination, and two of the three—including her—were on leave related to pregnancy or the birth of a child. Both her manager and her skip-level manager had been asked by their own manager whether they had any "low performers" on their teams. She believes her one lower rating, in 2025, was affected by the pregnancy-related leave she had taken. Doe 17 Decl. ¶¶ 4, 6–7, 10, 12, 14, 16.

**2. A ▮▮▮▮▮ manager whose own performance review documents that his demotion followed his medical leave, and who was selected sixteen days into a later medical leave.**

A ▮▮▮▮▮ manager with approximately five and a half years of tenure, who had received "Exceeds Expectations" ratings for his first four years and was promoted, took approved medical leave in 2024 for a serious health condition. Days after his medical clearance—while he was still on bridging leave and had not yet returned to work—he was removed from his management role and reduced from a manager ▮▮ level to an individual-contributor ▮▮ level; his 2024 performance review states that this transition occurred upon his return from medical leave. His ratings then declined for the first time in his tenure. He disclosed that he is ▮▮▮▮ received no accommodation, and was instead assigned to a ▮▮-intensive technical initiative. He began a second approved medical leave on May 4, 2026, scheduled to end July 26, 2026; on May 20, 2026—sixteen days into that leave—he was selected for termination, with a separation date of July 22, 2026, four days before his leave was scheduled to end. A colleague on his team, who reported to the same manager was also selected for termination while she was on medical and maternity leave. Doe 19 Decl. ¶¶ 3–4, 7, 9–15, 17–18.

**3. A ▮▮▮▮ engineer whose manager tied his lowered rating directly to his injury-related absence.**

A ▮▮▮▮▮ Engineer at the ▮ level in Meta's ▮▮▮▮▮▮▮ organization sustained a serious physical injury and required time away from work to recover, which Meta treated as a reasonable accommodation rather than as statutory leave. His manager connected his lowered performance rating directly to the time he was unable to work because of his injury, telling him in writing that there had not been "enough signals to gauge [him] operating at ic levels with [his] broken time," that this "does not count as leave of absence," and that

"unlucky leaves happen," later stating the rating was "impossible" to change but "it is what it is." He was selected for termination in the May 2026 reduction in force. Doe 6 Decl. ¶¶ 3–4, 7–17, 21, 26.

**4. An ▆▆▆▆▆▆▆▆ researcher whose first-ever "Meets Most" came soon after disclosing her diagnosis and requesting accommodations.**

An ▆▆ ▆▆▆▆ ▆ Researcher in Meta's ▆▆▆▆▆▆▆ organization, with prior contractor and full-time tenure dating to 2022, was assigned an undocumented "strategic roadmap" expectation by her manager in early 2026. The manager then involuntarily reassigned her due to perceived inadequacy of the roadmap, acknowledging the expectation had not been put in writing. On February 20, 2026, the employee disclosed her recent diagnosis of ▆▆▆ to her manager and explained she was pursuing reasonable-accommodation requests. Approximately eleven days later, she received the first "Meets Most" rating of her Meta tenure. When her manager eventually approved a subset of her formal accommodation requests, the approval was limited to a three-month window for what is a permanent disability, accompanied by caveats narrowing what she had requested. On May 5, 2026, she submitted a formal complaint of disability discrimination and retaliation; the following week, her manager issued written feedback—for the first time—stating she was "trending below expectations"; and on May 20, 2026, she was selected for termination. Doe 16 Decl. ¶¶ 3, 6–9, 12, 15, 17–18, 20, 22–23.

**5. A senior machine-learning engineer deterred from taking provider-approved medical leave, then selected anyway.**

A ▆▆▆▆▆▆ Engineer with four years of consistently strong ratings, a mid-2025 promotion, and an organization-wide "▆▆▆▆▆▆" award was diagnosed with ▆▆▆▆▆ ▆▆▆▆▆▆▆ in March 2026. Two providers—▆▆▆▆▆▆▆—signed off on twelve to sixteen weeks of medical leave. When he gave his manager the courtesy notification Meta's

leave process instructs, the manager threatened that taking leave would mean senior leadership "will definitely" terminate him or nominate him for the anticipated layoffs, offered a favorable performance letter only if he dropped the leave, and refused to put any of it in writing to "avoid a paper trail." When the engineer observed that Washington law protects employees who take protected leave from mass layoffs, the manager answered: "this is Meta—if the company wants something, they make it happen." Deterred—in part because his lawful presence in the United States depends on his employment—he never submitted the leave application and stopped his treatment. Meta selected him anyway on May 20, 2026: the only one of his ███-person team. Later that day his manager messaged him that the layoff came "just 1 month before we can mark your great performance into the system." Doe 15 Decl. ¶¶ 13, 16, 18–21, 23, 25–27.

**6. A ███████ director with cross-organizational process knowledge.**

A ███████ director with cross-organizational visibility, corroborates the same structural pattern from within the company's leadership. This witness participated in the calibration discussions that preceded Meta's prior round of layoffs but confirms there was no comparable calibration process before the May 2026 reduction in force; is aware, in a ███████ ███████, that Meta incorporated into its ███████████████████████████ ███████████████████████████; and was told by human resources that information regarding an artificial-intelligence-enabled performance management system referred to as "Checkpoint"—under which "employee AI adoption was going to be a core assessment metric"—"would not be shared with employees until after the May 20, 2026 reduction in force." In his role as Director, he "utilized these AI adoption dashboards to monitor organizational AI usage, viewing [his] team's progress almost daily," and attests that the dashboards "failed to distinguish employees' leave from lack of engagement." This witness is

himself a named Plaintiff: a ▮▮▮▮▮▮▮▮▮▮▮ whose treating provider recommended medical leave in early 2026, and who—after disclosing in November 2025 that his health was in crisis and receiving no advisement of his FMLA rights and no accommodation—deferred taking leave out of a concern, borne out by the May 20 selections, that an absence would be penalized. Doe 18 Decl. ¶¶ 3, 4, 6, 8-11, 20, 21-22, 25.

The corroboration of these facts across organizational levels, from individual contributors to second-tier directors and across multiple Meta business units, including ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, demonstrates that the selection process operates uniformly across the company and confirms that the named Plaintiffs' claims share the common questions that make joinder proper under Rule 20 and, in the alternative, support injunctive-class treatment of the disparate-impact claim.

