Andrea Mazingo, SBN 300824
Lumen Law Center, P.C.
8605 Santa Monica Blvd PMB 832031
West Hollywood, CA 90069
Telephone: (310) 269-6739
Email: andi@lumenlawcenter.com

Barbara E. Cowan, SBN 251942
Workplace Advocates, P.C.
9431 Haven Avenue, Suite 100
Rancho Cucamonga, CA 91730
Telephone: (909) 983-4102
Email: brandi@wpa.law

Rebecca Houlding *(pro hac vice pending)*
Houlding Law PC
431 Classon Avenue, Suite 1B
Brooklyn, NY 11238
Telephone: (646) 561-9119
Facsimile: (800) 345-4784
Email: rebecca@houldinglaw.com

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| Does 1 through 26 et al., <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. | Case No. _____ <br><br> **DECLARATION OF Doe 25 IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> *[Filed concurrently with Plaintiffs' Notice of Motion and Motion for Preliminary Injunction; Memorandum of Points and Authorities; and additional supporting declarations]* |

I, Doe 25 declare as follows:

1. I am over the age of eighteen and a resident of _____, California. I have personal

    knowledge of the matters stated in this declaration, except as to those matters stated on

Doc ID: 707877c5aea34586aab28ce79d832044422060e4

information and belief, and as to those matters I believe them to be true. If called as a witness, I could and would testify competently to the matters set forth below.

2. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I am one of the Meta employees who was selected for termination in Meta's May 2026 reduction in force. In the months before I was selected, I took protected leave ███████ ████████████████████████████████████████████████ and during the review period that covered that leave I received the first performance rating below "Exceeds Expectations" ██████████████ at Meta.

3. I began my employment with Meta Platforms, Inc. ("Meta") on ████████████████ My most recent position was ████████████████████ in Meta's ████████████████ ██████████ organization, which is responsible for ████████████████████████████ ████████████████████████████████████ across Meta's products. I worked from Meta's offices in ██████████ California for most of my tenure ██████ ███████████████████████████████████████████████ ████████████

4. In my role, ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████ I built working relationships across many teams and brought people together to collaborate, and I was an early adopter of Meta's internal artificial-intelligence tools who helped mentor others in their use.

Doc ID: 707877c5aea34586aab28ce79d832044422060e4

5.  My manager was ███████████████████████████████████ ████████████████████ My skip-level manager changed shortly before the reduction in force to ████████████ For part of the relevant period, while my skip-level manager was out on paid time off, a fill-in skip-level manager, ████████████ stood in; she was not familiar with the substantive area in which I worked.

6.  My performance at Meta was consistently strong throughout my employment. I received "Exceeds Expectations" ratings for ███████████ years, and I was promoted ████████████ ████████████████████████ In recognition of my performance, I received a rare additional restricted-stock-unit grant from my vice president in addition to my regular equity refreshers. I was never placed on a performance improvement plan, a coaching plan, or a written warning, and I was never the subject of any disciplinary action.

7.

8.  Throughout my employment, ████████████████████████████████████ ████████ I advocated within Meta for the fair treatment of LGBTQ+ employees and for more inclusive company policies. ███████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

Doc ID: 707877c5aea34586aab28ce79d832044422060e4



9.

10. I took the following protected and other leave ███████████████████████████



My year-end 2025 self-assessment had to

Doc ID: 707877c5aea34586aab28ce79d832044422060e4

be prepared and submitted during the period when I was on leave ███████████ ████████████████████████████████████████.

11. In early 2026, I received a year-end 2025 performance rating of "Consistently Met Expectations"—the first rating below "Exceeds Expectations" in over ████ years. My manager, ███████████ told me that he believed I had earned an "Exceeds Expectations" rating but that I had been moved down to satisfy a forced-distribution, or "bell curve," requirement.

12. Around the time I returned from ██████████ leave, the expectations of my role shifted substantially. I was taken off several of the programs I had been leading and reassigned to a single program as my organization moved to short "AI-native" sprint pods; the round of AI-native pods was being completed in the same week as the reduction in force.

