ERIN M. CONNELL (SBN 223355)
econnell@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:    +1 415 773 5700
Facsimile:    +1 415 773 5759

LAUREN M. GOLDSMITH (SBN 293269)
lgoldsmith@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:    +1 212 506-5000

DIXIE TAUBER (SBN 321692)
dtauber@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA  95814-4497
Telephone:    +1 916 329 7982

Attorneys for Defendant
META PLATFORMS, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| DOES 1 THROUGH 26, <br><br> Plaintiffs, <br><br> v. <br><br> META PLATFORMS, INC., <br><br> Defendant. | Case No. 3:26-cv-07122-WHO <br><br> **DECLARATION OF LINH DOAN IN SUPPORT OF DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER** |

I, Linh Doan, declare as follows:

1. I am Director, Human Resources Business Partner Enablement at Meta Platforms, Inc. ("Meta"), a position I have held since April 2012. My current responsibilities include designing and delivering change management activities for priority initiatives and high-profile go-to-market launches across HR teams and solutions; supporting projects like process improvements, new system implementations, talent management, and culture/values initiatives; conducting stakeholder assessments, change impact assessments, and go-to-market/communication planning; supporting change management training; and managing intake, scoping, resourcing, and delivery of change projects . I submit this declaration in support of Meta's Opposition to Plaintiffs' Application for Temporary Restraining Order. I have personal knowledge of the facts stated herein and could testify competently to them.

2. In my role, I was directly involved in planning and executing Meta's May 2026 reduction in force ("RIF"). I am familiar with the criteria used to identify positions for elimination, the process by which selection decisions were made and reviewed, and the safeguards applied to ensure that leave and disability status were not factors in selection decisions.

3. I understand that Plaintiffs have alleged that Meta used "a constellation of internal artificial-intelligence systems" to "score, rank, and select employees" for termination, and that this process systematically penalized employees who took protected leave or requested disability accommodations. Compl. ¶¶ 1-2. I further understand that Plaintiffs contend Meta "did not neutralize" certain inputs "for protected leave" and "did not pause the system for the individualized, leave- and accommodation-neutral review that the law requires." Compl. ¶ 2. These allegations are not accurate. This declaration explains how Meta's selection process for the RIF actually worked and the safeguards that ensured leave and disability status were not factors in selection decisions.

### The Selection Process Was Based on Neutral, Business-Related Criteria

4. The RIF was a structural reorganization driven by business needs. Selection decisions were made by human business leaders based on documented, neutral criteria. These leaders did not have discretion to select employees based on any factors or criteria they identified. They were only authorized to make selection decisions by applying the specific, pre-determined

DECLARATION OF LINH DOAN
3:26-cv-07122-WHO

permissible criteria for the applicable decisional unit. Those permissible criteria did not include leave status, leave history, disability status, accommodation requests, or any other protected characteristic. Meta has policies and manager training designed to ensure that leave status, disability, accommodations, and other protected characteristics are not negative factors in any employment decision, and those policies applied to this RIF.

5.     For each decisional unit, the business rationale for the restructuring determined which specific permissible criteria could be used. Depending on the business unit and its organizational objectives, selection criteria included one or more of the following:

a. Job profile (*e.g.*, software engineer) or Level (*e.g.*, individual contributor ("IC") level 3; Manager ("M") level 1).

b. Historical performance, based on performance ratings and promotion history over a defined period. There was no AI-assisted "scoring" or "ranking" related to employee performance.

c. Most recent performance rating, with employees rated "Meets Most Expectations," "Meets Some Expectations," or "Does Not Meet Expectations" identified for potential impact.[1]

d. Tenure, but only for the purpose of retaining longer-tenured employees depending on the decisional unit's need for institutional knowledge.

e. Location, consistent with business need.

f. Job function (*e.g.*, a decisional unit could decide to retain only attorneys whose job function focused on a specific set of laws).

g. Specialized skills or experience critical to future business needs, such as specific technical certifications or other capabilities identified by business leaders.

h. Spans and layers, *e.g.*, reducing the number of direct reports per manager or

---

[1] For context, for the relevant time period employees were evaluated on a seven-point performance rating scale for the full performance year to provide differentiation of performance impact. The ratings are as follows: (1) Does Not Meet Expectations; (2) Met Some Expectations; (3) Met Most Expectations; (4) Consistently Met Expectations; (5) Exceeded Expectations; (6) Greatly Exceeded Expectations; and (7) Redefined Expectations. Employees who receive a rating of "Met Most Expectations" or below are considered not to be meeting the expectations of their role.

DECLARATION OF LINH DOAN
3:26-cv-07122-WHO

hierarchical tiers to enhance speed, cost efficiency, and/or decision-making agility.

6.    These criteria were documented in advance, and business leaders were required to apply the documented criteria to their decisional unit for purposes of selecting employees for inclusion in the RIF. The criteria were reflected in the disclosures Meta provided to affected employees under the Older Workers Benefit Protection Act ("OWBPA").

