ERIN M. CONNELL (SBN 223355)
econnell@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

LAUREN M. GOLDSMITH (SBN 293269)
lgoldsmith@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:     +1 212 506-5000

DIXIE TAUBER (SBN 321692)
dtauber@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA  95814-4497
Telephone:     +1 916 329 7982

Attorneys for Defendant
META PLATFORMS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DOES 1 THROUGH 26,<br><br>                    Plaintiffs,<br><br>          v.<br><br>META PLATFORMS, INC.,<br><br>                    Defendant. | Case No. 3:26-CV-7122<br><br>**DECLARATION OF LINH DOAN PURSUANT TO THE COURT'S JULY 17, 2026 ORDER** |

DECL. OF LINH DOAN
3:26-CV-7122-WHO

I, Linh Doan, declare as follows:

1.     I am Director, Human Resources Business Partner Enablement at Meta Platforms, Inc. ("Meta"), a position I have held since April 2012. I previously submitted a declaration in support of Defendant Meta Platforms, Inc.'s Opposition to Plaintiffs' Application for Temporary Restraining Order (Dkt. No. 18). I have personal knowledge of the facts stated herein and could testify competently to them.

2.     I submit this declaration in response to the Court's July 17, 2026 Order directing Meta to explain how and why Doe Plaintiffs 4, 9, 15, and 26—the four Plaintiffs with Meta-sponsored employment visas—were selected for termination in the May 2026 reduction in force ("RIF") (Dkt. No. 25).

**Overview of Meta's Selection Process**

3.     As I explained in my prior declaration filed in support of Meta's Opposition to Plaintiffs' Application for Temporary Restraining Order (Dkt. No. 18), the RIF was a structural reorganization driven by business needs. Selection decisions were made by human business leaders based on documented, neutral criteria. These leaders did not have discretion to select employees based on any factors or criteria they deemed appropriate. They were only authorized to make selection decisions by applying the specific, pre-determined permissible criteria for the applicable decisional unit. Those permissible criteria did not include leave status, leave history, disability status, accommodation requests, or any other protected characteristic.

4.     The selection process followed a structured, multi-step approach designed to ensure that selection decisions were tied to documented business rationales and applied consistently within each decisional unit. The process proceeded as follows:

   a.  First, decisional units were established. A decisional unit is the organizational grouping within which selection decisions were made—typically defined by reporting structure (such as all employees reporting to a particular VP-level leader) or by team or function. Within most decisional units, the decision-maker evaluated smaller cohorts of employees for purposes of making considered and targeted decisions based on specific business needs within each decisional unit. For example,

DECL. OF LINH DOAN
3:26-CV-7122-WHO

within a single decisional unit, a decision-maker might evaluate separate cohorts for IC3-level Software Engineers, IC5-level Software Engineers, and managers, each with criteria tailored to the business needs applicable to that population.

b.  Second, for each decisional unit (and, where applicable, for each cohort within a decisional unit), business leaders were asked to identify and document the business rationale for the restructuring affecting that population. These business rationales explained why reductions or changes were needed—such as organizational flattening to reduce management layers, consolidation of teams, alignment with high-priority projects, or reduced investment in particular product areas.

c.  Third, selection criteria were identified that would further the documented business rationale for each decision. The selection criteria had to be objective and tied to the business rationale. For example, if the business rationale was to retain top talent within a particular team, the selection criteria might identify employees with lower performance ratings or lower historical performance scores. If the rationale was to retain employees with specialized skills needed for high-priority projects, the criteria might focus on employees lacking those specialized skills. If the rationale was to reduce management layers, the criteria might capture managers at a particular level with fewer direct reports. Human Resources Business Partners worked with decision-makers to ensure that the selection criteria were appropriate to further the stated business rationale.

d.  Fourth, selection decisions were made by applying the permissible selection criteria consistently to the employees within each decisional unit (and, where applicable, each cohort within a decisional unit). Only employees who met the selection criteria were identified for inclusion in the RIF, and the criteria could not be changed once the selection decisions were underway. Decision-makers were not permitted to select employees who did not meet the permissible criteria or to exclude employees who did meet the criteria.

DECL. OF LINH DOAN
3:26-CV-7122-WHO

e. Fifth, selection decisions were vetted to confirm that they were consistent with both the business rationale and the selection criteria for each decisional unit or cohort. Human Resources Business Partners reviewed the selections to confirm that they were based solely on the specific permissible criteria and that the criteria were applied consistently to that decisional unit or cohort. This multi-layered review process was designed to prevent any individual decision-maker from deviating from the documented criteria or introducing subjective factors into the selection process.

