ERIN M. CONNELL (SBN 223355)
econnell@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA 94105-2669
Telephone: +1 415 773 5700
Facsimile: +1 415 773 5759

LAUREN M. GOLDSMITH (SBN 293269)
lgoldsmith@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019
Telephone: +1 212 506 5000

DIXIE TAUBER (SBN 321692)
dtauber@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA 95814-4497
Telephone: +1 916 329 7982

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

DOES 1 THROUGH 26,

Plaintiffs,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 3:26-CV-07122-WHO

**DEFENDANT META PLATFORMS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Date: August 24, 2026
Time: 10:00 a.m.
Courtroom: 2, 17th Floor
Judge: Hon. William H. Orrick

## TABLE OF CONTENTS

Page

I. INTRODUCTION ... 1
II. FACTUAL BACKGROUND ... 3
III. PROCEDURAL BACKGROUND ... 5
IV. LEGAL STANDARD ... 5
V. PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION ... 6
- A. Plaintiffs' Claims Belong in Arbitration, Which Provides the Relief They Seek ... 6
- B. Plaintiffs' Motion Improperly Aggregates Individualized Claims Through Joinder and Alternative Class Certification ... 9
- C. Plaintiffs Do Not Show Likelihood of Success on the Merits of Their Claims ... 12
  - 1. Plaintiffs Must Make Individualized Showings, Not Blanket Assertions ... 13
  - 2. Plaintiffs' Declarations Rest on Speculation and Temporal Proximity, Not Causation or "Proof" Their Claims Have Merit ... 13
  - 3. Plaintiffs' Expanded Legal Theories Do Not Cure Their Evidentiary Deficiencies ... 16
  - 4. Plaintiffs' Evidence Is Insufficient ... 17
- D. Plaintiffs Will Not Be Irreparably Harmed—As This Court Already Found ... 18
  - 1. Loss of Unvested Equity Is Not an Irreparable Harm ... 19
  - 2. Loss of Health Coverage, Statutory Leave Rights, and Alleged Irreversibility of a RIF Does Not Constitute Irreparable Harm ... 20
  - 3. Loss of Work Authorization Is Not an Irreparable Harm ... 22
- E. The Balance of Hardships and Public Interest Weighs Strongly Against the Requested Preliminary Injunction ... 23
- F. Plaintiffs' Requested Injunction Would Upend, Rather than Preserve, the Status Quo ... 24
- G. If Injunctive Relief Is Granted, Plaintiffs Must Post a Substantial Bond ... 25

VI. CONCLUSION ... 25

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000) .......... 21

*All. for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) .......... 6

*Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. & Budget*, 807 F. Supp. 3d 1004 (N.D. Cal. 2025) .......... 21

*Brownfield v. Bonta*,
2021 WL 6621064 (N.D. Cal. Dec. 23, 2021) .......... 5

*Campbell v. City of Los Angeles*,
903 F.3d 1090 (9th Cir. 2018) .......... 11, 12

*Carlsson v. U.S. Citizenship & Immigr. Servs.*,
2012 WL 4758118 (C.D. Cal. Oct. 3, 2012) .......... 22

*Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*,
840 F.2d 701 (9th Cir. 1988) .......... 20

*Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*,
2020 WL 620294 (C.D. Cal. Jan. 9, 2020) .......... 1

*CleanFish, LLC v. Sims*,
2019 WL 2716293 (N.D. Cal. June 28, 2019) .......... 15

*In re Clorox Consumer Litig.*,
301 F.R.D. 436 (N.D. Cal. 2014) .......... 10

*Caribbean Marine Servs. Co. v. Baldrige*,
844 F.2d 668 (9th Cir. 1988) .......... 23

*Coleman v. Quaker Oats Co.*,
232 F.3d 1271 (9th Cir. 2000) .......... 24

*Collada v. Barr*,
2020 WL 8834784 (D. Ariz. June 2, 2020) .......... 22

*Costello v. Home Depot U.S.A., Inc.*,
888 F. Supp. 2d 258 (D. Conn. 2012) .......... 10

*Enyart v. National Conference of Bar Examiners, Inc.*,
630 F.3d 1153 (9th Cir. 2011) .......... 20

**TABLE OF AUTHORITIES**
(continued)

**Page (s)**

*Garcia v. Google, Inc.*,
786 F.3d 733 (9th Cir. 2015) .... 6, 25

*Garcia v. Spun Steak Co.*,
998 F.2d 1480 (9th Cir. 1993) .... 15

*Genias Graphics Gumb & Co. KG v. Tecplot, Inc.*,
2013 WL 12092542 (W.D. Wash. Aug. 21, 2013) .... 7, 8, 9

*Graphic Commc'ns Conf.—Int'l Bhd. of Teamsters Loc. 404M v. Bakersfield Californian*, 541 F. Supp. 2d 1117 (E.D. Cal. 2008) .... 7

*IBM v. Bajorek*,
191 F.3d 1033 (9th Cir. 1999) .... 19

*Int'l Franchise Ass'n, Inc. v. City of Seattle*,
803 F.3d 389 (9th Cir. 2015) .... 6

*Jordan v. Duff & Phelps, Inc.*,
815 F.2d 429 (7th Cir. 1987) .... 19, 20

*KCG Americas LLC v. Zhengquan Zhang*,
2017 WL 8294011 (N.D. Cal. Apr. 10, 2017) .... 18

*L.A. Memorial Coliseum Comm'n v. Nat'l Football League*,
634 F.2d 1197 (9th Cir. 1980) .... 25

*Lamps Plus, Inc. v. Varela*,
587 U.S. 176 (2019) .... 9

*Ludlow v. Flowers Foods, Inc.*,
2023 WL 2534618 (S.D. Cal. Mar. 15, 2023) .... 12

*McCollum v. Xcare.net, Inc.*,
212 F. Supp. 2d 1142 (N.D. Cal. 2002) .... 19

*Meyer v. Portfolio Recovery Associates, LLC*,
707 F.3d 1036 (9th Cir. 2012) .... 11

*Mobley v. Workday, Inc.*,
2025 WL 1424347 (N.D. Cal. May 16, 2025) .... 11, 12

*Mobley v. Workday, Inc.*,
740 F. Supp. 3d 796 (N.D. Cal. 2024) .... 16, 17

*O'Hailpin v. Hawaiian Airlines, Inc.*,
583 F. Supp. 3d 1294 (D. Haw. 2022) .... 20

**TABLE OF AUTHORITIES**
(continued)

**Page (s)**

*Ogunleye v. Arizona*,
66 F. Supp. 2d 1104 (D. Ariz. 1999) .......... 20

*Pac. Century Int'l Ltd. v. Does*,
2011 WL 5117424 (N.D. Cal. Oct. 27, 2011) .......... 10

*Pottenger v. Potlatch Corp.*,
329 F.3d 740 (9th Cir. 2003) .......... 24

*Pymanee v. Noem*,
2026 WL 220907 (C.D. Cal. Jan. 22, 2026) .......... 22

*Rabin v. PricewaterhouseCoopers LLP*,
2018 WL 3585143 (N.D. Cal. July 26, 2018) .......... 12

*Rodriguez v. Hayes*,
591 F.3d 1105 (9th Cir. 2010) .......... 11

*Sampson v. Murray*,
415 U.S. 61 (1974) .......... 20, 21

*Sanders v. City of Newport*,
657 F.3d 772 (9th Cir. 2011) .......... 14

*Shoup v. Jag Welding, Fab & Servs., Inc.*,
2025 WL 77062 (S.D. Cal. Jan. 10, 2025) .......... 15

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) .......... 7

*Stanley v. Univ. of S. Cal.*,
13 F.3d 1313 (9th Cir. 1994) .......... 25

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
559 U.S. 662 (2010) .......... 9

*Ta v. Noem*,
2025 WL 3716155 (C.D. Cal. Nov. 10, 2025) .......... 23

*Teddy's Red Tacos Corp. v. Vazquez Solis*,
2019 WL 6895983 (C.D. Cal. Oct. 10, 2019) .......... 6

*Telebrands Corp. v. Max Sales Grp., Inc.*,
2009 WL 10702466 (C.D. Cal. Mar. 11, 2009) .......... 15

