ERIN M. CONNELL (SBN 223355)
econnell@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105-2669
Telephone:     +1 415 773 5700
Facsimile:     +1 415 773 5759

LAUREN M. GOLDSMITH (SBN 293269)
lgoldsmith@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY 10019-6142
Telephone:     +1 212 506-5000

DIXIE TAUBER (SBN 321692)
dtauber@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
400 Capitol Mall, Suite 3000
Sacramento, CA  95814-4497
Telephone:     +1 916 329 7982

Attorneys for Defendant
META PLATFORMS, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| DOES 1 THROUGH 26,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:26-CV-7122<br><br>**DECLARATION OF LINH DOAN IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

DECL. OF LINH DOAN
3:26-CV-7122-WHO

I, Linh Doan, declare as follows:

1.    I am Director, Human Resources Business Partner Enablement at Meta Platforms, Inc. ("Meta"), a position I have held since April 2012. I previously submitted a declaration in support of Defendant Meta Platforms, Inc.'s Opposition to Plaintiffs' Application for Temporary Restraining Order (Dkt. No. 18) and Pursuant to the Court's July 17, 2026 Order (Dkt. No. 31). I have personal knowledge of the facts stated herein and could testify competently to them.

2.    I submit this declaration in support of Meta's Opposition to Plaintiffs' Motion for a Preliminary Injunction. This declaration responds to the Supplemental Declaration of Doe 16 (Dkt. No. 22-1) and, specifically, to the exhibits attached thereto, which Plaintiffs characterize as "bearing on" Meta's representations "concerning the role of AI-related metrics in performance evaluations." Dkt. No. 22 at 2.

3.    I have reviewed the documents attached as exhibits to Doe 16's Supplemental Declaration and am familiar with Meta's guidance concerning AI-related metrics, including how the guidance applied to the 2025 performance cycle and the RIF selection process.

4.    I understand that Plaintiffs have alleged, among other things, that Meta's selection process for the RIF drew on inputs including "AI-token consumption" that "by design, cannot be accumulated by an employee who is on protected medical or family leave." Compl. ¶ 2. Plaintiffs appear to be using the documents attached to Doe 16's Supplemental Declaration to imply that AI adoption and usage metrics were used as negative factors in performance reviews and, by extension, in the RIF—given performance ratings were one of the permissible selection criteria in certain decisional units. That assertion is a mischaracterization of these documents and of how the performance review process and RIF selection process actually worked. As explained below, Meta's guidance does not permit AI adoption and usage metrics to be used as negative factors in performance reviews in 2025 or as selection criteria in the RIF.

**Exhibit A: The "How We Work" Document**

5.    Exhibit A appears to be a screenshot of an internal document titled "How We Work." I understand that Doe 16 characterizes this document as evidence that "Meta's written 2025 performance expectations included AI-driven impact." Dkt. No. 22-1 at 2. Based on my review of

1

this document and my familiarity with Meta's guidance for the 2025 performance cycle, this characterization is misleading. The document makes clear that AI-driven impact could be recognized only as an "Above and Beyond" factor—meaning it could be recognized as a positive contribution, but not as a negative factor held against any employee. *Id.* at 5. It was not a "core expectation," and employees were not to be rated down or penalized based on AI adoption or usage metrics. *Id.* The document expressly states: **"Individual adoption metrics <u>will not</u> be considered as part of the performance cycle."** *Id.* It further instructs managers to "[l]ook for clear examples where AI enabled higher quality, efficiency, or innovation. *Id.* Recognition should be based on the outcome and overall impact delivered as a result of leveraging AI, **not if it was used**." *Id.*

6.    In other words, per Meta's guidance, to the extent AI-driven impact was recognized in performance reviews in 2025, it was through a qualitative assessment of outcomes—not a quantitative assessment of whether or how much AI was used. Any assessments based on AI-driven impact also were based only on the time when the employee was working. Also, as explained above, AI-driven impact was not to be treated as a negative factor in performance reviews.

7.    Doe 16's own 2025 performance review (Exhibit B) illustrates this point. The review credits Doe 16 with effectively "[l]everaging AI . . . to synthesize and visualize data"— treating AI use as a strength, not as a baseline expectation or negative factor. *Id.* at 9. The review also identifies areas for improvement unrelated to AI, such as strategic thinking and research methodology, demonstrating that performance evaluations were based on a substantive assessment of employee contributions, not AI adoption metrics. *Id.*

8.    In sum, based on my review of Exhibit A in light of Meta's guidance, the document confirms that for the 2025 performance cycle: (1) AI-driven impact was recognized only as an "Above and Beyond" factor that could help, but not hurt, an employee; (2) individual AI adoption metrics were explicitly excluded from performance reviews; (3) any recognition of AI-driven impact was to be based on qualitative assessment of outcomes, not quantitative metrics; and (4) the focus was on time when the employee was working, not on leave periods.