### E. The Plaintiffs and the Basis for Their Joinder.

This action is brought by twenty-six named Plaintiffs, each of whom Meta selected for separation in its May 2026 reduction in force, and each of whom, within the twenty-four months preceding that reduction in force, took, requested, or was approved to take statutorily protected leave—under the FMLA, the CFRA, the California Pregnancy Disability Leave Law, the California Paid Family Leave program, or analogous federal or state leave laws, attempted to take statutorily protected leave and suffered leave interference, or requested or received a reasonable accommodation for a disability under the ADA or FEHA. Their accounts span Meta's engineering, data-science, marketing, design, research, and finance organizations, in California (Doe 6 Decl. ¶ 3; Doe 24 Decl. ¶ 3; Doe 8 Decl. ¶ 3; Doe 21 Decl. ¶¶ 2–3), Washington (Doe 17 Decl. ¶¶ 4, 6–7, 10; Doe 16 Decl. ¶¶ 3, 6–9; Doe 20 Decl. ¶¶ 3, 5–6, 8–13, 15; Doe 18 Decl. ¶¶ 3–4, 8–11), New York (Doe 12 Decl. ¶¶ 3, 6, 8–10, 12, 14–17; Doe 14 Decl. ¶¶ 3–4, 6–12, 14–15; Doe 26 Decl. ¶¶ 3–10, 14–15; Doe 10 Decl. ¶¶ 3–8, 13–16), the District of Columbia

(Doe 5 Decl. ¶¶ 2–3, 7–10), Illinois (Doe 11 Decl. ¶¶ 2, 4–11, 13–15), Pennsylvania (Doe 3 Decl. ¶¶ 3, 5–11), and Florida (Doe 1 Decl. ¶¶ 2–3, 6, 9, 12), and include employees who were on pregnancy or parental leave (*e.g.*, Doe 17 Decl. ¶¶ 6–7, 10; Doe 8 Decl. ¶¶ 6–9; Doe 12 Decl. ¶¶ 3, 6; Doe 5 Decl. ¶¶ 2–3, 7–8), on medical leave or in disability-related treatment (*e.g.*, Doe 19 Decl. ¶¶ 13–15; Doe 6 Decl. ¶¶ 3–4, 7–9), who requested disability accommodations (*e.g.*, Doe 16 Decl. ¶¶ 3, 6–9, 12) and a senior leader with knowledge of the selection mechanism itself (Doe 18 Decl. ¶¶ 19–23).

Plaintiffs are properly joined under Federal Rule of Civil Procedure 20(a)(1). Their claims arise out of the same transaction, occurrence, or series of transactions or occurrences: a single, company-wide reduction in force, announced and executed on a common timetable (notification on May 20, 2026; separations scheduled to be finalized by July 22, 2026[4]) through a common, artificial-intelligence-assisted selection methodology applied uniformly across organizations, levels, and locations. Their claims also present questions of law and fact common to all of them—whether Meta's selection process used protected-leave or accommodation status, or proxies for either, as a negative factor; whether Meta tested the process for disparate impact; and whether the process produced an unjustified disparate impact. That common course of conduct and those common questions make joinder proper.

Because Meta conditions employment on an arbitration agreement containing class, collective, and representative-action waivers (*see* Section III), Plaintiffs do not seek to adjudicate the merits of their claims on a class-wide basis. They proceed as individually named, properly joined Plaintiffs and seek only the status-quo-preserving injunctive relief that Meta's own agreement reserves to this Court.

---

[4] And on or about August 20, 2026 for New York Plaintiffs..

## III.  LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish (1) likelihood of success on the merits, (2) likelihood of irreparable harm absent preliminary relief, (3) that the balance of equities tips in the plaintiff's favor, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In the Ninth Circuit, a plaintiff may also prevail by raising "serious questions going to the merits" where the balance of hardships tips sharply in the plaintiff's favor and the remaining *Winter* factors are met. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011). Because the requested relief preserves the status quo, it is prohibitory rather than mandatory and is reviewed under the ordinary standard. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). The audit and monitoring components are ancillary equitable machinery in aid of the prohibitory core, of a kind the Ninth Circuit routinely affirms in preliminary relief. *See Johnson v. Couturier*, 572 F.3d 1067, 1084–85 (9th Cir. 2009) (affirming preliminary injunction that included an asset freeze and an accounting); *Chalk v. United States Dist. Ct.*, 840 F.2d 701, 712 (9th Cir. 1988) (directing entry of a preliminary injunction affirmatively restoring the plaintiff to his position); *see also Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165–66 (9th Cir. 2011) (affirming preliminary injunctions issued in N.D. Cal under the ADA and finding irreparable harm where delay pending trial would cost the plaintiff "the loss of opportunity to pursue her chosen profession" and "precious, productive time irretrievably lost" (quoting *Chalk*, 840 F.2d at 710)). And even under the heightened standard, this is not a "doubtful case[]," the injuries at stake are not "capable of compensation in damages," and "extreme or very serious damage will result" absent relief—the loss of health coverage during active medical treatment, the extinguishment of time-bound statutory leave rights, and the forced departure of visa-dependent

---

employees from the United States. *Marlyn*, 571 F.3d at 879 (quoting *Anderson v. United States*, 612 F.2d 1112, 1114-15 (9th Cir. 1980)). Plaintiffs satisfy both formulations.

This Court is also the parties' agreed forum for the relief requested. Meta requires employees to execute a Mutual Arbitration Agreement as a condition of employment. Doe 16 Decl. ¶¶ 24 (describing arbitration agreement and class-action waiver executed through Meta's electronic-signature system at onboarding). That agreement expressly excludes from arbitration "claims for temporary or preliminary injunctive relief (including a temporary restraining order) in aid of arbitration or to maintain the status quo pending arbitration, in a court of competent jurisdiction in accordance with applicable law." *See, e.g.,* Doe 16 Decl. ¶ 24 & Ex. A (Meta_Lumen_01222–27). The relief Plaintiffs seek—preservation of the pre-May 20, 2026 status quo pending adjudication of the merits in whatever forum those claims proceed—falls squarely within that exclusion. Plaintiffs are contemporaneously filing demands for arbitration with the American Arbitration Association pursuant to the agreements Meta drafted; this Motion seeks only to preserve the status quo so that the arbitrators can render a meaningful award.

Nor does the agreement's class-, collective-, and representative-action waiver bar this Motion. Plaintiffs seek this preliminary injunction as individually named, properly joined parties under Federal Rule of Civil Procedure 20—not on behalf of a class—and seek only to preserve the status quo pending adjudication of the merits. The waiver therefore is not implicated by the primary relief Plaintiffs request. And to the extent Meta invokes the waiver against the alternative injunctive-class relief described in Section IV.F, the agreement commits any question concerning the validity of that waiver to this Court. Doe 16 Decl. Ex. A at Meta_Lumen_01224 ("Class, Collective or Representative Action Waiver").

## IV.  ARGUMENT

### A.  Plaintiffs Are Likely to Succeed on the Merits.

The Ninth Circuit and this District have long recognized that an employer may not use protected leave as a basis for termination, may not deploy facially neutral selection criteria that produce unjustified disparate impacts on protected groups, and may not avoid scrutiny by routing those decisions through an algorithm.  Plaintiffs are likely to succeed on five independent theories.  The two primary theories are addressed at length; the three additional theories supply independent and overlapping grounds for relief.