13. Meta maintained internal dashboards and leaderboards that tracked employees' adoption and use of its artificial-intelligence tools and rated employees on scales such as "AI First" and "AI Native." I was usually rated in one of those two top categories. After my leave, my scores on those dashboards dropped. The dashboards did not account for paid time off or protected leave; my time away was recorded as a gap rather than excluded from the measurement.

14. Meta also announced internally that, going forward, its AI tools would generate the first drafts of employees' performance reviews, including the reviews due in June 2026, and encouraged employees to train the AI on their work so that it would have enough context to draft those reviews.

15. Before my leave, Meta expected employees on my team, including me, to train an internal AI "second brain" or assistant on our work and to integrate Meta's internal AI tools into our workflows. My team set up such a "second brain," as well as a shared "team brain" for our documents, and I trained mine myself and granted it broad access to my work so that it could help me track and carry out my responsibilities. I used Meta's internal AI agent, Metamate (in both its 1.0 and 2.0 versions, the latter of which incorporated coding and "second brain" capabilities), among other tools. I understood this training to be intended to create an assistant, and I am now concerned that it was also training a system that could replicate or replace my work.

16. During my employment, Meta deployed activity-monitoring software on its systems that, I understand, captured activity including keystrokes, screen content, mouse and activity data, browsing history, messaging, and email. I worked on a Windows PC. I did not receive any pop-up, consent, or acknowledgment prompt regarding the monitoring software, which appeared to have been installed automatically; I understand that some colleagues using other devices did receive such a prompt. I used my Meta-issued device for nearly all of my work and, because I relied on it day to day, also for personal matters.

17. On May 20, 2026, I received an email at approximately 4:00 a.m. Pacific time notifying me that I had been selected for termination in Meta's May 2026 reduction in force. My employment is scheduled to end on July 22, 2026.

18. Two other individuals on my team were included in the May 20, 2026 reduction in force, such that 25% of my ███████████ team was impacted. ████████████████ ███████████████████████████████ shortly before those impacted by the May 20

DECLARATION OF ██Doe 25██████ ISO MOTION FOR PRELIMINARY INJUNCTION          Page 6

layoff were notified.  My skip level manager, ███████ had approximately ██ reports prior to the layoff, and I am informed that he now has ███.

19. I have been offered a severance and release agreement in connection with my termination, and I have not signed it or any release of my claims.

20. My compensation at Meta included a base salary of approximately ████████ per year and a substantial equity component in the form of restricted stock units ("RSUs"). I hold approximately ████ unvested RSUs, all of which I will forfeit if my employment is terminated.

21. I and my household rely on the health insurance provided through my employment at Meta, and my active coverage will end when my employment terminates. Meta has offered to pay the premiums for continued coverage through COBRA for a period of time, but I understand that premium subsidy to be conditioned on my signing a separation agreement and release, which would require me to release my claims, including the claims at issue in this case. Without signing that release, I would be responsible for the full cost of any COBRA continuation coverage myself, and after any subsidized period ends I would be responsible for the full cost in any event. Continued coverage is important to me because ██████████████████████████

Doc ID: 707877c5aea34586aab28ce79d832044422060e4

22. I am the sole source of income in my household.



Even while I was on leave ████████████████████████

Meta required me to submit my self-assessment for the performance cycle, which I wrote



23. I make this declaration in support of Plaintiffs' request that the Court preserve the status quo and enjoin the finalization of the May 2026 reduction in force pending an independent audit, or, in the alternative, enjoin Meta from separating employees who took protected leave pending such audit. If I am separated before that review can occur, I will lose my employer-sponsored health coverage, my unvested equity, and the opportunity to have my performance rating and my selection reviewed free of the effects of the protected leave I have described, none of which I believe a later award of money damages could fully restore.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DECLARATION OF Doe 25 ISO MOTION FOR PRELIMINARY INJUNCTION        Page 8

Executed on __1 July____, 2026, at █████ California.

Doe 25

Doe 25 █████

Doc ID: 707877c5aea34586aab28ce79d832044422060e4