### Employees on Leave and/or with Disabilities Were Not Disadvantaged

7.    Leave status, leave history, disability status, and accommodation requests were not factors in selection decisions. Meta took steps to ensure that employees on leave, with disabilities, or with accommodations were not disadvantaged. Business leaders were permitted to use only the documented, approved selection criteria for the applicable decisional unit. Human Resources Business Partners worked closely with decision-makers during the process to support the use of only the above explained criteria and to help ensure that protected characteristics were not used in selection decisions.

8.    Meta also requires all managers to participate in manager training to ensure that leave, disability, accommodations, and other protected characteristics are not negative factors in employment decisions. For example, all managers are required to complete a two hour training–within six months of hire and annually thereafter–that covers Meta's policies and standards for understanding and maintaining respect in the workplace, including: (1) avoiding harassment; (2) avoiding discrimination; (3) avoiding other unacceptable conduct; and (4) understanding manager reporting obligations. In addition to mandatory training dedicated to discrimination and harassment, Meta also offers additional training regarding mitigating bias, providing reasonable accommodations, creating an inclusive team environment, and other topics.

### Plaintiffs' Allegations Are Inconsistent with the Actual Selection Process

9.    I understand that Plaintiffs claim Meta's selection process penalized employees on leave because the system "failed to distinguish employees' leave from lack of engagement," causing scores to "drop[] dramatically" after protected leave. Compl. ¶ 49, 53, 95. Based on my review of Meta's documentation in connection with the RIF, these characterizations are not

DECLARATION OF LINH DOAN
3:26-cv-07122-WHO

accurate.

10.     The following examples illustrate how the selection process worked:

a.     One Plaintiff was selected because Meta needed fewer project management roles across the organization. This was a structural decision to reduce headcount based on level and tenure, not a decision based on leave status.

b.     Another Plaintiff was selected based on job level because Meta no longer had a business need for a Level 2 director dedicated to a particular subject matter. This was a structural decision to streamline the organization, not a decision based on leave status or any other protected characteristic.

c.     Another Plaintiff was selected as part of a reduction of the number of Level 5 generalist program managers. In the relevant area, increased workflow standardization and clearer production ownership reduced the need for multiple senior generalist roles focused on coordinating work across teams. Meta therefore eliminated two Level 5 generalist roles while retaining one Level 5 role aligned to a more specific specialized function. Notably, the Level 5 employee who was retained had taken leave from Meta within the 24 months preceding the RIF, underscoring that this was a structural decision based on role and specialized function, not leave status or any other protected characteristic.

11.     These are the real reasons these employees were selected and are illustrative of Meta's selection process. Based on my review of Meta's documentation in connection with the RIF, like the examples above, each of these Plaintiffs were selected for exit based on permissible and objective criteria. No Plaintiff was selected based on leave status, disability, or any other protected characteristic. Nor was any selection decision made by "AI."

### Plaintiffs' Claims About AI Are Inaccurate

12.     I understand that Plaintiffs allege Meta used AI systems to "score, rank, and select employees for inclusion on the [termination] list." Compl. ¶ 1. To be clear, Plaintiffs do not appear to allege that AI systems autonomously made termination decisions. Rather, they allege that AI

DECLARATION OF LINH DOAN
3:26-cv-07122-WHO

tools generated inputs that disadvantaged employees on leave. Compl. ¶¶ 1-2, 52-53.

13.     Based on my review of Meta's documentation, these allegations are incorrect. Selection decisions were made by human business leaders based on documented, legitimate selection criteria.

14.     I understand that Plaintiffs allege Meta used data from a "workforce-wide monitoring program" as inputs to the RIF selection process. Compl. ¶ 50. Plaintiffs refer to this tool as the "Model Capability Initiative" and allege it captured "keystrokes, screen content, mouse and activity data, browser history, messaging, [and] email." Compl. ¶¶ 50, 52. This is not accurate. Data from the Model Capability Initiative tool was not used as an input for selection decisions in the RIF.  Human Resources and business leaders do not have access to data from the Model Capability Initiative tool, and, as such, they did not use data from the Model Capability Initiative tool to make selection decisions. In any event, it also would not have been feasible to use this data because the RIF selection process was already well underway with many selection decisions already made by the time the Model Capability Initiative tooling was launched on April 22, 2026.

15.     I understand that Plaintiffs allege Meta used "AI-token-usage dashboards" and other AI metrics as inputs to the selection process, and that employees on leave were disadvantaged because they could not accumulate AI-token consumption. Compl. ¶¶ 1, 48. This is also completely inaccurate. AI-token usage and AI-adoption metrics were not selection criteria for the RIF.

16.     I understand that Plaintiffs allege Meta required employees to train "second brain" AI agents and that employees on leave were penalized because they could not generate this data. Compl. ¶¶ 51-53. This is again not accurate. Whether an employee had trained a "second brain" agent was not a selection criteria for the RIF.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 15, 2026, at San Jose, California.

_Linh Doan_
_____

Linh Doan

DECLARATION OF LINH DOAN
3:26-cv-07122-WHO