5. For each decisional unit, the business rationale for the restructuring and the needs of the organization moving forward informed which specific permissible criteria were applied. Depending on the business unit and its organizational objectives, selection criteria included one or more of the following:

a. Job profile (*e.g.*, software engineer) or level (*e.g.*, individual contributor ("IC") level 3; Manager ("M") level 1).

b. Historical performance, based on performance ratings and promotion history over a defined period. There was no AI-assisted "scoring" or "ranking" related to employee performance. Performance ratings were assigned through Meta's standard semi-annual performance review process, which involves human managers evaluating employee contributions.

c. Most recent performance rating, with employees rated "Meets Most Expectations," "Meets Some Expectations," or "Does Not Meet Expectations" identified for potential impact.

d. Tenure, but only for the purpose of retaining longer-tenured employees depending on the decisional unit's need for institutional knowledge.

e. Location, consistent with business need.

f. Job function (*e.g.*, a leader could decide to retain only attorneys whose job function focused on a specific practice area).

g. Specialized skills or experience critical to future business needs, such as specific technical certifications or other capabilities identified by business leaders.

h.   Spans and layers. Span refers to the number of direct reports a manager has. For example, managers with fewer than 7 direct reports could be eliminated if the average team size was 10. Layer refers to the organizational hierarchy measured by the number of reporting levels between an employee and Mark Zuckerberg. For example, employees at layer 6—six levels below Mark Zuckerberg—could be marked for elimination as part of the restructuring.

6.    Business leaders were required to apply the permissible criteria to their decisional unit for purposes of selecting employees for inclusion in the RIF. The criteria were reflected in the disclosures Meta provided to affected employees under the Older Workers Benefit Protection Act.

7.    Leave status, leave history, disability status, and accommodation requests were not factors in selection decisions and this information was not made available to decision-makers during the selection process. Business leaders were permitted to use only the permissible selection criteria for the applicable decisional unit or cohort.

8.    Critically, the selection criteria for each decisional unit or cohort were established and tied to a specific business rationale before any individual employees were considered for selection. Decision-makers did not have the ability to deviate from those criteria. The same objective criteria—such as job level, tenure, performance rating, or location—were applied uniformly to all employees in the decisional unit or cohort, regardless of whether an employee had taken leave, was on leave, or had never taken leave; business leaders did not have visibility into employees' leave status or any opportunity to identify this for either impacted or non-impacted employees during the selection process.

**Each Visa-Sponsored Plaintiff Was Selected Based on Neutral Criteria Unrelated to Leave, Disability, Accommodation, or Any Other Protected Characteristic**

9.    The following paragraphs explain how and why each of the four visa-sponsored Plaintiffs—Does 4, 9, 15, and 26—was selected for termination in the RIF. Each selection was made based on the pre-determined, documented selection criteria applicable to the employee's decisional unit. None of these selections was based on the employee's leave status, leave history, disability status, or any other protected characteristic.

DECL. OF LINH DOAN
3:26-CV-7122-WHO

**Doe 4 Was Selected Based on Job Level and Performance, Not Parental Leave**

10.     Doe 4 was a ▆ Scientist on the ▆▆▆ team within Meta's ▆▆▆ organization, working from Meta's offices in ▆▆▆, California. He held an IC5 (individual contributor level 5) position.

11.     Doe 4 was part of a decisional unit within the ▆ organization. Within this decisional unit, Doe 4's cohort had the greatest number of role eliminations. The selection criteria for his cohort were based on job level and performance. The decision-maker for this decisional unit was a VP, Analytics.

12.     The selection process in Doe 4's decisional unit involved two objective selection criteria applied in sequence. The first criterion used was job level, and therefore, ▆ Scientists at the IC5 job level were within scope for potential selection. The second criterion used was historical performance. No artificial intelligence or AI-based tools were used to determine performance. The same performance standards were applied to Doe 4 as to all other IC5-level ▆ Scientists in his cohort, whether or not those employees had taken parental leave or any other type of leave.

13.     Doe 4 met both selection criteria. He was an IC5-level ▆ Scientist, and his historical performance was lower than those in his cohort who were not included in the RIF. In his year-end 2025 performance review, Doe 4 received a "Consistently Met Expectations" rating. Meta maintains a high-performance culture with seven possible performance ratings; "Consistently Met Expectations" is the lowest rating that does not fall below expectations. The decision to select employees meeting these criteria was part of a broader effort to reduce headcount at this level while retaining higher-performing employees and transitioning to a smaller, talent-dense organization.