*Toyo Tire Holdings of Americas Inc. v. Continental Tire N. Am., Inc.*,
609 F.3d 975 (9th Cir. 2010) .......... 7

## TABLE OF AUTHORITIES
(continued)

**Page (s)**

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) .......... 11

*Whitfield v. Noem*,
2026 WL 1965094 (C.D. Cal. July 2, 2026) .......... 22

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) .......... 5, 13, 22, 23

*World Fin. Grp. Ins. Agency v. Olson*,
2024 WL 730356 (N.D. Cal. Feb. 22, 2024) .......... 18

**State Cases**

*Schachter v. Citigroup, Inc.*,
47 Cal. 4th 610 (2009) .......... 19

**Federal Statutes**

29 U.S.C. § 2617 .......... 6

42 U.S.C. § 2000 .......... 6

**Rules**

Fed. R. Civ. P. 20 .......... 9, 10

Fed. R. Civ. P. 23 .......... 9, 10, 11, 12

Fed. R. Civ. P. 65 .......... 18, 25

**Regulations**

29 C.F.R. § 825.216 .......... 14

**Other Authorities**

Am. Arbitration Ass'n, *Employment/Workplace Arbitration Rules and Mediation Procedures* (2025), *available at* https://www.adr.org/media/aktbpg2y/2026_employment-arbitration-rules-and-mediation-procedures.pdf .......... 6, 7



Orrick, Herrington & Sutcliffe LLP
Attorneys at Law
Silicon Valley

## I. INTRODUCTION

This Court should deny Plaintiff's Motion for the same reasons it denied Plaintiffs' emergency application for a temporary restraining order just weeks ago. In its July 17, 2026 Order, this Court found that Plaintiffs had "not demonstrated irreparable injury," their alleged harms "can be remedied through the arbitration process," and the balance of equities did not tip sharply in Plaintiffs' favor. Dkt. No. 25 at 4, 6, 8. Plaintiffs now repackage substantially the same arguments and evidentiary record, supplemented with expanded legal theories that do nothing to cure the fundamental deficiencies this Court has identified. The answer remains the same: Plaintiffs' claims belong in arbitration, their alleged harms are compensable through monetary relief, and this Court should not grant the extraordinary remedy of a preliminary injunction.

This Court's TRO denial is significant and should inform the analysis here. The Court found that "[l]oss of health care, employment, protected leave, and unvested restricted stock units ('RSUs') are not 'irreparable' harms because each can be remedied [] in the arbitration process." Dkt. No. 25 at 6. Every form of relief Plaintiffs seek in this Court is available in the individual arbitrations that Plaintiffs themselves already have filed.[1] The Court also found that "simply showing some 'possibility of irreparable injury' fails to satisfy" the irreparable harm factor. *Id.* The Court further found that Plaintiffs had not shown a likelihood of success on the merits, but rather only a "serious question" going to the merits, and that "Meta's declarations that it did not use AI in any way with respect to the RIF are unequivocal." *Id.* at 5. Nothing in Plaintiffs' Motion or new declarations changes that analysis.

The carveout Plaintiffs invoke does not authorize the extreme relief they seek. The Arbitration Agreement excludes only "claims for temporary or preliminary injunctive relief (including a preliminary injunction) *in aid of arbitration* or to maintain the status quo *pending arbitration*." Plaintiffs quote that language, but nothing in their Motion is "in aid of arbitration," nor is there any "status quo" to preserve. Plaintiffs' theory is that they may first obtain relief from

---

[1] Nothing in this opposition should be viewed as a waiver of Meta's rights to pursue arbitration. *See Chartwell Staffing Servs. Inc. v. Atl. Sols. Grp. Inc.*, 2020 WL 620294, at *9 (C.D. Cal. Jan. 9, 2020) ("defending against attempts to obtain a TRO or preliminary injunction" is not inconsistent with a right to arbitrate).

a federal court, and only then arbitrate the very claims they have asked the Court to prejudge. That is not how the carveout works. The carveout presupposes an existing arbitration that the court's intervention supports; it does not permit Plaintiffs to aggregate 25[2] employees' individualized claims—based on different facts, work locations, and state laws—into a single consolidated proceeding that bypasses the arbitrator's authority to make a decision on the merits.

Granting the preliminary injunction would also set a dangerous and unworkable precedent for business operations. Plaintiffs ask this Court to force Meta to reverse its reduction in force ("RIF"), which Meta implemented to meet legitimate business needs—something Meta plainly has the right to do. If Plaintiffs' theory is accepted, any at-will employee terminated in a RIF could obtain judicial intervention merely by alleging that protected leave, disability, or accommodation status was temporally proximate to the termination, and then ask the court to unwind the employer's decisions while an "audit" is conducted. That is not the law. The requested order would undo the employment separations for 25 employees, while inviting open-ended judicial supervision of Meta's selection process. Plaintiffs' Motion goes even further than their TRO application by requesting provisional class certification that could extend the injunction to thousands of additional employees who took protected leave in the prior 24 months. It would be an unprecedented intrusion into core management functions and would chill every employer's ability to conduct lawful workforce reductions.

The Motion also fails under every substantive factor, just as the TRO application did. *First*, Plaintiffs cannot show a likelihood of success on the merits because their theory rests on nothing more than speculation, conjecture, and temporal coincidence—they took leave, disclosed a disability, or requested an accommodation, and they were later included in a companywide RIF that impacted thousands of employees. None of them has personal knowledge of the selection process Meta used because they were not involved in it. Accordingly, their self-serving declarations fall far short of demonstrating likely success on the merits—and this Court already found that Plaintiffs had shown, at most, only a "serious question" going to the merits. *Second*, Plaintiffs cannot show irreparable harm because their alleged injuries are textbook economic

[2] On August 3, 2026, Doe 20 entered a voluntary dismissal, leaving 25 Plaintiffs. Dkt. No. 33.

harms that are fully compensable through monetary relief—a finding this Court expressly made in its TRO Order. *Third*, the equities favor Meta because Plaintiffs seek to reverse a large-scale workforce action that has been implemented, imposing substantial operational disruption without any showing of wrongdoing by Meta. And the public interest favors enforcing arbitration agreements, preserving the exceptional nature of preliminary injunctive relief, upholding the at-will employment doctrine, and declining to transform federal courts into supervisory bodies overseeing lawful business operations.

The Court should deny the Motion in full. In the alternative, if the Court is inclined to grant any interim relief, it should require Plaintiffs to post a bond sufficient to protect Meta from the substantial costs of continued compensation, benefits, equity treatment, administrative burdens, and operational disruption occasioned by any injunction. As explained below, although quantifying the cost to Meta is difficult given the novel and unwarranted approach Plaintiffs are taking, Meta proposes a bond of at least $10 million, including to cover the cost of re-hiring these highly compensated 25 individuals, all of whom already have been terminated, combined with the inevitable vesting of unvested RSUs to which they are not entitled, and interference with Meta's legitimate right to restructure its workforce to meet changing business needs and priorities.