DECL. OF LINH DOAN
3:26-CV-7122-WHO

**Exhibits D-1 through D-4: The Engineering Leaders' Workplace Post**

9.      Exhibits D-1 through D-4 appear to be screenshots of an internal Workplace post in which Meta engineering leaders discussed AI adoption data. Based on my review of this post, it similarly underscores that AI token usage was not to be used as a performance metric.

10.      The post explicitly states: "Like diff counts or lines of code, we don't advocate token usage as a primary input for measuring performance." *Id.* at 14. It further states: "Token usage tells us something about patterns of work across teams, **not about the quality of any individual's output.**" *Id.* The post expressly instructs: "**[T]oken usage is not a direct measure of impact.** AI tokens burn rate != performance rating."—in other words, how much an employee uses AI tools **does not equal** their performance rating. *Id.*

11.      Notably, the post specifically addresses concerns that high AI usage would automatically translate into being a high performer. The post states: "We wouldn't map high usage directly to being a high performer, and don't want to incentivize gaming AI adoption metrics." *Id.* at 15. The post further confirms that Meta's leadership explicitly instructed managers **not** to use token usage in individual performance evaluations: **"[W]e will ask managers not to use token usage as a justification for any performance rating on individuals in the team."** *Id.* Based on my familiarity with Meta's guidance, this reflects Meta's express direction not to evaluate employees based on AI adoption or usage volume.

12.      Based on my familiarity with Meta's practices, some teams at Meta developed AI "dashboards" to understand organizational trends and identify opportunities to share best practices across the company. *See id.* at 14-16. These dashboards were informational tools used to understand how teams were adapting to new technologies at an aggregate level—they were not tools for evaluating individual employee performance. To my knowledge, there was no official, company-wide dashboard or program to track or evaluate employees based on AI adoption or usage metrics.

13.      In sum, based on my review of Exhibits D-1 through D-4, these documents confirm that AI token usage was not to be used as a performance metric during the 2025 performance cycle,

DECL. OF LINH DOAN
3:26-CV-7122-WHO

that Meta did not equate high AI usage with high performance, and that managers were explicitly instructed not to use token usage as a justification for any performance rating.

### Exhibit C: The Anonymous Workplace Post

14. Exhibit C appears to be a screenshot of an anonymous post on Meta's internal Workplace platform in which an unidentified Meta employee claimed that "low AI adoption" was cited as a contributing factor to that employee's "Meets Most" rating for 2025. *Id.* at 12.

15. Based on my review of this document in the context of Meta's guidance, this anonymous post does not establish that AI adoption was used as a company-wide performance criterion or RIF selection criterion—and it was not. The anonymous employee acknowledged in the post that they "[h]aven't asked [their manager] for details on how exactly they evaluated this." *Id.* In my view, it would not be reasonable to draw any conclusions about Meta's performance evaluation process—even as to this one employee—based on a single anonymous post that contradicts Meta's express guidance.

16. Meta is a large organization with tens of thousands of employees and managers. Even if a single manager deviated from company guidance, that would not establish that Meta's performance evaluation or RIF selection process incorporated AI adoption or usage metrics. Based on my familiarity with Meta's guidance, the performance evaluation and RIF selection processes did not incorporate such metrics.

17. In sum, Exhibit C is an isolated, unverified claim by an unidentified employee who did not even ask their manager to explain the basis for the comment. It does not reflect any company-wide performance evaluation practice or RIF selection criteria.

### Conclusion

18. Based on my understanding of the Complaint's allegations and my review of the exhibits attached to Doe 16's Supplemental Declaration in the context of Meta's guidance, these documents do not support Plaintiffs' claims that Meta used AI metrics to make RIF selection decisions. To the contrary, these documents—when read in full and in their proper context— confirm that:

a. Meta's written guidance (Exhibit A) made clear that AI-driven impact was not a core expectation and was not to be used as a negative factor in 2025 performance ratings;

b. Meta's written guidance (Exhibit A) expressly stated that individual AI adoption metrics "will not be considered as part of the performance cycle"; and

c. Meta's engineering leaders (Exhibits D-1 through D-4) explicitly instructed managers not to use AI token usage as a justification for any individual performance rating.

19.    In short, based on my review of the exhibits and my familiarity with Meta's guidance, Plaintiffs' own exhibits refute their claims. The documents Plaintiffs submitted to the Court do not show that AI adoption or usage metrics were used as negative factors in the 2025 performance cycle or as selection criteria in the RIF—they show the opposite. Meta's written guidance expressly excluded AI adoption metrics from performance reviews. Meta's engineering leaders expressly instructed managers not to use token usage as a justification for performance ratings. And the one document suggesting otherwise—an anonymous, unverified post by an unidentified employee—is an isolated claim that is inconsistent with Meta's express guidance and cannot reasonably support any inference about company-wide practices.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 10, 2026, at San Jose, California.

_Linh Doan_

_____

Linh Doan

DECL. OF LINH DOAN
3:26-CV-7122-WHO