> *1.  FMLA interference: Meta used protected FMLA leave as a negative factor in its termination decisions.*

The FMLA entitles eligible employees to up to twelve workweeks of leave per year for qualifying medical and family reasons and to restoration to the same or an equivalent position upon return.  29 U.S.C. §§ 2612(a), 2614(a), 2615(a)(1).  Department of Labor regulations make the prohibition explicit: "employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; nor can FMLA leave be counted under 'no fault' attendance policies."  29 C.F.R. § 825.220(c).  The Ninth Circuit adopted this regulation as controlling in *Bachelder v. America West Airlines, Inc.*, 259 F.3d 1112 (9th Cir. 2001): a plaintiff need only prove by a preponderance that protected leave "constituted a negative factor" in the decision.  *Id.* at 1125.  This is not a but-for standard, not a motivating-factor standard, but a negative-factor standard: if protected leave entered into the calculus ***at all***, the employer has interfered.

A reduction in force does not change the analysis.  Courts have applied *Bachelder*'s reasoning to RIF selection decisions where a neutral metric was itself affected by protected leave.  *See Walker v. Verizon Pa. LLC*, 2017 WL 3675384 (E.D. Pa. Aug. 25, 2017) (upholding $454,000 jury verdict where employer's rate-and-rank RIF process selected plaintiff based on a

lowered performance score that reflected her prior FMLA leave), *appeal dismissed sub nom. Walker v. Verizon Servs. Corp.*, No. 17-3091, 2018 WL 11445452 (3d Cir. May 1, 2018); *Cutcher v. Kmart Corp.*, 364 F. App'x 183 (6th Cir. 2010) (triable issue where appraisal score dropped sharply following FMLA leave and was used to select plaintiff for national RIF).  The metric itself must be adjusted: courts hold that performance standards must be annualized or otherwise neutralized so that protected absence is not recorded as underperformance.  *See Pagel v. TIN, Inc.*, 695 F.3d 622, 629 (7th Cir. 2012) ("The FMLA does not require an employer to adjust its performance standards for the time an employee is actually on the job, but it can require that performance standards be adjusted to avoid penalizing an employee for being absent during FMLA-protected leave."); *Pecora v. ADP, LLC*, 232 F. Supp. 3d 1213, 1229 (M.D. Fla. 2017) ("[I]t was incumbent upon [d]efendant to ensure that the performance standards accommodated for [plaintiff's] statutorily protected absence and did not have the effect of penalizing him for taking FMLA leave."); *Gostola v. Charter Commc'ns, LLC*, 72 F. Supp. 3d 796, 802 (E.D. Mich. 2014) (granting summary judgment on FMLA interference claims for the employee where her performance evaluation included revenue data from the leave month); *Flores v. AT&T Corp.*, 2019 WL 5785095 (W.D. Tex. Nov. 6, 2019) (denying employer's motion for summary judgment on the employee's FMLA interference claim, highlighting affidavits wherein managers corroborated that the performance targets were unadjusted, negatively impacting the employees' evaluations and termination decisions).  No principled distinction permits employers to comply with the negative-factor rule in individual-discipline cases but evade it in mass-termination cases.  Meta's selection process violates the rule in the most direct possible way: by either intentional design or reckless disregard of the effects, the system penalizes employees who produced less output during the measurement window and rewards those who accumulated AI-token consumption, calibration sponsorship, roadmap ownership, and "strategic alignment"

signals.  An employee on twelve weeks of FMLA leave cannot, by definition, accumulate those signals at the rate of a continuously-present peer.

Patterns among the Plaintiffs reflect the penalty. One ████████ manager's 2024 performance review states that his reduction from a manager role to an individual-contributor role occurred upon his return from medical leave; he was later selected for termination sixteen days into a second approved medical leave. Doe 19 Decl. ¶¶ 7, 9–10. A ██████ engineer's manager attributed his lowered performance rating to the "broken time" during which a physical injury prevented him from working, stating in writing that there had not been "enough signals to gauge [him] operating at ic levels," that the period "does not count as leave of absence," and that "unlucky leaves happen," and telling him that the rating was "impossible" to change but that "it is what it is." Doe 6 Decl. ¶¶ 10–11. Long-tenured engineers and data scientists who had consistently met or exceeded expectations received the first lower ratings of their careers in the review cycle covering their protected medical or pregnancy leave. Doe 24 Decl. ¶¶ 4–6; Doe 17 Decl. ¶¶ 14, 16. Other employees were selected for termination while on approved protected leave and before any scheduled return, including employees on pregnancy, parental, and family-medical leave across multiple organizations and jurisdictions. Doe 8 Decl. ¶¶ 6–9; Doe 12 Decl. ¶¶ 3, 6; Doe 5 Decl. ¶¶ 3, 7–8. Employees understood the penalty well enough to forgo their rights: one senior employee, whose treating provider recommended FMLA leave in early 2026, deferred that leave out of a well-founded concern that an absence would be held against him—a concern the May 20 selections bore out—and an engineer deterred from a provider-approved medical leave by his manager's explicit threats was told, when he invoked Washington's statutory protection against including employees on paid leave in a mass layoff: "This is Meta—if the company wants something, they make it happen." Doe 18 Decl. ¶¶ 10–11; Doe 15 Decl. ¶¶ 18–19, 21. A director confirms the mechanism from the inside: he attests that

Meta announced an AI-enabled performance program called "Checkpoint" under which "employee AI adoption was going to be a core assessment metric," that Meta withheld the details of Checkpoint from employees "until after the May 20, 2026 reduction in force," and that he monitored his organization's AI-adoption dashboards "almost daily"—dashboards that "failed to distinguish employees' leave from lack of engagement." Doe 18 Decl. ¶ 22. Whether Meta's leadership labeled the protected-leave penalty "output," "AI-token usage," or "AI-native rating" does not change what the process does. *Cf. Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971) ("the Act proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation").

### 2. FEHA disparate impact: Meta's algorithmic selection violates the newly effective ADS regulations.

FEHA prohibits employers from discriminating against employees on the basis of sex (including pregnancy, childbirth, breastfeeding, and related medical conditions) and disability, reaching both intentional discrimination and the use of facially neutral selection criteria that produce a disparate impact without sufficient business-necessity justification. Cal. Gov't Code § 12940(a); *Jumaane v. City of Los Angeles*, 241 Cal. App. 4th 1390, 1404-05 (2015).