14.     I understand that Doe 4 states in his declaration that he "was on approved parental leave, caring for [his] newborn child, when Meta notified [him] of [his] selection" and that he was "the only person who was on parental leave in the group, at the time of the layoff notice." Doe 4 Decl. ¶¶ 2, 8. I understand that Doe 4 believes his parental leave contributed to the decision to include him in the RIF. That is false. Doe 4's parental leave played no role in the selection decision. Doe 4 was selected because he met the neutral selection criteria applicable to his cohort: he was an IC5-level ▆ Scientist whose historical performance was lower than that of his peers. The

DECL. OF LINH DOAN
3:26-CV-7122-WHO

decision-maker for Doe 4's decisional unit did not have access to information regarding Doe 4's, or any other employee's, leave status during the selection process. In fact, there were 13 employees within this cohort who were either on leave or had taken leave within the past 24 months who were not selected for separation. The selection criteria were applied consistently to meet the business objectives related to organizational transformation, not because of any protected characteristic.

15.    Doe 4 also states that, "[t]o [his] knowledge, [he was] the only one [reporting to his manager] impacted by the layoff." Doe 4 Decl. ¶ 8. That statement is misleading. The applicable decisional unit and cohort were broader than Doe 4's immediate manager's direct reports, and Doe 4 was one of 11 IC5 employees in that cohort who were selected for impact in this RIF.

**Doe 9 Was Selected Based on Job Profile and Skills, Not Leave or Accommodation**

16.    Doe 9 was a ▮▮▮▮▮ Designer on the ▮▮▮▮▮ team, working on a hybrid basis from Meta's office in ▮▮▮▮▮ California. She held an ▮▮▮▮▮ ▮▮▮▮▮ position.

17.    Doe 9 was part of a decisional unit within ▮▮▮▮▮. The selection criteria for her cohort were based on job profile and specialized skills needed for high-priority projects. The decision-maker for this decisional unit was a VP, ▮▮▮▮▮.

18.    The selection process in Doe 9's decisional unit involved objective criteria based on job profile and specialized skills. As design reviews at Meta increasingly focused on executive-level demos, the business need shifted toward ▮▮▮▮▮ Designers with deep experience in fully immersive interactive product elements presented to the executive suite, in support of high-priority projects. The selection criteria targeted ▮▮▮▮▮ Designers who lacked this specialized skill set.

19.    Doe 9 met the selection criteria. She was an ▮▮▮▮▮ Designer who lacked the deep experience in fully immersive interactive product elements required for the high-priority project. The decision to select employees meeting these criteria was part of a broader effort to align the team's skill set with high-priority business needs.

20.    I understand that Doe 9 states in her declaration that she "had recently returned from a three-month ▮▮▮▮▮ leave ▮▮▮ ▮▮▮▮▮" and that she "was working under an approved ▮▮▮

6

DECL. OF LINH DOAN
3:26-CV-7122-WHO

██████ accommodation that remained in effect, at the time [she] was selected." Doe 9 Decl. ¶ 2. I also understand that Doe 9 states that her "measured usage" of Meta's AI tools "placed [her] in the middle-to-lower range rather than the top, a ranking that [her] months-long ██████ leave necessarily depressed." Doe 9 Decl. ¶ 11. I understand that Doe 9 believes her medical leave, accommodation, and AI-tool usage contributed to the decision to include her in the RIF. That is false. Doe 9's medical leave and work-from-home accommodation—both of which Meta granted—played no role in the selection decision. Doe 9 was selected because she met the neutral selection criteria applicable to her cohort: she was an ██████████ Designer who lacked the specialized skills required for the team's high-priority work. The decision-maker for Doe 9's decisional unit did not have access to information regarding Doe 9's leave status or accommodation during the selection process. The selection criteria were established for business reasons related to aligning the team's skill set with strategic priorities, not because of any protected characteristic.

**Doe 15 Was Selected Based on Performance Rating, Not Health Condition or Leave**

21.    Doe 15 was a ██████████ Engineer, ██████████████, at the ██████████ ██████████████ on the ████████████ team within the ██████████████ organization of ██████ ████. He worked from Meta's office in ██████ Washington.