## II. FACTUAL BACKGROUND

Each Plaintiff chose to enter into an at-will employment relationship with Meta. Dkt. No. 3-16, Declaration of Doe 16 iso Preliminary Injunction ("Doe 16 Decl. ISO PI") ¶ 24, Ex. A. On April 23, 2026, Meta announced that it would lay off approximately 10 percent of the company as part of a comprehensive organizational transformation. Dkt. No. 18-1, Declaration of Bryan Sharkey iso Opposition to TRO ("Sharkey Decl. ISO Opp. to TRO"), ¶ 5. On May 20, 2026, Plaintiffs and thousands of other employees were notified that their roles had been eliminated. *Id.* ¶ 7. Plaintiffs lost access to Meta systems that same day and have not performed any work for Meta since. *Id.*

Contrary to Plaintiffs' baseless allegations about Meta's purported use of AI to make selection decisions (for which they cite no evidence), the RIF was a structural reorganization driven by business needs. Dkt. No. 18-3, Declaration of Linh Doan iso Opposition to TRO ("Doan

Decl. ISO Opp. to TRO"), ¶ 4. Selection decisions were made by human business leaders based on documented, neutral criteria. *Id.* These leaders were only authorized to make selection decisions by applying the specific, pre-determined permissible criteria for the applicable decisional unit. *Id.* Those permissible criteria did not include leave status, leave history, disability status, or accommodation requests, or any other protected characteristic. *Id*. For each decisional unit, the business rationale for the restructuring determined which specific permissible criteria could be used. *Id.* Depending on the business unit and its organizational objectives, selection criteria included one or more of the following:

a. Job profile (e.g., software engineer) or Level (e.g., individual contributor ("IC") level 3; Manager ("M") level 1);

b. Historical performance, based on performance ratings and promotion history over a defined period. There was no AI-assisted "scoring" or "ranking" related to employee performance;

c. Most recent performance rating, with employees rated "Meets Most Expectations," "Meets Some Expectations," or "Does Not Meet Expectations" identified for potential impact;

d. Tenure, but only for the purpose of retaining longer-tenured employees depending on the decisional unit's need for institutional knowledge;

e. Location, consistent with business need;

f. Job function (e.g., a decisional unit could decide to retain only attorneys whose job function focused on a specific set of laws);

g. Specialized skills or experience critical to future business needs, such as specific technical certifications or other capabilities identified by business leaders; and

h. Spans and layers, e.g., reducing the number of direct reports per manager or hierarchical tiers to enhance speed, cost efficiency, and/or decision-making agility.

*Id.* ¶ 5. As of the TRO hearing, Plaintiffs were still on Meta payroll, but as of the hearing on the Preliminary Injunction, all Plaintiffs' terminations are effective, and no Plaintiff will be a current Meta employee or on Meta payroll. *See* Sharkey Decl. ISO Opp. to TRO ¶ 7.[3]

[3] The majority of Plaintiffs had a termination effective date of July 22, 2026. For the New York Plaintiffs, their effective termination date was August 20, 2026.

## III. PROCEDURAL BACKGROUND

On July 13, 2026, Plaintiffs filed this action and concurrently moved for a TRO and a preliminary injunction. Meta opposed the TRO on July 15, and the Court heard argument on July 16. On July 17, the Court denied the TRO. Dkt. No. 25. The Court held that Plaintiffs had raised, at most, "serious questions going to the merits," but had "not demonstrated irreparable injury at this juncture." *Id.* at 4, 5, 6. The Court held that "[l]oss of health care, employment, protected leave, and unvested restricted stock units ('RSUs') are not 'irreparable' harms because each can be remedied [] in the arbitration process." *Id.* at 6. The Court further concluded that the balance of equities and public interest did not tip sharply in Plaintiffs' favor. *Id.* at 8.

With respect to the four visa-holder Plaintiffs, the Court found that it could not make a determination on the existing record as to whether they were likely to suffer irreparable harm. *Id.* at 7. The Court directed Meta to submit a declaration explaining how and why those four Plaintiffs were selected for termination by July 23, 2026, which Meta did. *Id.* at 7; Dkt. No. 31, Declaration of Linh Doan pursuant to Court's July 17, 2026 Order ("Doan Decl. Pursuant to Court's July 17 Order"). The Court also permitted Plaintiffs to file responsive declarations by August 6, 2026, which they did. Dkt. Nos. 34-39.

## IV. LEGAL STANDARD

A Plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Brownfield v. Bonta*, 2021 WL 6621064, at *2 (N.D. Cal. Dec. 23, 2021). Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008). This Court applied this standard in denying Plaintiffs' TRO application, finding that Plaintiffs had "not demonstrated irreparable injury at this juncture" and that "the balance of the equities and public interest factors do not tip sharply in plaintiffs' favor." Dkt. No. 25 at 4, 8.

Under the Ninth Circuit's "serious questions" formulation, a plaintiff must show serious questions going to the merits, a balance of hardships that tips sharply in the plaintiff's favor, a

likelihood of irreparable harm, and consistency with the public interest. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011). That sliding-scale approach does not eliminate the irreparable-harm requirement. *Id.* at 1135. Nor does it allow a court to issue injunctive relief based on speculation, conjecture, or generalized allegations. *See Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 412 (9th Cir. 2015). "[C]ourts routinely deny requests for preliminary injunctions 'where the parties fundamentally disagree on the facts underlying the case.'" *Teddy's Red Tacos Corp. v. Vazquez Solis*, 2019 WL 6895983, at *2 (C.D. Cal. Oct. 10, 2019) (internal citations omitted).

Where, as here, the requested injunction would require affirmative action and alter the operative status of the parties after all Plaintiffs have been terminated, the requested relief is mandatory and subject to heightened scrutiny. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Mandatory injunctions are "particularly disfavored" and should not be issued unless the facts and law "clearly favor" the moving party. *Id.*

## V. PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

### A. Plaintiffs' Claims Belong in Arbitration, Which Provides the Relief They Seek

The threshold question is whether this Court should grant injunctive relief that Plaintiffs can obtain in the arbitral forum to which they contractually committed. It should not. The federal and state employment statutes under which Plaintiffs assert claims contain comprehensive remedies provisions that go far beyond monetary damages. These statutes expressly authorize equitable relief, including reinstatement, front pay, and "make whole" relief. *See, e.g.*, 42 U.S.C. § 2000e-5(g)(1) (Title VII remedies "include, but [are] not limited to, reinstatement…or any other equitable relief"); 29 U.S.C. § 2617(a)(1)(A)(i)(I)-(B) (FMLA remedies: "any wages, salary, employment benefits, or other compensation denied or lost" plus "such equitable relief as may be appropriate, including employment, reinstatement, and promotion"). The arbitrator adjudicating Plaintiffs' claims has full authority to award the same equitable remedies Plaintiffs seek here, but only *if* Plaintiffs prevail on their claims and convince an arbitrator they are entitled to equitable and injunctive relief—not *before* their claims have been adjudicated. Am. Arbitration Ass'n, *Employment/Workplace Arbitration Rules and Mediation Procedures*, at R-46 (2025), *available*

*at* https://www.adr.org/media/aktbpg2y/2026_employment-arbitration-rules-and-mediation-procedures.pdf ("The arbitrator may grant any remedy, relief, or outcome that the parties could have received in court."). Plaintiffs ask this Court to usurp the role of the arbitrator and override the remedial frameworks that Congress and the state legislatures enacted.

Additionally, the Agreement specifically confirms that emergency relief is available within the arbitral process. The Agreement provides for AAA's Optional Rules for Emergency Measures of Protection, which authorize an emergency arbitrator to "order or award any interim or conservatory measures," including injunctive relief. Doe 16 Decl. ISO PI ¶ 24, Ex. A; *see also* Am. Arbitration Ass'n, *Employment/Workplace Arbitration Rules and Mediation Procedures*, at R-35 (2025), *available at* https://www.adr.org/media/aktbpg2y/2026_employment-arbitration-rules-and-mediation-procedures.pdf. Thus, the very contract Plaintiffs signed provides a mechanism for obtaining interim relief in the arbitral forum—precisely the kind of relief Plaintiffs now seek from this Court. Plaintiffs argue they may bypass that mechanism entirely and instead ask a federal court to adjudicate the merits of their claims under the guise of "preserving the status quo." But the law does not permit Plaintiffs to obtain relief first, and have the merits of their claims decided later. Where, as here, "an arbitrator is authorized under the governing rules of arbitration to grant the equivalent of the interim relief sought—and is in a position to do so—it is not appropriate for a district court to grant preliminary injunctive relief." *Genias Graphics Gumb & Co. KG v. Tecplot, Inc.*, 2013 WL 12092542, at *1–2 (W.D. Wash. Aug. 21, 2013) (citing *Toyo Tire Holdings of Americas Inc. v. Continental Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010) and *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725–26 (9th Cir. 1999)) (court denied PI and dismissed case; "the Court simply does not understand why [plaintiff] has not sought immediate equitable relief from the arbitrator, as it is clearly permitted to do"); *see also Graphic Commc'ns Conf.—Int'l Bhd. of Teamsters Loc. 404M v. Bakersfield Californian*, 541 F. Supp. 2d 1117, 1125–26 (E.D. Cal. 2008) (denying PI to prevent termination pending arbitration where arbitrator would have full authority to reinstate employees); *Simula*, 175 F.3d at 725 (affirming denial of PI where "provisional relief is available from the [arbitrator]"). Indeed, "it would [be] inappropriate for the district court to grant preliminary injunctive relief" here. *Id.* at

726; *Genias Graphics Gumb & Co. KG*, 2013 WL 12092542, at *2.