On October 1, 2025, the California Civil Rights Council's Employment Regulations Regarding Automated-Decision Systems ("ADS") took effect. 2 Cal. Code Regs. §§ 11008, 11008.1, 11017, 11020. These regulations make explicit what FEHA already required: an employer may not use an automated-decision system that produces unlawful discrimination, including disparate-impact discrimination. *Id.* § 11017(e). An ADS is defined as "a computational process that makes a decision or facilitates human decision making regarding an employment benefit" that "may be derived from and/or use artificial intelligence, machine-learning, algorithms, statistics, and/or other data processing techniques." *Id.* § 11008.1(a). The regulations reach any "employment benefit," a term that expressly includes

"freedom from . . . discharge from employment," and "any other favorable term, condition or privilege of employment," *id.* §§ 11008.1(a), 11008(h), *see id.* § 11017(e), and any "employment practice," meaning "[a]ny act, omission, policy or decision of an employer . . . affecting any of an individual's employment benefits," *id.* § 11008(i). Meta's constellation of internal AI systems that facilitated leadership's decisionmaking falls squarely within this definition. The regulations identify the use of "proxies" for protected characteristics as a basis for liability, *id.* § 11008(l) (proxy is a characteristic "closely correlated with a basis protected by the Act"), and make an employer's failure to conduct adequate anti-bias testing relevant to liability, *id.* § 11020(b)(i). *Mobley v. Workday, Inc.*, 740 F. Supp. 3d 796 (N.D. Cal. 2024) (Lin, J.), is the leading authority in this District on algorithmic disparate impact, sustaining disparate-impact claims against an ADS vendor; the court subsequently granted preliminary certification of a nationwide ADEA collective. *See Mobley v. Workday, Inc.*, 2025 WL 1424347 (N.D. Cal. May 16, 2025).

Meta's selection process violates these regulations in at least four independent respects. First, pregnancy disability leave is, by definition, taken only by employees who experience pregnancy-related disability; an algorithmically assisted selection process that penalizes PDL time disproportionately disadvantages women. Cal. Gov't Code §§ 12945, 12926(m), (r); *see Young v. United Parcel Serv., Inc.*, 575 U.S. 206 (2015). Second, pregnancy-related leave and pregnancy-related absences are taken disproportionately or exclusively by women; the account of one Meta data scientist whose performance rating dropped in the cycle covering her pregnancy-related leave, and who was selected while on approved pre-birth leave two days before she gave birth, illustrates how the algorithmically assisted selection process penalizes pregnancy-related absence, as do the selections, while on pregnancy or parental leave, of additional female employees and of employees of both sexes who had taken family-care leave. Doe 17 Decl. ¶¶ 6–7, 10, 14, 16; Doe 8 Decl. ¶¶ 7–9; Doe 12 Decl. ¶¶ 3, 6; Doe 5 Decl. ¶¶ 2,

7–9; *see also, e.g.*, Doe 14 Decl. ¶¶ 6–12. Third, on information and belief, Meta did not adequately test the selection model for disparate impact on pregnant employees, PDL-takers, or employees with caregiving responsibilities, an omission directly relevant under § 11020(b)(i). Fourth, on information and belief, Meta relies on third-party ranking, calibration, and second-brain vendors subject to ADS liability as "agents." 2 Cal. Code Regs. § 11008(a), (e)(3). Even assuming a legitimate interest in reducing headcount, Meta could have adopted a less-discriminatory alternative: neutralizing the protected-leave window from each input metric and evaluating leave-takers as if continuously present. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425 (1975). The availability of that alternative defeats any business-necessity defense.

### 3. Additional independent grounds for relief.

*CFRA interference.* The California Family Rights Act mirrors and in important respects expands upon the FMLA, prohibiting discharge or discrimination because of the exercise of CFRA leave rights. Cal. Gov't Code § 12945.2(k)(1), (q). California courts apply the same negative-factor framework *Bachelder* articulated for the FMLA. *Soria v. Univision Radio L.A., Inc.*, 5 Cal. App. 5th 570, 601 (2016). CFRA also reaches a broader range of protected leave than the FMLA, including leave to care for a parent-in-law, grandparent, grandchild, sibling, or designated person. Cal. Gov't Code § 12945.2(b). For the reasons in Section IV.A.1, Meta's selection process uses protected CFRA leave as a negative factor. *See* Doe 8 Decl. ¶¶ 6–10; Doe 19 Decl. ¶¶ 15–18; Doe 24 Decl. ¶¶ 7–9.

*FEHA and ADA disability discrimination and failure to accommodate.* FEHA and the ADA prohibit discrimination against qualified individuals with disabilities and require reasonable accommodations. Cal. Gov't Code §§ 12940(a), (m); 42 U.S.C. §§ 12112(a), (b)(5). Meta's selection process violates these provisions in two ways. First, the process produces a disparate impact on employees with disabilities, whose conditions often manifest in altered

---

work-pattern signals (intermittent absences, reduced output, accommodation-driven changes) that Meta's monitoring-driven system records as reduced productivity. An engineer's manager tied his lowered rating directly to the injury-related time he was unable to work, demonstrating the penalty in operation. Doe 6 Decl. ¶¶ 9-12. Second, the temporal proximity between one witness's February 20, 2026 disclosure of her █████ diagnosis and her first-ever "Meets Most" rating approximately eleven days later, together with the three-month time-limited accommodation for a permanent disability, the five-week delay in acting on her accommodation request, and her selection for termination roughly two weeks after she submitted a formal discrimination complaint, supplies a prima facie case for disparate treatment, retaliation, and failure to accommodate. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see* Doe 16 Decl. ¶¶ 20-23; *see also* Doe 6 Decl. ¶¶ 14 (HR complaint regarding disability-based rating never resolved).

*Title VII disparate impact: pregnancy and sex.* Title VII prohibits practices that produce a disparate impact on the basis of sex, including pregnancy. 42 U.S.C. §§ 2000e-2(a), (k); Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k). PDL is taken exclusively by women; miscarriage-related bereavement leave, first-trimester sick days, and post-partum bonding leave are taken predominantly by women. A process that systematically downgrades employees who took such absences will, predictably and as a structural matter, fall more heavily on women than men. *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 990-91 (1988). The pattern is borne out among the named Plaintiffs: in one organization, the █████ scientist selected while on pre-birth leave was one of three selected out of approximately twenty-five, two of whom were on pregnancy- or birth-related leave, Doe 17 Decl. ¶ 14; in another, an entire team of women, including the employee who was on parental leave, was selected while a male peer absorbed her duties, Doe 12 Decl. ¶ 15; in another, the sole team member selected was the pregnant employee then on disability leave, Doe 5 Decl. ¶¶ 9-10. At this preliminary injunction stage, Plaintiffs

need only show a likelihood of success or serious questions; the structural design of the selection process supplies that precise showing.

>    *4. The federal theories reach every Plaintiff; the non-California Plaintiffs are independently protected by their own States' law.*

The federal theories set out above—FMLA interference under the negative-factor rule (Section IV.A.1), and Title VII/PDA and ADA disparate impact and discrimination (Section IV.A.3)—apply to every joined Plaintiff regardless of work location, because the FMLA, Title VII, the Pregnancy Discrimination Act, the ADA, and the Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg *et seq.*, are nationwide statutes. The Court may therefore grant the requested status-quo relief on a uniform federal basis common to all Plaintiffs. The California statutory theories (FEHA, CFRA, PDL, and the ADS regulations, Sections IV.A.2–.3) apply to the Plaintiffs who worked in California. *See, e.g.,* Doe 6 Decl. ¶¶ 1, 3; Doe 24 Decl. ¶¶ 1, 3; Doe 8 Decl. ¶¶ 1, 3; Doe 21 Decl. ¶¶ 1, 3. The Plaintiffs who worked outside California are independently protected by their own jurisdictions' analogues, each of which applies a standard at least as protective as federal law.