22.    Doe 15 was part of a decisional unit within the ██████████████████ organization. The selection criteria for his cohort were based on performance rating. The cohort encompassed ██████████████ Engineers on the ██████████████████████████████████████████████████████████████████████████████████████████████████████ teams, and a decision was made that Meta needed to reduce the number of ██████████ in these teams consistent with changes in business needs. The decision-maker for this decisional unit was a Director, ██████████████████ ██████████.

23.    The selection process in Doe 15's decisional unit involved objective criteria based on performance rating. As Meta reduced scope and focused on retaining top talent, the selection criteria targeted ██████████████ Engineers who were not meeting performance expectations—specifically, those who received a "Met Most Expectations" rating (or below). A

DECL. OF LINH DOAN
3:26-CV-7122-WHO

"Met Most Expectations" or below rating indicates that the employee's performance did not meet the expectations for their role and level.

24.    Doe 15 met the selection criteria. He was an ████████████ Engineer who received a "Met Most Expectations" for his most recent performance rating. The decision to select employees meeting these criteria was part of a broader effort to focus on retaining top talent as Meta reduced headcount across the organization.

25.    I understand that Doe 15 states in his declaration that he ████████████ ███████████████████████████████████████████████████████ ████████████████ Doe 15 Decl. ¶¶ 2, 16. I understand that Doe 15 believes his health condition and request for leave contributed to the decision to include him in the RIF. That is false. Doe 15's health condition and any request for medical leave played no role in the selection decision. Doe 15 was selected because he met the neutral selection criteria applicable to his cohort: he was an ███ ████████████ Engineer with a "Met Most Expectations" performance rating, indicating that he was not meeting the expectations of his role. That performance rating was assigned through Meta's standard annual performance review process, not through any AI-based system, and predated Doe 15's ████████████ and request for medical leave. The selection criteria targeting employees with a rating of "Met Most Expectations" or below were determined before Doe 15 or any other individual employee was identified for potential selection, and they could not be changed during the decision-making process. The decision-maker for Doe 15's decisional unit did not have access to information regarding Doe 15's health condition or any leave requests during the selection process. The selection criteria were established for business reasons related to focusing on top talent, not because of any protected characteristic.

26.    Doe 15 also states that "[o]f the ████████████ on [his] team, [he] was the only one selected." Doe 15 Decl. ¶ 25. That statement is misleading. The applicable cohort was broader than Doe 15's immediate team, and Doe 15 was one of 10 employees in that cohort who were selected for impact in this RIF.

DECL. OF LINH DOAN
3:26-CV-7122-WHO

**Doe 26 Was Selected Based on Job Level and Performance, Not Parental Leave**

27.     Doe 26 was a ▮ Scientist on the ▮▮▮▮ team, working from Meta's office in ▮▮▮, New York. She held an IC5 (individual contributor level 5) position.

28.     Doe 26 was part of a decisional unit within the ▮▮▮ organization that focused on reductions within the ▮▮▮▮ team at the IC5 level. The decision-maker for this decisional unit was a VP, ▮▮▮▮.

29.     The selection process in Doe 26's decisional unit involved objective criteria based on job level and performance. The first criterion used was job level, and therefore, IC5-level ▮ Scientists were in scope. The second criterion used was historical performance.

30.     Doe 26 met the selection criteria. She was an IC5-level ▮ Scientist whose historical performance was lower than those in her cohort who were not included in the RIF. The decision to select employees meeting these criteria was part of a broader effort to reduce headcount at this level while retaining higher-performing employees.

31.     I understand that Doe 26 states in her declaration that she "had just returned from ▮▮▮ parental leave ▮▮▮▮ when [she] was selected." Doe 26 Decl. ¶ 2. I also understand that Doe 26 states that she was notified of her selection "[l]ess than two weeks after [she] returned from leave." Doe 26 Decl. ¶ 9. I understand that Doe 26 believes her maternity and parental leave contributed to the decision to include her in the RIF. That is false. Doe 26's maternity and parental leave played no role in the selection decision. Doe 26 was selected because she met the neutral selection criteria applicable to her cohort: she was an IC5-level ▮ Scientist whose historical performance was lower than that of her peers who were not selected in the RIF. The selection criteria were established before Doe 26 or any other individual employee was identified for potential selection, and the same criteria—job level and performance—were applied to all employees in Doe 26's cohort. The decision-maker for Doe 26's decisional unit did not have access to information regarding Doe 26's leave status during the selection process. The selection criteria were established for business reasons related to organizational transformation, not because of any protected characteristic.