Plaintiffs purport to rely on the arbitration agreement's injunctive relief carveout, but that carveout is conditional, individual, and narrow by design: it excludes only "claims for temporary or preliminary injunctive relief (including a temporary restraining order) **in aid of arbitration** or to maintain the status quo **pending arbitration**, **in a court of competent jurisdiction** in accordance with applicable law." Compl. ¶ 38 (emphasis added); Doe 16 Decl. ISO PI ¶ 24, Ex. A. Plaintiffs quote that carveout as their ticket to federal court, but it does not create an all-purpose license to aggregate 25 highly individualized disputes into a single preliminary injunction motion.

*First*, the phrase "in a court of competent jurisdiction in accordance with applicable law" preserves, rather than overrides, individualized forum and choice-of-law limits. Doe 16 Decl. ISO PI ¶ 24, Ex. A. The agreement provides that it, and claims arising under it, are governed by "the law of the state where Employee works or worked at the time the arbitrable dispute or claim arose," and it separately provides that arbitration shall take place "in the county in which the Employee worked." *Id.* Plaintiffs here did not all live or work in California, and nothing in the agreement adopts California federal court as a universal forum or law for all employees; it instead points to each employee's own work location and applicable state law. Plaintiffs' Motion confirms that they are not proceeding under one common state-law regime, because it invokes California statutes and regulations for some theories while separately identifying "New York Plaintiffs." Dkt No. 3 at 21, 32, 38. The carveout therefore does not permit Plaintiffs to collapse different employees, work locations, and state-law regimes into a single multi-plaintiff filing in this district merely by labeling it a preliminary injunction.

*Second*, the agreement does not authorize consolidation or joint prosecution of individual employees' claims. The agreement is entered into between Meta and the named "Employee," repeatedly defines the parties as "Employer" and "Employee," and requires arbitration of disputes between that individual Employee and Meta. Doe 16 Decl. ISO PI ¶ 24, Ex. A. It also provides that "no claims may be brought or maintained on a class, collective or representative basis either in a court of law or arbitration," and that the parties waive any right to submit, initiate, or

participate as a plaintiff, claimant, or member in a class or collective action. *Id.* To the extent Plaintiffs characterize their filing as ordinary joinder rather than a class, collective, or representative action, that distinction still does not help them; the agreement contains no affirmative consent to aggregate 25 employees' individual claims, which seek to invoke different federal and state laws and statutes, into one court proceeding, and under the FAA courts may not infer consent to aggregate adjudication from silence or ambiguity. *See Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184–89 (2019); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684–87 (2010).

Reading the carveout as Plaintiffs propose would invert the Agreement's structure and nullify its core purpose. Plaintiffs would transform a narrow exception for interim relief in support of individual arbitration into a vehicle for consolidated federal-court litigation governed by no single state's law, aggregating 25 different employees' individual claims, and displacing the authority of the arbitrator to decide the very claims—and fashion the very remedies—the Agreement assigns to arbitration. Even if the Court were to agree with Plaintiffs that this "clause specifically authorizes the parties to seek preliminary equitable relief in court rather than from the arbitrator," the Court should still conclude that Plaintiffs "should pursue [their] request for equitable relief in arbitration rather than in this Court." *Genias Graphics Gumb & Co. KG*, 2013 WL 12092542, at *2 (denying PI). This Court should reject Plaintiffs' attempt to convert the carveout into an escape hatch from arbitration and deny the Motion on this ground alone.

### B. <u>Plaintiffs' Motion Improperly Aggregates Individualized Claims Through Joinder and Alternative Class Certification</u>

Plaintiffs' Motion introduces two new procedural theories not present in the TRO application: (1) that joinder of all 25 Plaintiffs is proper under Federal Rule of Civil Procedure 20, and (2) that, in the alternative, the Court should provisionally certify a Rule 23(b)(2) injunctive class of all employees who took protected leave or requested accommodation in the prior 24 months. Both theories are meritless and should be rejected.

Joinder under Rule 20 is improper here. Rule 20(a)(1) permits joinder only where claims arise out of "the same transaction, occurrence, or series of transactions or occurrences" and present "any question of law or fact common to all plaintiffs." Fed. R. Civ. P. 20(a)(1). Plaintiffs

contend that a single companywide RIF satisfies this standard, but a mass reduction in force does not constitute a single "transaction or occurrence" for Rule 20 purposes simply because it was announced on one date. Plaintiffs worked in different positions, in different organizations, in different states, under different managers, and were selected based on different business objectives and criteria applicable to that Plaintiff's decisional unit. The individualized nature of these claims—acknowledged by Plaintiffs' own groupings of "California Plaintiffs," "Washington Plaintiffs," "New York Plaintiffs," and others—demonstrates that they do not arise from the same transaction or occurrence. *See Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263–64 (D. Conn. 2012) (no permissive joinder where "plaintiffs' claims ar[ose] out of their employment in different [] stores, in different states," and used groupings including "Connecticut plaintiffs," "Massachusetts plaintiffs," and "New Hampshire plaintiffs"). Moreover, even if joinder were technically permissible, the Court has discretion to sever claims that would "confuse and complicate the issues." *Pac. Century Int'l Ltd. v. Does*, 2011 WL 5117424, at *3 (N.D. Cal. Oct. 27, 2011) (holding "manageability difficulties, procedural inefficiencies, and likelihood that Defendants will assert myriad factual and legal defenses compel it to sever Does 2–101 from this case"). Permitting 25 Plaintiffs asserting claims under at least ten different state and federal statutes, based on different facts and different employment circumstances, to proceed as a single consolidated action would be unmanageable and prejudicial to Meta.

Plaintiffs' alternative request for provisional Rule 23(b)(2) class certification is equally improper. Provisional class certification at the preliminary injunction stage is an extraordinary measure that is appropriate only where the Rule 23 requirements are plainly met—including commonality, typicality, adequacy and numerosity. *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 442 (N.D. Cal. 2014) (denying certification). Here, they are not. Plaintiffs seek to certify a class of *all* employees who took protected leave or requested accommodation in the prior 24 months. But Plaintiffs have offered no evidence of the size, composition, or characteristics of that putative class. Nor have they established commonality; to the contrary, the question of whether any individual employee was unlawfully selected turns on the specific criteria applied to that employee's decisional unit, the specific facts of that employee's leave or accommodation history,

and the specific state and federal laws that apply to that employee. Those are quintessentially individualized inquiries that defeat class certification under Rule 23(b)(2). *See Campbell v. City of Los Angeles*, 903 F.3d 1090, 1115 (9th Cir. 2018) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)) ("[W]hat matters" in the analysis "is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation."). Moreover, Plaintiffs' arbitration agreements contain express class-action waivers. Doe 16 Decl. ISO PI ¶ 24, Ex. A. Those waivers bar precisely the kind of class-wide relief Plaintiffs seek.

The cases Plaintiffs cite in support of provisional class certification do not help them. Plaintiffs rely largely on *Meyer v. Portfolio Recovery Associates, LLC*, 707 F.3d 1036 (9th Cir. 2012), and *Rodriguez v. Hayes*, 591 F.3d 1105 (9th Cir. 2010). But both cases are distinguishable. *Meyer* involved a consumer-protection class action where the challenged practice, a uniform debt-collection methodology, was applied identically to every putative class member, and liability turned on a single legal question common to the entire class: whether the defendant's collection letters violated the statute. *Id.* at 1041–43. *Rodriguez* involved a class of immigration detainees challenging a uniform government detention policy where the question was whether mandatory detention without bond hearings violated the statute—a purely legal question applicable identically to every class member. 591 F.3d at 1110–12. In both cases, the putative class was defined by a single, uniform practice and a single, common legal question. Here, by contrast, the putative class would encompass every Meta employee who took protected leave or requested an accommodation in the prior 24 months—a sprawling group whose members worked in different states, held different jobs, reported to different managers, and were selected or not through decisional-unit-specific criteria that varied by organization and business objective. Whether any individual class member was unlawfully selected turns on the specific criteria applied to that member's decisional unit, the specific facts of that member's leave or accommodation history, and the specific state and federal laws that apply to that member's jurisdiction.