**Washington.** The Washington Law Against Discrimination, RCW ch. 49.60, prohibits disability discrimination and failure to accommodate (§ 49.60.180) and sex and pregnancy discrimination, and is construed more broadly than its federal counterparts. *State v. City of Sunnyside*, 550 P.3d 31, 51 (Wash. 2024) ("The WLAD demands liberal construction in order to effectuate its purposes of preventing and eliminating discrimination."); *Frisino v. Seattle Sch. Dist. No. 1*, 160 Wash. App. 765, 777, 249 P.3d 1044, 1049 (2011) (WLAD requires an employer to reasonably accommodate an employee with a disability absent undue hardship). Washington's Paid Family and Medical Leave Act, RCW Title 50A, separately prohibits retaliation against employees for exercising or attempting to exercise rights under the program. RCW 50A.40.010(1)(a); *see also* RCW 50A.40.035; RCW 50A.40.040; RCW 50A.05.125; RCW

49.45.060. These provisions reach the Washington Plaintiffs' disability, accommodation, pregnancy, and protected-leave claims. Doe 17 Decl. ¶¶ 1, 3, 7, 10–12, 14; Doe 16 Decl. ¶¶ 1, 3, 6, 9, 17–18, 23; Doe 20 Decl. ¶¶ 3, 5–6, 8–13; Doe 18 Decl. ¶¶ 3–4, 8–11.

**New York.** The New York State Human Rights Law, N.Y. Exec. Law § 296, and—for New York City worksites—the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107, prohibit pregnancy, sex, and caregiver discrimination and are construed liberally and more broadly than Title VII. N.Y. Exec. Law § 300 (reflecting amendment to NYSHRL as construing state anti-discrimination law "liberally for the accomplishment of the remedial purposes thereof" even when provisions worded similarly to federal law); *Syeed v. Bloomberg L.P.*, 41 N.Y.3d 446, 451-52 (2024) (reaffirming need to construe the Human Rights Laws "broadly in favor of discrimination plaintiffs, to the extent that such a construction is reasonably possible"); *Chauca v. Abraham*, 30 N.Y.3d 325 (2017) (confirming the "uniquely broad and remedial purposes" and liberal construction of the New York City Human Rights Law). New York Paid Family Leave provides separate anti-retaliation protection. N.Y. Workers' Comp. Law § 120; § 203-a (applying the anti-retaliation protections of § 120 to family leave); § 203-b (reinstatement requirement). New York City law explicitly codifies that decisions with a discriminatory disparate impact are illegal. N.Y.C. Admin. Code § 8-107(17). These provisions reach the New York Plaintiffs' pregnancy, disability, and leave claims. Doe 12 Decl. ¶¶ 3, 8–16; Doe 14 Decl. ¶¶ 3–4, 6–12; Doe 26 Decl. ¶¶ 3–10; Doe 10 Decl. ¶¶ 3–8, 13–16.

**District of Columbia.** The D.C. Human Rights Act, D.C. Code § 2-1402.11, prohibits pregnancy and disability discrimination. The District of Columbia Plaintiff is protected under statutes with no minimum-tenure threshold: the federal Pregnant Workers Fairness Act, 42 U.S.C. § 2000gg, the PDA, and the ADA, in addition to the DCHRA. Doe 5 Decl. ¶¶ 2–3, 7–9.

---

**Florida.** The Florida Civil Rights Act, Fla. Stat. § 760.10, prohibits pregnancy and sex discrimination, supplementing the Florida Plaintiff's federal Title VII/PDA, FMLA, and ADA claims. Doe 1 Decl. ¶¶ 3, 6–12.

**Illinois.** The Illinois Human Rights Act, 775 ILCS 5/1-101 *et seq.*, 5/2-102, prohibits disability discrimination and requires reasonable accommodation and a good-faith interactive process, and reaches the disability and protected-leave claims of the Illinois Plaintiff. Doe 11 Decl. ¶¶ 2, 5–13.

**Pennsylvania.** The Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.*, § 955(a), prohibits disability discrimination and, as construed coextensively with the ADA, requires reasonable accommodation and a good-faith interactive process; it reaches the disability, accommodation, and protected-leave claims of the Pennsylvania Plaintiff. Doe 3 Decl. ¶¶ 3, 5–11.

Because every Plaintiff asserts at least one federal claim common to the group, and the state-law claims travel with each Plaintiff's own jurisdiction, joinder is proper under Rule 20 and the Court may grant uniform federal status-quo relief while the individualized state-law claims proceed within their respective frameworks.

### B. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief.

Irreparable harm is harm that cannot adequately be remedied by money damages. *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Although ordinary employment-termination cases generally proceed at law because back pay and reinstatement can make plaintiffs whole, *Sampson v. Murray*, 415 U.S. 61, 89-92 (1974), this is the "genuinely extraordinary situation" *Sampson* preserved, *id.* at 92 n.68, in which several distinct categories of harm cannot be undone after the fact. *Chalk*, 840 F.2d at 709–10 (reversing denial of preliminary relief where the employee's "emotional and psychological" injury was "immediate," could not "be adequately compensated for by a monetary award after

trial," and a "delay, even if only a few months, pending trial represent[ed] precious, productive time irretrievably lost to him"); *see also Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. & Budget*, 807 F. Supp. 3d 1004, 1040–41 (N.D. Cal. 2025) (Illston, J.) (although arising under the APA, holding that a mass reduction in force "so far depart[s] from the normal situation" *Sampson* contemplated, because *Sampson* concerned "the potential loss of income of one individual employee," not "the widespread termination of salaries and benefits for individuals, families, and communities with severe, far-reaching repercussions"). Five categories of harm support the requested relief.

First, loss of employer-sponsored health insurance is irreparable. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000); *Diaz v. Brewer*, 656 F.3d 1008, 1013-14 (9th Cir. 2011) (affirming preliminary injunction premised on loss-of-coverage harm); *see also Whitfield v. Noem*, No. 2:25-cv-04499-HDV-PDx, Dkt. 151 at 2–3 (C.D. Cal. July 2, 2026) (following remand from the 9th Circuit identifying the correct test for an ordinary prohibitory injunction—the same as requested here—enjoining employer from effectuating employee's noticed-but-not-final removal where termination before adjudication of ADA and Rehabilitation Act accommodation claims would cost the plaintiff "all his income, healthcare, and other benefits," "imminent and irreparable harm"). Among the named Plaintiffs are: (i) an engineer who is on medical leave and in active, intensive treatment, whose continued treatment depends on Meta-sponsored coverage, Doe 24 Decl. ¶¶ 8–9, 16, 17; (ii) a ▮▮▮▮▮ manager who was selected while on medical leave and who remains in active treatment for a serious chronic health condition that requires ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Doe 19 Decl. ¶¶ 17, 25, 27; (iii) a ▮▮ scientist who has just given birth and needs ongoing medical care for herself and her newborn, Doe 17 Decl. ¶¶ 2,