DECL. OF LINH DOAN
3:26-CV-7122-WHO

32.     Doe 26 also states that her "team consisted of approximately ▮ people, including [her] manager" and that "▮ of [them] were selected for termination." Doe 26 Decl. ¶ 10. This statement actually undercuts any inference of targeting: nearly 40% of Doe 26's team was selected for termination, demonstrating that Doe 26 was not singled out. In addition, the ▮ other employees in Doe 26's cohort who were impacted were not on leave and did not have a history of leave-taking. Due to the reorganization, Doe 26's manager became an individual contributor and the team, as previously structured, no longer exists.

**Plaintiffs' Allegations Regarding AI Are False**

33.     I understand that the Complaint alleges that Meta used "artificial-intelligence systems" to "score, rank, and select employees" for termination in the RIF and that as a result, "employees who took protected leaves were disproportionately selected." Compl. ¶¶ 1, 2, 50-53. To the extent Plaintiffs allege that AI or AI-based systems were used as inputs to selection decisions or to identify employees for termination, those allegations are false.

34.     AI was not used to conduct the RIF. AI did not select anyone for termination. AI did not assist anyone in making selection decisions. AI was not used to calculate performance scores, to rank employees, or to generate, influence, or recommend selection criteria. As I described in my prior declaration (Dkt. No. 18), and in paragraphs 3 through 8 above, selection decisions were made by human business leaders based on documented, neutral criteria established before any individual employee was identified for selection.

35.     I understand that the Complaint alleges that Meta deployed activity-monitoring software—referred to as the "Model Capability Initiative"—and that Meta used data from this tool as an input for selection decisions. Compl. ¶¶ 50, 52. To the extent Plaintiffs allege that data from the Model Capability Initiative tool was used as an input for selection decisions in the RIF, that allegation is false. Human Resources and business leaders do not have access to data from the Model Capability Initiative tool. In any event, the Model Capability Initiative tool was not launched until April 22, 2026, by which time the RIF selection process was already well underway with some decisions and corresponding selection criteria already documented and confirmed. The timeline is inconsistent with any theory that activity-monitoring data informed selection decisions.

10

DECL. OF LINH DOAN
3:26-CV-7122-WHO

36. I understand that the Complaint alleges that Meta used "AI-token-usage dashboards" and "AI-adoption" metrics as inputs to the selection process, and that employees on leave were disadvantaged because they could not accumulate AI-token consumption. Compl. ¶¶ 1, 48-49. To the extent Plaintiffs allege that AI-token usage or AI-adoption metrics were used as inputs to selection decisions in the RIF, those allegations are false. AI-token usage and AI-adoption metrics were not selection criteria for the RIF.

37. I understand that the Complaint alleges that Meta required employees to use a "second brain" AI system and that employees on leave were penalized because they could not generate "second-brain training data." Compl. ¶¶ 51-53. To the extent Plaintiffs allege that "second brain" usage or training data was used as an input to selection decisions in the RIF, those allegations are false. Whether an employee had trained a "second brain" agent was not a selection criterion for the RIF.

**The Declarations of Does 4, 9, 15, and 26 Do Not Support Their Claims**

38. Based on my review of their declarations, none of Does 4, 9, 15, or 26 allege that AI was actually used to select them for termination—and it was not. Doe 4 states that "Meta introduced internal dashboards that tracked each employee's use of Meta's artificial-intelligence tools" and that Meta "deployed activity-monitoring software on its systems." Doe 4 Decl. ¶¶ 10-11. Doe 9 states that "Meta maintained an internal dashboard that compared each employee's usage of its artificial-intelligence tools against that of peers" and that "Meta deployed activity-monitoring software on its systems." Doe 9 Decl. ¶¶ 11, 13. Doe 15 makes no allegations regarding AI tools or monitoring. Doe 26 states that she "used Meta's internal artificial-intelligence tools" and that "Meta deployed activity-monitoring software on its systems." Doe 26 Decl. ¶¶ 11-12. None of these statements support the allegation that AI was used to make selection decisions.

39. The RIF was planned and executed through a rigorous, human-led process as described in my prior declaration and above. AI was not used. Each of the four visa-sponsored Plaintiffs was selected because he or she met the documented, neutral selection criteria applicable to their decisional unit. The fact that some Plaintiffs had taken leave, were on leave, or had

requested accommodations is coincidental to their selection and was not a factor in the decision-making process.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 23, 2026, at San Jose, California.

_____

Linh Doan

DECL. OF LINH DOAN
3:26-CV-7122-WHO