Plaintiffs also cite *Mobley v. Workday, Inc.*, 2025 WL 1424347 (N.D. Cal. May 16, 2025), which granted preliminary certification of a nationwide ADEA collective in an algorithmic-

disparate-impact case. But *Mobley* involved certification of a collective under the ADEA's opt-in mechanism—a fundamentally different procedural vehicle from the Rule 23(b)(2) opt-out class Plaintiffs seek here. Indeed, because cases under the ADEA follow the collective action standards that govern FLSA cases, the requirements of Rule 23 (commonality, typicality, adequacy and numerosity) do not even apply to collective actions under the ADEA—again, the analysis is fundamentally different. *See Campbell,* 903 F.3d at 1099 (ADEA incorporates enforcement provisions of the FLSA); *Rabin v. PricewaterhouseCoopers LLP*, 2018 WL 3585143, at *3 (N.D. Cal. July 26, 2018) ("The ADEA incorporates the collective action procedures of FLSA"); *Ludlow v. Flowers Foods, Inc.*, 2023 WL 2534618, at *3 (S.D. Cal. Mar. 15, 2023) ("FLSA collective action is governed by different standards than a class action under Federal Rule of Civil Procedure Rule 23"). Moreover, the preliminary certification order in *Mobley* involved a single legal claim of disparate impact based on a single protected characteristic (age). Here, Plaintiffs do not allege disparate impact: they challenge an employer's internal, multi-factor selection process that varied by decisional unit and involved human business leaders applying documented criteria. Plaintiffs cite no case—and Meta is aware of none—where a court has granted the type of extraordinary relief Plaintiffs seek here, which also would directly contradict the class action waivers in the arbitration agreements Plaintiffs signed.

### C. <u>Plaintiffs Do Not Show Likelihood of Success on the Merits of Their Claims</u>

This Court already has considered a record that is largely identical to the one now before it and declined to find that Plaintiffs could demonstrate likelihood of success on the merits. In its TRO Order, the Court found that Plaintiffs had not shown "a likelihood of success on the merits." Dkt. No. 25 at 5. The Court reached that conclusion after reviewing Plaintiffs' declarations, weighing them against Meta's evidence, and observing that "Meta's declarations that it did not use AI in any way with respect to the RIF are unequivocal" and that "Plaintiffs understandably do not have the evidence to rebut what Meta says it has done with respect to RIF—they were not in the rooms where it happened." *Id.* That assessment applies with equal force here.

Since the TRO ruling, Plaintiffs have submitted additional declarations, but they still cannot carry their burden to show a likelihood of success on any pleaded claim. The *only*

evidence they offer in support of the claims is their own self-serving declarations, which on their face are based on speculation and conjecture, combined with their own subjective view that Meta should not have selected them for termination. They also improperly aggregate 25 materially different Plaintiffs whose claims turn on individualized allegations that Meta categorically denies. Indeed, their merits theory reduces to temporal coincidence, and their evidentiary showing falls far short of the "clear showing" required for emergency relief.

**1. <u>Plaintiffs Must Make Individualized Showings, Not Blanket Assertions</u>**

Plaintiffs do not make the individualized evidentiary showing required for any single Plaintiff—much less all of them. *See Winter*, 555 U.S. at 20-23. Plaintiffs' papers show they are differently situated. They worked in different states, held different jobs , and assert different claims. The Complaint divides Plaintiffs into separate groups, including "California Plaintiffs," "Washington Plaintiffs," "New York Plaintiffs," "Pregnancy- and Sex-Discrimination Plaintiffs," and "FMLA-Eligible Plaintiffs." Compl. ¶ 44. Those groupings confirm Plaintiffs' claims turn on different statutes, work locations, leave histories, accommodation requests, and alleged decisionmaking facts. Those differences matter. A plaintiff-specific showing is therefore indispensable.

Plaintiffs' Motion ignores these differences and asks the Court to treat all 25 Plaintiffs as a single undifferentiated block. The Motion refers to "Plaintiffs" collectively, asserts that each took or requested protected leave or an accommodation within 24 months, and then demands that the Court require that Meta rehire all of them. That is not how the law works. Each Plaintiff must independently establish likelihood of success on the particular claim he or she asserts. *See Winter*, 555 U.S. at 20–22. Plaintiffs' generalized allegation that they were all selected in the same RIF does not establish that any particular Plaintiff was unlawfully selected, much less that all 25 were.

**2. <u>Plaintiffs' Declarations Rest on Speculation and Temporal Proximity, Not Causation or "Proof" Their Claims Have Merit</u>**

Plaintiffs' merits showing also fails because their allegations reduce to temporal proximity and speculation. Plaintiffs allege that each Plaintiff took or requested leave, or received an accommodation, at some point within the 24 months before the RIF. From that chronology alone,

Plaintiffs conclude—without evidence—that protected leave "must have" caused their selection. That is not causation; it is conjecture. As the Court found in denying the TRO, Plaintiffs have no personal knowledge of how Meta made RIF selection decisions because they were not part of those decisions, and otherwise have no evidence regarding how they were made. Dkt. No. 25 at 5. That is even more true now that Plaintiffs have submitted their supplemental declarations in which they concede, for example, that they do not know how Meta defined the relevant decisional units and cohorts (Doe 4 Supplemental Decl., ¶ 3), nor do they know who the relevant decisional makers were (Doe 15 Supplemental Decl., ¶ 3). By contrast, Meta has submitted evidence confirming the legitimate criteria Meta used, which does not include AI to "score, rank, and select employees" full stop, and certainly did not use AI inputs to unlawfully disadvantage leave takers, as well as confirming who the decision makers were. Doan Decl. ISO Opp. to Pltfs.' TRO App. ¶ 5–6 and ¶ 11. Since the TRO hearing, Meta has submitted additional evidence establishing that AI adoption and usage metrics were not used as negative factors in performance reviews or in the RIF. Doan Decl. Pursuant to Court's July 17 Order ¶¶ 11–13,17–19, 22–24, 28–30, 34–37. None of the "evidence" upon which Plaintiffs rely, including the supplemental declarations they filed, disputes that reality. Indeed, the very document Doe 16 attached plainly states that "[i]ndividual adoption metrics will not be considered as part of the performance cycle." Dkt. No. 22-1, Doe 16 Supp. Declaration ISO TRO and PI, Ex. A; Declaration of Linh Doan ISO Opp. to PI ¶ 5. Moreover, Meta categorically denies Plaintiffs' allegations. In a companywide RIF affecting thousands of employees, the fact that some of those employees had taken leave at some point does not establish that protected leave caused any individual selection.

For leave-interference and retaliation theories, Plaintiffs must show far more than the bare fact that leave preceded a termination notice. The FMLA and similar state statutes do not confer immunity to at-will employees from a legitimate RIF, and an employee has no greater right to reinstatement or continued employment than he or she would have had absent protected leave. *See* 29 C.F.R. § 825.216(a); *Sanders v. City of Newport*, 657 F.3d 772, 778–79 (9th Cir. 2011). Plaintiffs recognize the relevant standard as a "negative factor" rule, but they do not—and cannot—show that protected leave was actually used as a negative factor for each or any Plaintiff.

Dkt. No. 3 at 24. Instead, Plaintiffs allege "on information and belief" that Meta did not neutralize certain inputs for protected leave, did not exclude leave-takers from the selection cohort, and did not pause the system for individualized review. *Id.* at 14-15. Allegations "on information and belief" are not evidence and do not establish likelihood of success. *See Shoup v. Jag Welding, Fab & Servs., Inc.*, 2025 WL 77062, at *3 (S.D. Cal. Jan. 10, 2025) (conclusory allegations "insufficient to satisfy the relevant standard for issuance of a preliminary injunction"); *CleanFish, LLC v. Sims*, 2019 WL 2716293, at *4 (N.D. Cal. June 28, 2019) (same); *Telebrands Corp. v. Max Sales Grp., Inc.*, 2009 WL 10702466, at *9 (C.D. Cal. Mar. 11, 2009) ("Claims 'on information or belief' are insufficient" for PI).