12; (iv) an employee who gave birth in June 2026, weeks after her selection, and needs continued coverage for herself and her newborn, Doe 5 Decl. ¶¶ 2, 8, 15; (v) an employee with a recently operated ███████████████████████████████ anticipates further surgery, Doe 6 Decl. ¶¶ 9, 16, 22; (vi) an ████ employee with ████ ████████ ██████████████████ through Meta's health plan and whose spouse depends on her Meta-sponsored coverage, Doe 16 Decl. ¶¶ 6, 21, 26, 29; and (vii) an employee who receives ████████████ and is the primary earner for a family that depends on her coverage following the recent birth of her child, Doe 12 Decl. ¶¶ 21–22; *see also* Ex. B. Meta's severance offer does not mitigate this harm; it makes use of it. The only subsidized continuation coverage Meta has offered is conditioned on each Plaintiff signing a separation agreement releasing the very claims at issue in this action, *see* Doe 12 Decl. Ex. B (Summary of Key Terms)—so a new mother, a plaintiff in active medical treatment, and a plaintiff weeks postpartum face a choice between uninterrupted medical care and pursuing their employment claims in arbitration, *see* Doe 26 Decl. ¶ 16; Doe 1 Decl. ¶ 16; Doe 5 Decl. ¶ 15; *see also* Doe 19 Decl. ¶¶ 25, 27. For each, loss of coverage will mean immediate disruption of treatment for serious health conditions, the very harm Congress enacted the FMLA to prevent.

Second, the loss of the protected leave time itself, together with the statutory leave-reinstatement rights, constitutes irreparable harm. The FMLA, CFRA, and PDL do not merely protect income; they protect "the entitle[ment of] employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." 29 U.S.C. § 2601(b)(2); Cal. Gov't Code §§ 12945, 12945.2. These statutory windows are time-bound and not tollable: the FMLA's twelve-week entitlement must be exercised within a fixed twelve-month period, 29 U.S.C. § 2612(a)(1); CFRA bonding leave must be taken within twelve months of the child's birth or placement, Cal. Gov't Code § 12945.2(a), 2 Cal. Code Regs. § 11090(d); and PDL protection attaches only to

current employees disabled by pregnancy or childbirth, Cal. Gov't Code § 12945.  Once Meta separates a leave-taker, no subsequent monetary judgment can re-create the protected leave time itself, and the statutory restoration right, 29 U.S.C. § 2614(a), is functionally extinguished, particularly where the role has been redistributed, eliminated, or replicated by a second-brain AI agent the leave-taker was required to train.  This is the heartland of *Chalk*'s teaching that time itself can be the irreparable asset—"precious, productive time irretrievably lost."  840 F.2d at 710.  Among the named Plaintiffs, one is on medical leave and in intensive treatment that her physician has determined must occur during this leave period, Doe 24 Decl. ¶¶ 8–9, 16; one was on approved pre-birth leave and gave birth two days after her selection, such that her bonding-leave and reinstatement rights will be extinguished by termination, Doe 17 Decl. ¶¶ 2, 10–12; one was selected sixteen days into a medical leave, with a separation date set four days before that leave was scheduled to end, Doe 19 Decl. ¶¶ 17–18; one expected to return from maternity leave in the fall but will lose that reinstatement right, Doe 8 Decl. ¶¶ 8, 12; one was selected while on parental leave, with the statutory leave she had remaining effectively consumed by the notice period, Doe 12 Decl. ¶ 16; and one was selected two days into a pre-birth disability leave that was scheduled to run through late 2026, Doe 5 Decl. ¶¶ 8–9. An arbitration decision in three years cannot give these Plaintiffs back the time the FMLA, CFRA, PDL, and FEHA were enacted to protect.

Third, loss of unvested equity compensation, which forms a substantial portion of compensation for many Meta employees, creates uniquely difficult valuation problems not adequately captured by back pay.  Unvested RSUs are contingent rights not directly recoverable as earned wages until vesting.  *Schachter v. Citigroup, Inc.*, 47 Cal. 4th 610 (2009); *IBM v. Bajorek*, 191 F.3d 1033, 1039 (9th Cir. 1999). The forfeitures here are substantial and, in several cases, are timed to fall just after separation: one engineer holds unvested RSUs valued at approximately $██████ including approximately $██████ scheduled to vest on August 15 and

November 15, 2026—after her separation, Doe 24 Decl. ¶ 16; a ▓▓▓▓▓ manager holds unvested RSUs valued at approximately $▓▓▓▓ Doe 19 Decl. ¶ 26; a ▓▓▓ engineer holds a new-hire equity grant valued at approximately $▓▓▓ over four years, including units scheduled to vest in the period around his termination date, Doe 6 Decl. ¶ 21; a ▓▓▓▓ manager holds approximately $▓▓▓ to $▓▓▓ in unvested RSUs from an initial grant valued at approximately $▓▓▓ Doe 12 Decl. ¶ 20; and a director offered a $▓▓▓ severance stands to forfeit ▓▓▓▓ in unvested RSUs, Doe 18 Decl. ¶ 25. Termination timed to defeat imminent vesting is independently actionable as opportunistic conduct violating the implied covenant of good faith and fair dealing, and supports equitable intervention before the forfeiture becomes final.  See *McCollum v. Xcare.net, Inc.*, 212 F. Supp. 2d 1142, 1152–56 (N.D. Cal. 2002); *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir. 1987) (holding that firing an employee on the eve of his bonus vesting may be opportunistic behavior of the kind that violates the implied covenant of good faith); *Kelly v. Stamps.com Inc.*, 135 Cal. App. 4th 1088, 1102–04 (2005) (triable issue where pregnant employee was terminated two months before a promised bonus payment).

Fourth, for Plaintiffs whose lawful presence in the United States depends on Meta-sponsored employment visas, separation triggers immigration consequences that no monetary judgment can remedy. Four named Plaintiffs hold employment-based nonimmigrant visas sponsored by Meta. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Upon cessation of employment, each is left with, at most, a single discretionary grace period of up to sixty days—or the remainder of the authorized validity period, whichever is shorter—in which to secure new sponsored employment, change status, or depart the United States, and during which the regulation bars them from working at all without new sponsorship. 8 C.F.R. § 214.1(l)(2). Separation itself starts that clock. ▓▓▓▓▓▓▓▓. A Plaintiff forced to depart the country cannot meaningfully participate in this litigation or arbitration of the merits, and the

statutory restoration right, 29 U.S.C. § 2614(a), becomes a practical impossibility from abroad: back pay does not restore lawful status, and no damages award returns a family to the country. Like the time-bound leave rights addressed above, this harm follows automatically from separation and is irreversible once it occurs—once a Plaintiff is forced to depart, reinstatement itself may become impossible.