For discrimination and disparate-impact theories, Plaintiffs likewise must show causation and, where applicable, reliable proof of disparate impact. *See Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1486 (9th Cir. 1993) (in disparate impact case, "plaintiffs must do more than merely raise an inference of discrimination before the burden shifts; they 'must actually prove the discriminatory impact at issue' . . . by prov[ing] the existence of adverse effects of the policy, [] prov[ing] that the impact of the policy is on terms, conditions, or privileges of employment of the protected class, [] prov[ing] that the adverse effects are significant, and [] prov[ing] that the employee population in general is not affected by the policy to the same degree") (internal citations omitted).

Plaintiffs' allegations about AI do not strengthen their arguments. Plaintiffs cite no evidence that Meta used AI to make selection decisions. Because no such evidence exists. Nor do Plaintiffs establish that Meta lacked legitimate business reasons for the RIF or for the criteria used in the selection process. The RIF was a structural reorganization driven by business needs. Doan Decl. ISO Opp. to TRO ¶ 4. Selection decisions were made by human business leaders based on documented, neutral criteria. *Id.* ¶¶ 4-6. Leave and accommodation status were not criteria for selection. *Id.* ¶ 11. As this Court held in ruling on the TRO, if Plaintiffs disagree with those facts, they can seek discovery in arbitration, but they cannot obtain a prejudgment from this Court. Dkt. No. 25 at 5.

Plaintiffs' invocation of "AI" does not cure the reality that they have no evidence to

demonstrate a causal link between any protected status or activity and their selection in the RIF. It obscures it. Plaintiffs assert that Meta used "Metamate," "second-brain" agents, keystroke- and activity-monitoring data, AI-token-usage dashboards, and algorithmically assisted ranking and calibration. Dkt. No. 3 at 13. But describing tools is not proof of causation. Plaintiffs must establish protected leave or accommodation status *caused* the selection of each Plaintiff under the statute that Plaintiff invokes. The Motion does not do so. Plaintiffs' strategy of generating alarm about "AI" in the hope the Court will infer unlawfulness does not work. The question remains: did Meta's process violate the law. Plaintiffs have offered no evidence that it did.

### 3. <u>Plaintiffs' Expanded Legal Theories Do Not Cure Their Evidentiary Deficiencies</u>

Plaintiffs' Motion introduces several expanded legal theories not present in the TRO, including a multi-state law analysis covering Washington, New York, DC, Florida, Illinois, and Pennsylvania; a CFRA interference claim; independent ADA and FEHA disability discrimination and failure-to-accommodate claims; a Title VII disparate-impact theory based on sex and pregnancy; and reliance on the California ADS regulations and *Mobley v. Workday, Inc.*, 740 F. Supp. 3d 796 (N.D. Cal. 2024). None of these theories changes the analysis.

Adding more legal theories does not compensate for the absence of evidence. Regardless of whether Plaintiffs invoke the FMLA, CFRA, FEHA, the ADA, Title VII, the Pregnant Workers Fairness Act, or various state anti-discrimination statutes, each theory requires Plaintiffs to establish that their protected status or activity *caused* their selection for termination. Plaintiffs have not done so. Their multi-state law analysis catalogs various statutes that prohibit discrimination—a proposition Meta does not dispute—but does not establish that Meta violated any of them. The question is not whether anti-discrimination laws exist; it is whether Meta violated them. Plaintiffs have offered no evidence that it did.

Plaintiffs' reliance on *Mobley v. Workday, Inc.* is, once again, inapposite. *Mobley* involves allegations of disparate impact discrimination based on Workday's AI-powered software features—a factual scenario fundamentally different from the present case. Here, Meta submitted unequivocal evidence that it did not use AI to score, rank, or select employees for the RIF. Doan Decl. ISO Opp. to TRO ¶ 11 and Doan Decl. Pursuant to Court's July 17 Order ¶ 34–37.

Plaintiffs' invocation of *Mobley* does not create a factual dispute; it merely highlights Plaintiffs' strategy of generating alarm about AI in the hope that the Court will draw inferences unsupported by any evidence in the record. Plaintiffs' attempt to invoke the California ADS regulations similarly fails. Even assuming those regulations apply, they require Plaintiffs to establish that an automated-decision system was actually used in the challenged decisions—a factual predicate Plaintiffs have not established and that Meta's evidence directly refutes.

Plaintiffs' expanded arguments regarding Meta's workforce-wide keystroke monitoring and compelled AI training are similarly unavailing. Dkt. No. 3 at 15–16. Even accepting Plaintiffs' characterization of Meta's internal tools and monitoring programs, the existence of such tools does not establish that they were used as inputs to RIF selection decisions. Meta has submitted evidence—which Plaintiffs cannot rebut—that selection decisions were made by human business leaders based on documented, neutral criteria. Doan Decl. ISO Opp. to TRO ¶¶ 4–5 and Doan Decl. Pursuant to Court's July 17 Order ¶¶ 3–5. Plaintiffs' theory that monitoring data and AI-token consumption "must have" influenced the selection process is precisely the kind of speculation and conjecture that this Court should reject. As the Court observed in its TRO Order, "discovery during the arbitration process will be necessary to test the credibility of Meta's declarants." Dkt. No. 25 at 5. That is the proper forum for these factual disputes—not a motion for preliminary injunctive relief.

**4. <u>Plaintiffs' Evidence Is Insufficient</u>**

Plaintiffs' evidentiary showing is inadequate for the extraordinary relief they seek. Plaintiffs rely only on their own self-serving declarations and cite their own alleged observations that scores dropped after vacations or protected leave, their own accounts of ratings and leave history, and their own views about how Meta's systems operated. Those declarations may describe individual employment histories, but they do not establish the companywide selection criteria, the relevant comparator populations, the statistical effect of those criteria, the decisionmakers' reasons for selecting each Plaintiff, or whether any Plaintiff would have been selected absent the alleged protected leave or accommodation status. Self-serving declarations and anecdotal examples are not a substitute for documentary evidence, statistical analysis, or

reliable proof tying protected status to each selection decision. *See World Fin. Grp. Ins. Agency v. Olson*, 2024 WL 730356, at *4 (N.D. Cal. Feb. 22, 2024) (denying TRO; "court should be wary of issuing an injunction based solely upon allegations and conclusory affidavits submitted by plaintiff").

Plaintiffs' requested relief confirms the weakness of their evidentiary showing. In the Complaint's prayer for relief and in the Motion, Plaintiffs ask the Court to order an "independent auditor" to examine inputs, weights, outputs, proxies, and leave-neutralized recomputations, and to identify any Plaintiff whose selection cannot be justified on leave- and accommodation-neutral grounds. That request is a tacit admission that Plaintiffs do not possess the proof needed to establish causation or likely success. Plaintiffs are asking for discovery disguised as injunctive relief. Rule 65 does not permit Plaintiffs to obtain an injunction first and develop the merits later; that reverses the standard and turns the extraordinary remedy of a preliminary injunction into a fishing expedition. If Plaintiffs believe an audit or investigation is warranted, that is a matter for the arbitrator—who has full authority to order discovery—not for this Court.

### D. <u>Plaintiffs Will Not Be Irreparably Harmed—As This Court Already Found</u>

Even if Plaintiffs could demonstrate a likelihood of success on the merits—which they cannot—the Motion would still fail because Plaintiffs have not shown they will suffer irreparable harm. This failure is independently dispositive. Irreparable harm is "arguably the 'single most important prerequisite for the issuance of a preliminary injunction.'" *KCG Americas LLC v. Zhengquan Zhang*, 2017 WL 8294011, at *2 (N.D. Cal. Apr. 10, 2017) (citation omitted). And critically, this Court already found that Plaintiffs failed to establish irreparable harm when it denied Plaintiffs' TRO. This Court held that "[l]oss of health care, employment, protected leave, and unvested restricted stock units ('RSUs') are not 'irreparable' harms because each can be remedied through damages, back pay, or other comparable relief in the arbitration process." Dkt. No. 25 at 6, 8. That finding should be given significant weight here, because Plaintiffs' preliminary injunction motion rests on the same record and the same categories of alleged harm.