Fifth, once Meta executes a mass termination and disperses the affected workforce, the practical ability to undo that decision deteriorates rapidly. Roles will be eliminated, redistributed, or backfilled; teams reorganized; replacement hires made. Without early judicial review, protected-leave and disability-accommodation rights become practically unenforceable after mass terminations are finalized. Adding to this, employee output captured by Meta's AI systems—including the Metamate tool, the "second brain" agents, shared analytics "recipes" or "team brains," and coding tools that ingested employees' work product and communications—will continue to operate after the employee's separation, effectively transferring the employee's professional value to Meta without continuing employment or compensation. Doe 19 Decl. ¶ 20; Doe 8 Decl. ¶ 13; Doe 24 Decl. ¶ 13; Doe 12 Decl. ¶ 18; Doe 5 Decl. ¶ 11; Doe 6 Decl. ¶ 20; Doe 18 Decl. ¶¶ 23; Doe 15 Decl. ¶¶ 3–4.  This is precisely the situation in which the Ninth Circuit's preliminary-injunction frame operates: where the law affords a right that money damages cannot vindicate after the fact.

These harms are concrete, particularized, and imminent.  Layoff notifications were issued on May 20, 2026. On information and belief, separations will be finalized on or about July 22, 2026 for most Plaintiffs; on or about July 30, 2026 for Doe 1; and on or about August 20, 2026 for the New York Plaintiffs Doe 12, Doe 10, Doe 14, and Doe 26. *See, e.g.,* Doe 12 Decl. ¶ 14 & Ex. A (Meta Notification Letter, May 20, 2026).

### C. The Balance of Equities Tips Sharply in Plaintiffs' Favor.

The balance-of-equities inquiry weighs the harm Plaintiffs will suffer if the injunction is denied against the harm Meta will suffer if it is granted. *Winter*, 555 U.S. at 24. Plaintiffs' side of the ledger is set out above: loss of employment, healthcare, vesting equity, statutory reinstatement rights, and the protected leave time itself, falling on the named Plaintiffs and their families, including those currently on medical leave, currently pregnant, and currently relying on disability accommodations. Meta's side of the ledger consists of, at most, a delay in completing a workforce-reduction plan and modest administrative cost to a company which has posted record first-quarter 2026 results, with revenue up 33% year-over-year to $56.31 billion and net income increasing 61% to $26.77 billion, particularly where the alternative Meta has constructed requires Plaintiffs to release their claims as the cost of continued health coverage. Meta retains the absolute right to reduce its workforce; nothing in the requested injunction prohibits Meta from doing so. The injunction merely requires Meta to do so in a manner that does not violate federal and state laws.

Where, as here, an injunction requires a defendant only to comply with the law, the defendant suffers no cognizable hardship. *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *Z Channel Ltd. P'ship v. Home Box Office, Inc.*, 931 F.2d 1338, 1342 (9th Cir. 1991). Meta's interest in carrying out a particular RIF process, a process designed and executed in the way it chose, does not outweigh the rights of leave-takers and accommodation-seekers protected by the FMLA, CFRA, FEHA, ADA, and Title VII. Meta's own decision to keep the selection criteria and process secret from employees deprived them of any chance to identify or mitigate the risk that their protected leave or accommodation status was being counted against them—an information asymmetry of Meta's own making that weighs against, not for, denying relief.

Meta's framing for investors further undermines any claim of hardship: leadership described the RIF as a capital reallocation toward artificial-intelligence investment, reporting that

the company posted increasing profits in the first quarter of 2026, with revenue hitting $56.31 billion.[5] A ▮▮▮▮▮▮▮▮▮▮▮▮ within Meta's ▮▮▮▮▮▮▮ organization confirms that Meta incorporated an approximately $10 billion reduction attributable to the layoffs into its financial forecasts. Doe 18 Decl. ¶ 21. An injunction requiring Meta to ensure that its algorithmic selection process does not itself violate the law cannot be characterized as a meaningful burden on a company simultaneously celebrating its AI investment and record results.

The narrower form of relief Plaintiffs propose as a fallback further reduces any hardship to Meta. Under that narrower injunction, Meta could complete its RIF for all employees other than those who took protected leave, attempted to take protected leave and suffered leave interference, or requested a disability accommodation in the prior twenty-four months. Meta would be required only to pause and individually review the much smaller subset of leave-takers and accommodation-seekers, conduct the leave-neutralization audit that the law already requires, and not proceed with the termination of any leave-taker or accommodation-seeker whose selection cannot be justified on leave-neutral and accommodation-neutral grounds. Meta has no cognizable interest in resisting that limited and law-compliant pause.

### D. An Injunction Is in the Public Interest.

When the United States is not a party, the public-interest inquiry primarily addresses whether the injunction will benefit or harm non-parties. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009). Two distinct public interests support the requested relief.

First, the public interest favors enforcement of federal and state anti-discrimination law. *Chalk*, 840 F.2d at 711. Congress enacted the FMLA to allow employees "to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition," a public-interest determination of the highest order. 29 U.S.C. § 2601(b)(2). The California Legislature reached the same conclusion with

---

[5] *See supra* note 1.

respect to the CFRA, FEHA, the Pregnancy Disability Leave Law, and the recently effective ADS regulations.  Cal. Gov't Code §§ 12940, 12945, 12945.2; 2 Cal. Code Regs. §§ 11008, 11008.1, 11017, 11020.  Allowing those rights to be effectively nullified by an algorithmically assisted selection process, in which the very act of exercising protected leave or requesting an accommodation becomes the basis for selection, would undermine the public-interest determinations Congress and the Legislature have already made.

Second, the broader public has a substantial interest in the lawful deployment of artificial intelligence in employment decision-making. This case presents a national rule-setting moment. AI-mediated employment decisions are increasingly common, and California has, through its newly effective ADS regulations, taken a leading role in ensuring that those decisions do not become a vector for the kind of disparate-impact discrimination that civil-rights law has long prohibited. 2 Cal. Code Regs. §§ 11008, 11008.1, 11017, 11020 (eff. Oct. 1, 2025). An injunction here vindicates the public interest in ensuring that those regulations have practical effect. Conversely, denying the injunction would signal to employers that an algorithmically assisted performance system, fed by ubiquitous workforce-monitoring data captured without meaningful notice or consent, Doe 12 Decl. ¶ 19; Doe 5 Decl. ¶ 12; Doe 16 Decl. ¶ 26, can be used to make termination decisions affecting thousands of employees, including thousands of leave-takers and disability-accommodation-seekers, without the kind of pre-implementation audit that the law requires. That outcome would not be in the public interest.