Plaintiffs identify five categories of alleged harm: loss of health coverage, loss of statutory leave and reinstatement rights, forfeiture of unvested equity, loss of work authorization, and the

claimed irreversibility of a mass termination. None constitutes irreparable harm—as this Court found. The law is clear that termination, lost wages, and lost benefits do not constitute irreparable harm because they can be remedied through damages. Dkt. No. 25 at 6 (collecting cases). Moreover, Plaintiffs ignore altogether that Meta offered each of them incredibly generous severance packages, which they chose not to accept. And to be clear, Plaintiffs did not lose access to health insurance upon their termination. Even for those Plaintiffs who rejected Meta's severance offers, Plaintiffs can obtain COBRA continuation coverage—they have only lost Meta-subsidized coverage. Declaration of Cindy Pulido ("Pulido Decl.") ¶¶ 9-10, 15-16. Indeed, COBRA continuation exists to address exactly the type of situations that Plaintiffs face here.

Plaintiffs' expanded Motion adds a new argument that Meta's severance offers are coercive because they condition subsidized COBRA benefits on signing a release of claims. Dkt. No. 3 at 35. That argument is meritless. Conditioning severance benefits on a release of claims is standard, lawful, and commonplace in employment separations. Plaintiffs have no entitlement to both generous severance and the right to pursue litigation—the choice between the two is not coercion, it is the ordinary operation of a contractual severance arrangement.

Plaintiffs' Motion also introduces a new theory that Meta's AI systems will continue to operate using Plaintiffs' captured work product after separation, "effectively transferring the employee's professional value to Meta without continuing employment or compensation." *Id.* at 38. This argument has nothing to do with irreparable harm. If Plaintiffs have claims relating to the use of their work product, those are claims sounding in intellectual property or contract law that can be adjudicated in arbitration and remedied through damages.

**1. <u>Loss of Unvested Equity Is Not an Irreparable Harm</u>**

Plaintiffs' arguments regarding unvested equity do not demonstrate irreparable harm. Plaintiffs cite *Schachter v. Citigroup, Inc.*, 47 Cal. 4th 610 (2009), *IBM v. Bajorek*, 191 F.3d 1033 (9th Cir. 1999), *McCollum v. Xcare.net, Inc.*, 212 F. Supp. 2d 1142 (N.D. Cal. 2002), and *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429 (7th Cir. 1987), in support of their position, but none of those cases holds that loss of unvested equity constitutes irreparable harm. *Schachter* and *Bajorek* do not address the irreparable harm standard for injunctive relief whatsoever. *McCollum* and

*Jordan* concern claims of opportunistic termination, not the propriety of preliminary injunctions to prevent equity forfeiture. Moreover, this Court has already held that unvested RSUs are fully compensable through damages. Dkt. No. 25 at 6.

### 2. Loss of Health Coverage, Statutory Leave Rights, and Alleged Irreversibility of a RIF Does Not Constitute Irreparable Harm

As Meta explained in its opposition to Plaintiffs' TRO, Plaintiffs' reliance on *Chalk v. U.S. Dist. Ct. Cent. Dist. of Cal.*, 840 F.2d 701 (9th Cir. 1988), is misplaced. *Chalk* involved a teacher with AIDS who had a limited amount of time to enjoy the relief he sought—return to the teaching setting—and the court found that the "nature of Chalk's affliction" meant that "delay, even if only a few months," was time irretrievably lost. *Id.* at 710. Plaintiffs' alleged injuries are categorically different. They are facing ordinary employment-termination consequences that are fully compensable if they win on the merits of their employment law claims. Again, they will not lose health benefits because COBRA continuation is available to them. *See* Pulido Decl. ¶¶ 9–10, 15–16. Nor do Plaintiffs' claimed personal and family disruptions transform compensable employment injuries into irreparable harm. *Ogunleye v. Arizona*, 66 F. Supp. 2d 1104, 1111 (D. Ariz. 1999) (denying preliminary injunction where plaintiff alleged termination uprooted her family and damaged her career because loss of employment, even if accompanied by financial distress, does not establish irreparable harm); *O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1302–03 (D. Haw. 2022) (citing *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974)) ("discharge and its associated consequences do not ordinarily constitute irreparable harm, no matter how 'severely they may affect a particular individual.'").

Plaintiffs' reliance on *Enyart v. National Conference of Bar Examiners, Inc.*, 630 F.3d 1153 (9th Cir. 2011), fares no better. Enyart involved a blind plaintiff who, absent a preliminary injunction requiring accommodations for the bar examination, would have been categorically prevented from sitting for the exam at all, and thus entirely foreclosed from entering her chosen profession. *Id.* at 1165–66. The Ninth Circuit found irreparable harm precisely because the plaintiff faced a foreclosure from a professional path that no amount of money damages could restore: without accommodation, she simply could not take the test, and the resulting "loss of

opportunity to pursue her chosen profession" was unique to her circumstances. *See id*. at 1160–66. Plaintiffs here face no comparable foreclosure. They are not categorically barred from any profession, industry, or type of work. They have experienced the loss of at-will employment with one employer, and the economic harms about which they claim are common in any wrongful-termination case—harms that are compensable (if proven on the merits) through back pay, front pay, compensatory damages, and reinstatement, the precise categories of relief this Court found adequate in its TRO Order. Dkt. No. 25 at 6. Plaintiffs' reliance on *Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000), is similarly misplaced. *Adams* is non-binding Third Circuit authority, and even on its own terms it undercuts Plaintiffs' position: of 136 plaintiffs alleging loss of health coverage, the court found irreparable harm as to only three who had "effectively demonstrated that they would not be able to afford the medicine" they needed absent injunctive relief. *Id*. at 491. Plaintiffs here have made no comparable showing. They have not demonstrated that any individual Plaintiff is unable to afford COBRA continuation coverage or otherwise obtain health insurance, particularly given that, as this Court noted at the TRO hearing, Plaintiffs are all highly compensated individuals. Tr. of Proc., July 16, 2026, at 12.

Plaintiffs' reliance on *Sampson v. Murray*, 415 U.S. 61 (1974), and *Am. Fed'n of State, Cnty. & Mun. Emps., AFL-CIO v. U.S. Off. of Mgmt. & Budget*, 807 F. Supp. 3d 1004 (N.D. Cal. 2025), actually undercuts their position. *Sampson* holds that "insufficiency of savings or difficulties in immediately obtaining other employment—external factors common to most discharge employees—" do not ordinarily constitute irreparable harm. 415 U.S. at 92 n.68. Plaintiffs try to invoke *Sampson*'s narrow exception for "genuinely extraordinary situations," but their case does not qualify. *See id.* Unlike the government mass-termination at issue in *AFSCME*, which involved mass termination of federal employees during a government shutdown, this case involves at-will private-sector employees who have signed binding arbitration agreements and who have an adequate remedy through the arbitral forum. 807 F. Supp. 3d at 1040. In addition, it was not the "mass RIF" that the court found persuasive in finding there was irreparable harm, as Plaintiffs would have this Court believe. Instead, the fact that the RIF in *Sampson* was occurring during a government shutdown that made it a "departure" from the "normal situation." *See id.*

Plaintiffs' citation to *Whitfield v. Noem*, 2026 WL 1965094 (C.D. Cal. July 2, 2026), is also distinguishable. *Whitfield* involved a single federal employee facing removal where the court found that the employee's ADA and Rehabilitation Act accommodation claims would be mooted by termination. *See id.* at *1-3. Here, Plaintiffs are at-will private-sector employees who signed arbitration agreements that provide a comprehensive remedial forum, including the ability to seek emergency measures of protection from an arbitrator. The availability of that forum—which does not exist for federal employees subject to civil-service protections—defeats any analogy to *Whitfield*. Additionally, Plaintiffs have already been terminated, unlike the Plaintiff in *Whitfield*.