### E. The Scope of the Requested Relief Is Properly Tailored.

Plaintiffs request, as primary relief, an order preserving the status quo as to the named Plaintiffs—enjoining Meta from separating, terminating, or altering the compensation, benefits, equity vesting, or protected leave status of the named Plaintiffs pending an independent audit of the algorithmically assisted selection process and resolution of the merits in the proper forum. This relief is narrow, runs only to the twenty-six named Plaintiffs, and falls squarely within the

injunctive carve-out of Meta's own arbitration agreement. In the alternative, and on behalf of a provisionally certified Rule 23(b)(2) injunctive class (*see* Section IV.F), Plaintiffs request a cohort-wide order enjoining Meta from finalizing the termination of any employee who took, requested, or was approved to take statutorily protected leave (FMLA, CFRA, PDL, or analogous protected leave), who attempted to take statutorily protected leave and suffered leave interference, or who requested or received a reasonable accommodation for a disability, at any point during the twenty-four months preceding the announcement; Meta would be permitted to proceed with the balance of the RIF. During the pendency of either form of relief, an independent auditor approved by the Court would (i) examine the inputs, weights, and outputs of the selection process; (ii) determine whether protected-leave status, accommodation status, or any proxy was used as an input; (iii) recompute selection using leave-neutralized inputs (treating each leave-taker as if she had been continuously present and continuously full-output); and (iv) identify any leave-taker or accommodation-seeker whose selection cannot be justified on leave-neutral and accommodation-neutral grounds, to be retained pending further order. Both forms of relief require Meta to do only what the law already requires and are appropriately tailored under Federal Rule of Civil Procedure 65(d).

### F. The Named Plaintiffs Are Properly Joined; In the Alternative, Provisional Injunctive-Class Certification is Warranted for the Disparate-Impact Claim.

The relief Plaintiffs primarily seek—preservation of the status quo as to the named Plaintiffs pending an audit and the merits—requires no class certification. *See* Section II.E. The Court may grant the requested status-quo relief on behalf of the joined Plaintiffs without certifying any class.

To the extent Plaintiffs seek to extend injunctive relief to the broader cohort of leave-takers and accommodation-seekers, the Court may provisionally certify a Rule 23(b)(2) injunctive-only class for the limited purpose of the disparate-impact and process claims. The

Ninth Circuit permits provisional Rule 23(b)(2) certification for the purpose of entering preliminary injunctive relief where the Rule 23 requirements are likely to be met. *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1041-43 (9th Cir. 2012); *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010). Certification under (b)(2) is appropriate because Meta "acted or refused to act on grounds that apply generally to the class"—a single selection methodology applied cohort-wide—and the relief sought (audit, leave- and accommodation-neutralization, and preservation pending review) is indivisible and would apply uniformly. Fed. R. Civ. P. 23(b)(2). The Rule 23(a) requirements are likely satisfied for that limited class. *Numerosity*: Meta's EDD filings reflect approximately 3,468 separations in California alone, with the protected-leave and accommodation subset numbering in the hundreds. *Commonality*: every cohort member's disparate-impact claim turns on the same questions, whether Meta's algorithmically assisted selection process used protected leave or accommodation activity as a negative factor, whether the process was tested for disparate impact, and whether it produced unjustified disparate impact. *Typicality and adequacy*: the named Plaintiffs' claims arise from the same process and theory that would apply cohort-wide, and Plaintiffs have retained experienced counsel without conflicts.

Neither the arbitration agreement nor its class-action waiver bars this limited relief. As explained in Section III, the status-quo relief falls within the arbitration agreement's express carve-out, and the validity of the class waiver is committed to this Court. Should the Court provisionally certify the injunctive class, a formal motion addressing certification of that limited class will follow on the ordinary schedule.

## V.  THE COURT SHOULD WAIVE OR MINIMIZE THE BOND REQUIREMENT.

Federal Rule of Civil Procedure 65(c) commits the bond amount, including whether to require any bond at all, to the Court's discretion. *Couturier*, 572 F.3d at 1086. A bond should be waived or minimized here for three reasons.

First, the requested injunction merely requires Meta to comply with federal and state civil-rights statutes; an order requiring compliance with the law imposes no compensable harm. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."). Meta cannot make the required showing of likely harm, *see Jorgensen*, 320 F.3d at 919–20 ("Without a showing that some harm is more likely absent the posting of a security bond, we cannot say that the district court . . . abused its discretion by not ordering a bond."): maintaining twenty-six employees in the status quo is de minimis against $26.77 billion in quarterly net income, *see supra* Section II.A, and by Meta's own severance formula these separations extinguish far more than they cost, *see* Doe 18 Decl. ¶ 25. Second, the equities of this case, a sophisticated multi-hundred-billion-dollar employer on one side, individual employees and their families on the other, weigh heavily against requiring Plaintiffs to post substantial security. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005); *People ex rel. Van de Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325-26 (9th Cir. 1985). Third, requiring twenty-six individual employees—including Plaintiffs presently on medical leave (Doe 24 Decl. ¶¶ 2, 9; Doe 19 Decl. ¶ 17; Doe 3 Decl. ¶ 9), Plaintiffs caring for newborns weeks after giving birth (Doe 17 Decl. ¶¶ 2, 12; Doe 5 Decl. ¶¶ 2, 8; Doe 1 Decl. ¶ 2), and Plaintiffs who are the primary or sole earners for their families (Doe 5 Decl. ¶ 15; Doe 12 Decl. ¶ 21; Doe 16 Decl. ¶ 29; *see also* Doe 19 Decl. ¶ 27 (sole legal parent))—to post substantial security as the price of relief against one of the largest companies in the world would effectively deny them access to the very remedy Rule 65 provides. The Court "has discretion to dispense with the security requirement, or to request mere nominal security, where requiring security would effectively deny access to judicial review." *Save Our Sonoran*, 408 F.3d at 1126 (quoting *Van de Kamp*, 766 F.2d at 1325); *see Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999) (affirming $1,000 nominal bond where the movants' financial means were limited

and the litigation served the public interest); *cf. GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1211 (9th Cir. 2000) (declining to increase a bond where doing so "would risk denying [the plaintiff] access to judicial review").

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant a preliminary injunction preserving the status quo as to the named Plaintiffs—enjoining Meta from separating, terminating, or altering the compensation, benefits, equity vesting, or protected-leave status of the named Plaintiffs pending an independent audit of the algorithmically assisted selection process and resolution of the merits in the proper forum—or, in the alternative and on behalf of a Rule 23(b)(2) injunctive class, enjoining Meta from separating any employee who took or requested statutorily protected leave, attempted to take statutorily protected leave and suffered leave interference, or requested a disability accommodation within the prior twenty-four months pending such audit and a Court-supervised neutralization process; an order requiring Meta to preserve all data, models, training data, decision logs, calibration materials, workforce-planning documents, monitoring data, second-brain training inputs and outputs, AI-token-usage dashboards, and communications relating to the RIF and the algorithmic selection process; waiver of the bond requirement or imposition of a nominal bond; and such further relief as the Court deems just and proper.

DATED: July 12, 2026

Respectfully submitted,

**LUMEN LAW CENTER, P.C.**
**WORKPLACE ADVOCATES, P.C.**
**HOULDING LAW PC**

By: *Andrea Mazingo*
Andrea Mazingo
Barbara E. Cowan
Rebecca Houlding (*pro hac vice* pending)

*Attorneys for Plaintiffs*