**3. <u>Loss of Work Authorization Is Not an Irreparable Harm</u>**

Although this Court recognized in its TRO Order that immigration consequences "likely constitute irreparable harm and may warrant injunctive relief," Dkt. No. 25 at 8, the record does not support that conclusion on closer examination. None of the four visa-holder Plaintiffs has alleged that removal proceedings are pending or that any immigration enforcement action is imminent. Their supplemental declarations do not suggest otherwise, and indeed all admit that they are actively looking for jobs—and will continue to do so during their 60-day grace period—which would provide them with new work authorization. *See* Dkt. Nos. 34-35, 36, 39. Instead, their claimed harm reduces to the possibility that, following the expiration of the 60-day grace period, they *may* need to depart the United States *if* they do not secure new employment or a change of status. But under *Winter*, a mere "possibility" of irreparable harm is insufficient; Plaintiffs must demonstrate that irreparable harm is likely. 555 U.S. at 22. Courts applying that standard have consistently held that immigration-related harms, even serious ones, do not constitute "clearly irreparable" injury where no removal proceedings are pending or imminent. *See Carlsson v. U.S. Citizenship & Immigr. Servs.*, 2012 WL 4758118, at *9 (C.D. Cal. Oct. 3, 2012) (court denied TRO; where there are no pending removal proceedings, court was "unable to conclude that irreparable harm is likely, as required under *Winter*"); *Collada v. Barr*, 2020 WL 8834784, at *2 (D. Ariz. June 2, 2020) (petitioner subject to a formal order of expedited removal failed to show irreparable harm absent specific circumstances indicating imminent removal in the near future); *Pymanee v. Noem*, 2026 WL 220907, at *2 (C.D. Cal. Jan. 22, 2026) (quoting

*Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)) (holding "claims regarding removal to a third country are purely speculative," and "speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction"); *Ta v. Noem*, 2025 WL 3716155, at *4 (C.D. Cal. Nov. 10, 2025) ("[T]he possibility of removal to a third country is speculative, and therefore [plaintiff] cannot show the requisite likelihood of irreparable harm . . .").

Here, none of the four visa-holder Plaintiffs has identified any pending removal proceeding, any immigration enforcement action, or any concrete deadline by which departure from the United States is required. Their theory of irreparable harm rests entirely on a chain of contingencies: that the grace period will expire, that they will not secure alternative employment or a change of status, and that removal proceedings will then be initiated. That chain of speculation falls far short of the *Winter* standard. Any immigration-related consequences that may eventually materialize are, at this stage, speculative—and speculative harm cannot justify the extraordinary remedy of a preliminary injunction.

### E. <u>The Balance of Hardships and Public Interest Weighs Strongly Against the Requested Preliminary Injunction</u>

The balance of equities does not favor Plaintiffs, as this Court already found in its TRO Order. Dkt. No. 25 at 8. Plaintiffs' motion merely regurgitates the same arguments raised in their TRO Application that this Court rejected. On that same record, this Court found that "the balance of the equities and public interest factors do not tip sharply in plaintiffs' favor" and that Plaintiffs' harms "can be remedied through the arbitration process." *Id.* That remains true.

Plaintiffs ask the Court to judicially reverse part of a companywide restructuring affecting thousands of employees after notices have been issued, roles eliminated, and teams dissolved. *See* Sharkey Decl. ISO Opp. to TRO ¶ 7. The operational disruption would be significant, and the precedent would be worse: any subset of employees in any future RIF could seek similar relief simply by alleging that protected leave was temporally proximate to their selection. The financial disruption would be equally as significant. *Id.* ¶¶ 10–11. Allowing Plaintiffs to remain employed for just one extra month would cost Meta an additional several million dollars for RSUs that

would not otherwise vest, and to which Plaintiffs, who have not worked for four months, are not entitled. *Id.* ¶ 11. Additionally, for each month the Court orders Meta to re-hire and keep Plaintiffs employed, Meta will pay nearly $600,000 to Plaintiffs for their salary and benefits, despite the fact that Plaintiffs have not been, and will not be, working for Meta. *Id.*

Meta has a legitimate business interest in implementing its reduction in force, reallocating resources, and continuing workforce actions after they have been initiated. Plaintiffs cite no legal authority empowering a court to reverse a lawful RIF on this basis, because no such authority exists. Plaintiffs' own filing acknowledges that Meta announced the RIF as part of a capital reallocation toward AI investment. Dkt. No. 3 at 39. Plaintiffs may disagree with that business judgment, but their disagreement does not give them a veto. Courts do not sit as super-personnel departments, and employment laws do not prohibit employers from making business judgments, including reductions in force, absent proof of unlawful discrimination or interference. *See Pottenger v. Potlatch Corp.*, 329 F.3d 740, 747–49 (9th Cir. 2003); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1281–85 (9th Cir. 2000). Plaintiffs have offered no such proof. And if they believe they do have evidence of unlawful conduct, the place to present it is in arbitration.

Plaintiffs' expanded public interest argument that this case presents a "national rule-setting moment" for AI-mediated employment decisions is overblown rhetoric, not a basis for a preliminary injunction. Dkt. No. 3 at 41. The public interest analysis in the injunctive-relief context asks whether the requested injunction serves the public interest—not whether the case raises questions of broad importance. The public interest is served by enforcing the binding arbitration agreements that Plaintiffs voluntarily signed, by preserving the at-will employment doctrine, and by declining to transform preliminary injunction proceedings into vehicles for judicially supervised audits of employers' internal decision-making processes. If Plaintiffs believe that Meta's employment practices raise novel questions about AI in the workplace, those questions should be resolved on a full evidentiary record—in arbitration—not on the basis of self-serving declarations and speculation at the preliminary injunction stage.

### F. <u>Plaintiffs' Requested Injunction Would Upend, Rather than Preserve, the Status Quo</u>

The purpose of a preliminary injunction is to preserve the status quo until a final

determination on the merits. *L.A. Memorial Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1200 (9th Cir. 1980). A preliminary mandatory injunction, which mandates an affirmative act that changes the status quo, is "particularly disfavored" and should not issue unless the facts and law "clearly favor" the moving party. *Garcia*, 786 F.3d at 740. Plaintiffs claim that they are merely seeking to preserve the status quo, but that is not true. The status quo is not "continued employment." The actual status quo is that Plaintiffs have been terminated. To give Plaintiffs what they seek—active employment with a company from which they have been terminated in positions that have been eliminated—would require the Court to mandate affirmative action by Meta. That is a quintessential mandatory injunction. *See, e.g.*, *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (holding plaintiff's request for reinstatement was a request for a mandatory injunction). If Plaintiffs are ultimately entitled to reinstatement or comparable relief, the arbitrator can order it after hearing the evidence—but this Court should not do so on a record that lacks any individualized proof of wrongdoing.

### G. <u>If Injunctive Relief Is Granted, Plaintiffs Must Post a Substantial Bond</u>

For the foregoing reasons, the Motion should be denied in full. If the Court grants any interim relief, the order should be narrowly limited to Plaintiffs who make an individualized evidentiary showing, should avoid compelling vesting or other benefits not otherwise due, and should require Plaintiffs to post a meaningful bond. Plaintiffs seek an order that would require Meta to re-hire Plaintiffs and reinstate employment-related benefits and equity-related status. Those burdens are not nominal. Any interim order should therefore require security of at least $10 million, which even still would not be sufficient to cover Meta's costs, administrative burdens, and damages if the injunction is later determined to have been wrongful. Fed. R. Civ. P. 65(c).

## VI. <u>CONCLUSION</u>

For the foregoing reasons, Meta respectfully requests that the Court deny Plaintiffs' Motion for Preliminary Injunction. This Court already denied Plaintiffs' TRO application on substantially the same record, finding that Plaintiffs failed to establish irreparable harm and that the balance of equities did not tip sharply in their favor. Plaintiffs' expanded legal theories and additional case citations do not cure those fundamental deficiencies.

Dated: August 10, 2026

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: Erin Connell

ERIN CONNELL
Attorneys for Defendant
META PLATFORMS, INC.