Andrea Mazingo, SBN 300824
LUMEN LAW CENTER, P.C.
8605 Santa Monica Blvd PMB 832031
West Hollywood, CA 90069
Telephone: (310) 269-6739
Email: andi@lumenlawcenter.com

Barbara E. Cowan, SBN 251942
WORKPLACE ADVOCATES, P.C.
9431 Haven Avenue, Suite 100
Rancho Cucamonga, CA 91730
Telephone: (909) 983-4102
Email: brandi@wpa.law

Rebecca Houlding (admitted *pro hac vice*)
HOULDING LAW PC
431 Classon Avenue, Suite 1B
Brooklyn, NY 11238
Telephone: (646) 561-9119
Email: rebecca@houldinglaw.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DOES 1 THROUGH 26,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:26-cv-07122-WHO<br><br>**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: August 24, 2026<br>Time: 10:00 a.m.<br>Courtroom: 2, 17th Floor<br>Judge: Hon. William H. Orrick |

# TABLE OF AUTHORITIES

## Cases

*Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d Cir. 2000) .... 38

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) .... 32

*All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127 (9th Cir. 2011) .... 35

*Apple Inc. v. Superior Court*, 56 Cal. 4th 128 (2013) .... 28

*Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) .... 41

*Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112 (9th Cir. 2001) .... 13

*Barahona-Gomez v. Reno*, 167 F.3d 1228 (9th Cir. 1999) .... 44

*Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018) .... 36

*Blesedell v. Mobil Oil Co.*, 708 F. Supp. 1408 (S.D.N.Y. 1989) .... 6

*Blue Star Land Servs., LLC v. Coleman*, 2017 U.S. Dist. LEXIS 232012 (W.D. Okla. Aug. 30, 2017) 32

*Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011 (9th Cir. 2016) .... 41

*Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928 (D. Md. 2020) .... 36, 37

*Chalk v. U.S. Dist. Ct.*, 840 F.2d 701 (9th Cir. 1988) .... 39

*Cortez v. Chipotle Mexican Grill, Inc.*, 2018 U.S. Dist. LEXIS 227201 (C.D. Cal. Aug. 9, 2018), aff'd, 2021 U.S. App. LEXIS 22534 (9th Cir. July 29, 2021) .... 28

*Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258 (D. Conn. 2012) .... 6

*Doe v. Noem*, 778 F. Supp. 3d 1151 (W.D. Wash. 2025) .... 36

*Doe v. Noem*, 2026 U.S. Dist. LEXIS 97078 (S.D.N.Y. May 1, 2026) .... 36

*EEOC v. iTutorGroup, Inc.*, No. 1:22-cv-02565 (E.D.N.Y. 2023) .... 33

*EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746 (9th Cir. 1991) .... 43

*Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015) .... 42

*Garcia v. Spun Steak Co.*, 998 F.2d 1480 (9th Cir. 1993) .... 7

*Genias Graphics Gumb & Co. KG v. Tecplot, Inc.*, 2013 WL 12092542 (W.D. Wash. Aug. 21, 2013) 4, 5

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) .... 41

*Gostola v. Charter Commc'ns, LLC*, 72 F. Supp. 3d 796 (E.D. Mich. 2014) .... 15

*Hallmark Ins. Adm'rs, Inc. v. Colonial Penn Life Ins. Co.*, 1987 U.S. Dist. LEXIS 6587 (N.D. Ill. June 19, 1987) .... 32

*Hedayati v. Edlow*, 2026 U.S. Dist. LEXIS 150071 (N.D. Cal. July 7, 2026) .... 36

*Herrera v. Zumiez, Inc.*, 953 F.3d 1063 (9th Cir. 2020) .... 28

*Hohlbein v. Heritage Mut. Ins. Co.*, 106 F.R.D. 73 (E.D. Wis. 1985) .... 6

*Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009) .......... 12, 34, 43

*Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003) .......... 44

*Karakozova v. University of Pittsburgh*, 2009 WL 1652469 (W.D. Pa. June 11, 2009) .......... 36

*Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262 (9th Cir. 1991) .......... 34–35

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018) .......... 24

*Lee v. City of Los Angeles*, 250 F.3d 668 (9th Cir. 2001) .......... 24

*Local 28, Sheet Metal Workers v. EEOC*, 478 U.S. 421 (1986) .......... 32

*Louis v. SafeRent Solutions, LLC*, No. 1:22-cv-10800 (D. Mass. 2024) .......... 33

*Louisiana v. United States*, 380 U.S. 145 (1965) .......... 32

*OOO Brunswick Rail Management v. Sultanov*, 2017 U.S. Dist. LEXIS 2343 (N.D. Cal. Jan. 6, 2017)33

*Pagel v. TIN, Inc.*, 695 F.3d 622 (7th Cir. 2012) .......... 15

*Pecora v. ADP, LLC*, 232 F. Supp. 3d 1213 (M.D. Fla. 2017) .......... 15

*Porter v. Lee*, 328 U.S. 246 (1946) .......... 39, 40, 41

*Puricelli v. CNA Ins. Co.*, 185 F.R.D. 139 (N.D.N.Y. 1999) .......... 6

*Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) (en banc) .......... 12

*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) .......... 44

*Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804 (9th Cir. 1963) .......... 41

*Toyo Tire Holdings of Ams. Inc. v. Continental Tire N. Am., Inc.*, 609 F.3d 975 (9th Cir. 2010) .......... 4, 5

*Van Asdale v. Int'l Game Tech.*, 577 F.3d 989 (9th Cir. 2009) .......... 34

*Waymo LLC v. Uber Technologies, Inc.*, 2017 U.S. Dist. LEXIS 73843 (N.D. Cal. May 11, 2017)32–33

*Wellpoint Health Networks, Inc. v. Superior Court*, 59 Cal. App. 4th 110 (1997) .......... 28

*WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834 (N.D. Cal. 2019) .......... 31

*Whitfield v. Noem*, 2026 WL 1965094 (C.D. Cal. July 2, 2026) .......... 20, 40

*World Fin. Grp. Ins. Agency v. Olson*, 2024 WL 730356 (N.D. Cal. Feb. 22, 2024) .......... 35

**Statutes**

42 U.S.C. § 2000e-2(k) .......... 7

42 U.S.C. § 2000e-2(k)(1)(B)(i) .......... 8

42 U.S.C. § 2000e-5(g)(1) .......... 32

29 U.S.C. § 2601 et seq. .......... 44

29 U.S.C. § 2614(a)(1) .......... 39

Cal. Gov't Code § 12945.2 .......... 39, 44

Cal. Lab. Code § 226 ..... 28
Cal. Lab. Code § 432 ..... 28
Cal. Lab. Code § 1198.5(a) ..... 28
Cal. Lab. Code § 1198.5(n) ..... 28
N.Y.C. Admin. Code § 8-107(17) ..... 7

**Regulations**

29 C.F.R. § 825.220(c) ..... 13
29 C.F.R. § 1607.4 ..... 33
29 C.F.R. § 1607.15 ..... 33
2 Cal. Code Regs. § 11008(l) ..... 7
2 Cal. Code Regs. § 11008.1 ..... 33
2 Cal. Code Regs. § 11013(c) ..... 3, 43, 45
2 Cal. Code Regs. § 11017(e) ..... 7
2 Cal. Code Regs. § 11020(b) ..... 7
2 Cal. Code Regs. § 11020(b)(i) ..... 33

**Rules**

Fed. R. Civ. P. 20(a)(1)(B) ..... 6, 8
Fed. R. Civ. P. 53(a)(1)(C) ..... 31, 43
Fed. R. Civ. P. 65(c) ..... 44, 45
Fed. R. Evid. 706 ..... 43
Fed. R. Evid. 801(d)(2) ..... 24

# TABLE OF CONTENTS

**I. INTRODUCTION** ..... 1

**II. ARGUMENT** ..... 4

A. The Carve-Out Meta Drafted Authorizes This Motion, and the Arbitral Alternative Meta Invokes Does Not Exist ..... 4

B. Joinder Is Proper, and *Costello* Supports Plaintiffs ..... 6

C. The Record Now Establishes a Likelihood of Success on the FMLA and CFRA Negative-Factor Claims ..... 8

1. Meta's Showing Rests on a Witness Who Has Sworn Three Different Versions of the Same Story, Undercut by the Partial Performance Reviews Meta Produced ..... 8

2. Ms. Doan's Own Admissions Establish the Negative Factor ..... 13

3. Meta Obtained Denial of the TRO on Representations It Has Since Abandoned ..... 17

4. The Court's Question Remains Unanswered: No Dates, No Denominators, No Ranking Artifact, and No Skills Assessment ..... 21

5. Meta Tells Investors, Regulators, and the Department of Labor a Different Story ..... 24

6. Meta Withheld Critical Selection-Related Records Under § 1198.5, Has Never Represented That the Records Do Not Exist, and Its Own "Compromise" Production Shows No Leave-Neutralization Control ..... 28

7. The Expert Declarations Show the Requested Audit Is Bounded, Conventional, and Feasible—Not a "Fishing Expedition" ..... 30

8. "Unequivocal" Has Not Survived the Month ..... 34

D. The Six Plaintiffs at Issue Face Irreparable Harm That Money Cannot Remedy ..... 35

1. The Harm Is Loss of Lawful Status and Work Authorization—Not "Imminent Removal"—and Courts Uniformly Hold That Harm Irreparable ..... 35

2. The Windows Are Concrete, Plaintiff by Plaintiff ..... 37

3. The Health-Coverage and Statutory-Leave Showings Meta Says Are Missing Are in the Record ..... 38

4. *Whitfield* Remains Undistinguished ..... 40

E. The Requested Order Preserves the Last Uncontested Status Quo; Even Under the Mandatory-Injunction Standard, the Facts and Law Clearly Favor the Six Plaintiffs at Issue Here ..... 41

F. In the Alternative, Audit and Preservation Relief Should be Ordered Even If the Court Declines to Restore Any of the Plaintiffs to the Status Quo ..... 42

G. The Balance of Hardships Tips Sharply Toward Plaintiffs, and the Public Interest Favors Relief ..... 43

H. Any Bond Should Be Nominal ..... 44

**III. CONCLUSION** ..... 45

## I. INTRODUCTION

A month ago, this Court denied a temporary restraining order for one principal reason: Meta's denials were "unequivocal." Dkt. 25 at 5. Meta has spent the four weeks since taking them back. The one-word answers the Court solicited at the hearing, including "No," AI played no role in the ratings; and "Correct" no AI used in any way in the RIF selection, have been qualified out of existence by Meta's own sworn filings. *Infra* § II.C.3. Use of AI-token-usage dashboards was "completely inaccurate" in July, but their use is "informational" in August. What "was not used in any way" now "could help, but not hurt." *Id*. And Meta's sole process witness now concedes the mechanism at the heart of the claims: the ratings that decided the RIF credited "AI-driven impact" in assessments "based only on the time when the employee was working," Dkt. No. 42-1,¶¶ 4-6, 8—*i.e.*, impact that an employee on protected leave categorically could not earn. The Court reserved the power to reconsider "based on any additional evidence." Dkt. No. 25 at 8-9. The most important new evidence is Meta's retreat.

Meta has had the opportunity to place those categorical answers under penalty of perjury. Both times it substituted narrower, defined-term denials. The space between what counsel affirmed and what Meta's declarant swears to is consequential. A categorical "no AI in any way" denial is one no single witness is positioned to validate, O'Neil Decl. ¶¶ 11–12; if even one manager used AI to draft even a line of a document considered in the process, the denial is wrong. *Id.* ¶ 12. And the chances of this are high: by November 2025, employees were using Meta's AI tools to draft performance reviews, and this subsequently was announced as standard procedure for first-draft reviews. *Infra* § II.C.3.

Meta's produced documents fill the spaces between its positional hedging. The year-end 2025 review instrument—the cycle that produced the ratings Meta calls its neutral criteria—was

rewritten company-wide to direct evaluation of "AI-driven impact": four Plaintiffs[1] across three organizations attach the same before-and-after forms, *infra* II.C.2, and Meta's newest declaration concedes the factor could lift a rating, Dkt. No. 42-1 ¶¶ 5, 8. Meta's contemporaneous compensation records financially reward the very performance it now disparages as layoff-worthy: at- and above-target bonus multipliers, fresh four-year equity grants, a promotion, an [redacted] recognition—all were issued on the ratings Meta's declarant recasts as documented deficiencies. *Infra* § II.C.5. Two of the four Plaintiffs were rated above Meta's own stated selection cutoff, so their selection is explicable only by a ranking no Meta document describes, *infra* § II.C.4; the one percipient people manager on this record swears the only criterion ever communicated to him was the rating itself and he never saw any document setting out selection criteria at all, Dkt. No. 38 ¶¶ 3–4. And Meta has withheld critical selection-related records requested under Labor Code § 1198.5—including calibration notes whose headers appear in its own production with the content stripped—while never once representing, after diligent search, that the records do not exist. *Infra* § II.C.6. Some of the incomplete performance reviews Meta did produce reference leavetaking on their face, such as a Plaintiff's 2025 year-end rating reading, in full, "Leave of Absence," and another Plaintiff's review crediting her "[m]aintain[ing] momentum . . . during and after medical leave." *Infra* § II.C.1.

The second Doan declaration's paragraphs 3 through 8 describe what decision-makers knew—that leave information was not "made available" to them (should that be construed to the exclusion of being accessible to them). Dkt. No. 31 ¶¶ 3–8. But Plaintiffs' disparate-impact theory is that purportedly neutral selection criteria themselves carried leave-correlated inputs: (1) performance ratings scored in part against a company-wide "AI-driven impact"

[1] On August 3, 2026, Doe 20 filed a notice of voluntary dismissal, leaving 25 Plaintiffs. Dkt. No. 33; see Opp. at 2 n.2. References herein to the "Plaintiffs" are to the 25 remaining Plaintiffs unless otherwise noted.

expectation—one Meta now concedes could lift a rating, Dkt. No. 42-1 ¶¶ 5, 8—that an employee on protected leave categorically cannot demonstrate during the leave, (2) activity-based measures that accrue only while working, *infra* § II.C.3, and (3) rating cycles that ran "throughout the year" without neutralization, *infra* § II.C.2. Every intent-focused proposition in Meta's declarations can be true and the disparate-impact claims still succeed.

This reply focuses where the Court's July 17 Order did: on the Plaintiffs most significantly impacted by delay. Does 4, 9, 15, and 26 hold lawful status and work authorization that extinguish on dates already fixed, September 20 and October 19. *Infra* § II.D.2. Doe 6's wife's adjustment application was called into question fifteen days after his separation. *Id.* Doe 16's medically necessary treatment has already lapsed once. *Infra* § II.D.3. Plaintiffs' showing as to all twenty-five stands, and nothing in this reply narrows it; the point is that the Court need not resolve all twenty-five claims to stop the most significant injuries that are irreversible on a date certain. For these six, the Court has three independent ways to keep the claims decidable. It can restore the six to payroll, benefits, and sponsorship status, as applicable, pending an independent audit under a court-approved protocol. It can order the audit itself, through a neutral reporting to this Court and the arbitrators, which will confirm Meta's account if that account is accurate. O'Neil Decl. ¶ 23. Or, at minimum, it can require Meta to preserve the auditable records while an arbitrator is appointed, an obligation California law already imposes. 2 Cal. Code Regs. § 11013(c). Plaintiffs ask only that this Court preserve, for six families, what no later award can restore—while a neutral answers the question this Court ordered answered and Meta has now, three declarations later, still not answered.

## II. ARGUMENT

### A. The Carve-Out Meta Drafted Authorizes This Motion, and the Arbitral Alternative Meta Invokes Does Not Exist

Meta's threshold argument reads its own carve-out out of its own contract. The Agreement Meta drafted excludes from arbitration "claims for temporary or preliminary injunctive relief (including a preliminary injunction) in aid of arbitration or to maintain the status quo pending arbitration, in a court of competent jurisdiction," Dkt. 3-16 ¶ 24, Ex. A, language that is crystal clear in its preservation of the path Plaintiffs followed. Plaintiffs served AAA arbitration demands on July 14, 2026. Mazingo Decl. ¶ 2. The arbitrations exist. This motion is "in aid of" them in the only sense that phrase can bear: it preserves the possibility of meaningful final relief—reinstatement, continued sponsorship, lawful status—that will be gone before any arbitrator can act. Meta's own authority holds that a district court may issue interim injunctive relief in an arbitrable dispute where necessary to preserve the status quo and the meaningfulness of the arbitration. *Toyo Tire Holdings of Ams. Inc. v. Continental Tire N. Am., Inc.*, 609 F.3d 975, 981 (9th Cir. 2010).

In arbitration, Claimants are proceeding under the Mass Arbitration rules, whereby the AAA may appoint a process arbitrator and/or one or more merits arbitrators to achieve efficiencies concerning discovery and other preliminary matters, while Claimants' arbitrations are still individual. But the separate emergency rules do not specify a procedure for relief on any group basis, meaning that there is no mechanism in place for evaluating Plaintiffs' claims collectively, something Meta's arbitration agreements otherwise prohibit. Mazingo Decl. ¶ 3. *Genias Graphics*, the unreported Washington district court decision on which Meta principally relies, faulted a single commercial plaintiff for bypassing an arbitrator who had already been appointed, wherein a preliminary arbitral hearing had already been held, and the arbitrator was

available and "in a position" to act. *Genias Graphics Gumb & Co. KG v. Tecplot, Inc.*, 2013 WL 12092542, at *1–2 (W.D. Wash. Aug. 21, 2013) (distinguishing *Toyo* where a panel had not yet been formed and thus could not consider interim relief). Here there is no arbitrator to ask, and the separations—including the extinguishment of the visa-dependent Plaintiffs' lawful status—will be complete before there is. That is precisely the circumstance the carve-out Meta wrote exists to address. And even if 25 arbitrators were available to mete out emergency relief on the individual bases required by the arbitration agreements, that does not preclude Plaintiffs from seeking their remedy here, with Plaintiffs joined for efficiency, where it is a clear and available forum under Meta's Arbitration Agreement.

Meta's related suggestion that any audit "is a matter for the arbitrator – who has full authority to order discovery," Opp. at 18, reads the carve-out backwards. The proposed order directs the auditor's report to this Court *and to the arbitrators*; machinery that generates the record the arbitrators will need is relief "in aid of arbitration" in the most literal sense. The suggestion also assumes an arbitrator who does not exist. A month after Plaintiffs served their demands, AAA has appointed no one, and its most recent correspondence confirms the matters remain in administrative processing. Mazingo Decl. ¶ 3. Meanwhile, the evidence the arbitrators will need is degrading in real time: dashboard views may not be systematically preserved and change over time, an AI system's documentation changes with continued use, and system administrators' memories fade. O'Neil Decl., ¶¶ 17-19. "Each week of continued operation widens the gap between the system as it was in May 2026 and the system as examined later" and prompt preservation "could represent the difference between an answerable and an unanswerable question." *Id.* ¶ 20. Deferring the audit to an arbitrator who has not been appointed is not a forum argument; it is a way of ensuring the question is never answered.

Meta's remaining contract arguments attack the packaging of this motion rather than any Plaintiff's right to bring it. Each Plaintiff invokes the carve-out individually; Rule 20 joinder of individual claims for pretrial purposes is not a "class, collective or representative" proceeding, and Meta cites no authority holding that employees who each hold an identical carve-out forfeit it by filing on a single docket. Nor does the choice-of-law clause help Meta: the carve-out permits suit "in a court of competent jurisdiction," and Meta—headquartered in this District—does not contend venue or personal jurisdiction is improper here. The individualized state-law variations Meta catalogues go to the merits of particular counts, not to whether this Court may preserve the status quo as to any Plaintiff properly before it. Meta wrote a clause that directs interim relief to court, and now objects that court procedure, Rule 20, governs here.

### B. Joinder Is Proper, and *Costello* Supports Plaintiffs

*Costello v. Home Depot U.S.A.*, Inc., 888 F. Supp. 2d 258 (D. Conn. 2012), is Meta's lead authority, and it cuts against Meta. *Costello* granted a motion to sever (a posture not before this Court) FLSA misclassification claims even though it found that plaintiffs shared a common question of law or fact. *Id.* at 265. But it granted the motion to sever in part because the factors did not favor plaintiffs, including that plaintiffs did "not seek to prove a pattern or practice" and each claim turned on store-by-store daily duties. *Id.* at 265. In the same passage, the court collected the cases holding that claims *do* arise from the same series of transactions where plaintiffs challenge a common policy. *Costello*, 888 F. Supp. 2d at 264, *citing Blesedell v. Mobil Oil Co.*, 708 F. Supp. 1408, 1422 (S.D.N.Y. 1989) ("[a] company-wide policy purportedly designed to discriminate . . . arises out of the same series of transaction or occurrences"); *Puricelli v. CNA Ins. Co.*, 185 F.R.D. 139, 143 (N.D.N.Y. 1999); *Hohlbein v. Heritage Mut. Ins. Co.*, 106 F.R.D. 73, 77 (E.D. Wis. 1985). This case sits on the policy side of *Costello's* line: one

RIF, announced company-wide on a single day; one centrally designed five-step process that Meta's single declarant purports to describe for *every* decisional unit, Dkt. No. 18-3 ¶ 4; one centrally promulgated menu of "permissible criteria," *id.* ¶ 5; one company-wide review instrument that supplied the ratings used as criteria; one notification date. Meta cannot prove its defense through a single corporate declaration describing a uniform process and insist the challenges to that process are too individualized to be heard together.

Meta's merits section makes the point for Plaintiffs by contradicting its joinder section. At page 12, the Opposition asserts that "Plaintiffs do not allege disparate impact." Opp. at 12. Three pages later, it devotes a subsection to arguing that Plaintiffs' disparate-impact showing fails on the merits. Opp. at 15 (discussing *Garcia v. Spun Steak Co.*, 998 F.2d 1480 (9th Cir. 1993)). The Complaint pleads disparate impact expressly, in captioned counts: Count IV is titled "Title VII / Pregnancy Discrimination Act—Disparate Impact," 42 U.S.C. § 2000e-2(k), Compl. ¶¶ 125–26; Count VIII alleges that Meta's automated-decision system "produced an unjustified disparate impact" in violation of FEHA and the Civil Rights Council's ADS regulations, 2 Cal. Code Regs. §§ 11008(l), 11017(e), 11020(b), Compl. ¶¶ 134–35; Count XIV invokes the New York City Human Rights Law's express disparate-impact provision, N.Y.C. Admin. Code § 8-107(17), Compl. ¶ 152; Count VI alleges the same disparate impact on employees with disabilities under the ADA, Compl. ¶ 130; and the joinder allegations identify "whether the process produced an unjustified disparate impact" as a question common to all Plaintiffs, Compl. ¶ 42. Nor can Meta's assertion be rehabilitated as a distinction of *Mobley*. Plaintiffs challenge a specific, identified employment practice—a single, centrally designed selection instrument built on common performance-rating, activity, and AI-usage inputs. Compl. ¶¶ 47–48, 53. Where the elements of a decisionmaking process "are not capable of separation for analysis," Title VII

expressly permits the process to be analyzed as one employment practice, 42 U.S.C. § 2000e-2(k)(1)(B)(i)—which is precisely why Meta's refusal to disclose the process's components, *infra* § II.C.6, cannot defeat the claim it conceals. A challenge to a common selection instrument's disparate impact on leave-takers is the paradigm of a question "common to all plaintiffs," Fed. R. Civ. P. 20(a)(1)(B)—it is the same instrument, and the statistical question has one answer. The Court need not reach provisional certification to grant the relief this reply prioritizes; Plaintiffs maintain and preserve that alternative request. Mot., Dkt. 3, at pp. 33-34.

### C. The Record Now Establishes a Likelihood of Success on the FMLA and CFRA Negative-Factor Claims

#### *1. Meta's Showing Rests on a Witness Who Has Sworn Three Different Versions of the Same Story, Undercut by the Partial Performance Reviews Meta Produced*

When this Court denied the TRO, it credited Meta's evidence because the denials were "unequivocal." Dkt. No. 25 at 5. The Court expected that testing the credibility of Meta's declarants would have to await discovery in arbitration. *Id.* It has not had to wait. In the four weeks since, Meta's sole process witness, Linh Doan, has sworn two more declarations. Dkt. No. 18-3 (July 15); Dkt. No. 31 (July 23); Dkt. No. 42-1 (August 10). As it turns out, several of the denials this Court relied on are no longer denials at all. They are admissions.

***The dashboards.*** On July 15, Ms. Doan swore that Plaintiffs' allegation of "AI-token-usage dashboards" was "completely inaccurate." Dkt. No. 18-3 ¶ 15. After Doe 16 filed Meta's internal documents, Dkt. No. 37, Exs. A-D4, the dashboards materialized: "some teams at Meta developed AI 'dashboards.'" Dkt. No. 42-1 ¶ 12. And the denial acquired a qualifier on its way out the door: "To my knowledge, there was no official, company-wide dashboard or program to track or evaluate employees based on AI adoption or usage metrics." *Id.* Next she reframes another Doe 16 exhibits in a way Plaintiffs never contested, summarizing that

the engineering leaders' post disclaims token usage only as "a primary input for measuring performance" and promises that Meta "will ask managers not to use token usage as a justification for any performance rating." *Id.* ¶¶ 10–11. Indeed: a forward-looking assurance that concedes the data existed, was visible, and had not been off-limits. Ms. Doan also highlights the same post fretting that employees might start "gaming AI adoption metrics." *Id.* Of this concern, Plaintiffs observe that a metric no one uses cannot be gamed.

***The timing defense.*** On July 15, the monitoring program could not have mattered because the selection process "was already well underway with many selection decisions already made" when the program launched on April 22, according to Ms. Doan. Dkt. No. 18-3 ¶ 14. By July 23, Ms. Doan's "many selection decisions already made" had become "some decisions and corresponding selection criteria already documented and confirmed" by April 22. Dkt. No. 31 ¶ 35. Ms. Doan never explains what happened to "many." The difference is not stylistic. If only "some" decisions and criteria existed on April 22, then a substantial share of both were finalized while the monitoring program was live, which defeats her own conclusion that "[t]he timeline is inconsistent" with Plaintiffs' theory, *id.*, and collides with her testimony that the criteria "could not be changed once the selection decisions were underway." *Id.* ¶ 4(d). Criteria still being "documented and confirmed" in late April were not pre-determined, and they were not beyond the reach of the data streams Meta was collecting. The sworn record independently contradicts the premise: token-usage dashboards that ranked individual employees—filterable by organization and job family—existed, were shared widely in internal groups, and were personally used by multiple Plaintiffs no later than December 2025, months before the launch Ms. Doan treats as the earliest possible date for any such tooling. Dkt. No. 34 ¶ 13; Dkt. No. 37 ¶ 5; *see also* Dkt. No. 3-18 ¶ 22.

***The leave-blindness story.*** On July 15, the safeguard preventing discrimination was oversight: policies, training, and HR Business Partners who "worked closely with decision-makers" to "help ensure" protected characteristics were not used. Dkt. No. 18-3 ¶¶ 4, 7–8. On July 23, oversight was promoted to total ignorance: leave information "was not made available to decision-makers," who had no "visibility . . . or any opportunity to identify this." Dkt. No. 31 ¶¶ 7–8. By August 10, the ignorance had transformed into knowledge without neutralization: assessments of AI-driven impact "were based only on the time when the employee was working." Dkt. No. 42-1 ¶ 6. That concession does two things at once. It means the managers who assigned the ratings knew exactly when employees were out. And it means the ratings penalized the absence itself: an employee assessed "only" on her time working had less time to generate the "AI-driven impact" her colleagues were earning credit for, so she fell behind them by virtue of being out. Nothing in Ms. Doan's three declarations says Meta corrected for that. The blindness was never plausible on her own telling anyway. The decision-makers were Vice Presidents and Directors inside the affected organizations. Dkt. No. 31 ¶¶ 11, 17, 22, 28. Leave was publicly visible on shared calendars through ordinary channels. Doe 26 Supp. Decl. (Dkt. 39) ¶ 16. And when it served Meta's defense, someone at Meta counted the leave-takers in every cohort, down to the person. Dkt. No. 18-3 ¶ 10(c); Dkt. No. 31 ¶¶ 14, 32.

***Fact became "guidance."*** The first declaration speaks in categorical fact: "was not used," "not accurate," "completely inaccurate." Dkt. No. 18-3 ¶¶ 13–16. The second adopts a lawyer's conditional: "To the extent Plaintiffs allege . . . , those allegations are false." Dkt. No. 31 ¶¶ 33, 35–37. The third retreats to policy: "Meta's guidance does not permit AI adoption and usage metrics to be used as negative factors," resting on "my familiarity with Meta's guidance" and "[t]o my knowledge." Dkt. No. 42-1 ¶¶ 4, 8, 11–12, 16. Ms. Doan does nothing to apprise

the Court or Plaintiffs as to the source of her knowledge, and regardless, a company policy is not synonymous with actual practice. Most, if not all, large employers have policies prohibiting illegal discrimination, but that does not mean such policies are always followed, and Plaintiffs have repeatedly provided evidence to confront and contradict the conclusory statements contained in each successive Doan declaration. Faced with a Meta employee's account that "low AI adoption" was cited as a contributing factor in a 2025 "Meets Most" rating, Ms. Doan attacks the account as anonymous and unverified. She never testifies that it did not happen, despite that she presumably has access to the relevant information. *See* Dkt. No. 42-1 ¶¶ 14–17. And by her own scale, "Meets Most" is no small thing: it means the employee is "considered not to be meeting the expectations of their role," Dkt. No. 18-3 ¶ 5(c) & n.1, and it was itself a selection criterion in the RIF. Dkt. No. 31 ¶ 23.

Meta's process descriptions also do not agree with themselves: the first swears business leaders "did not have discretion to select employees based on any factors or criteria they identified," only "permissible criteria," Dkt. No. 18-3 ¶ 4, while a later one describes a process in which those same leaders were "asked to identify and document the business rationale" behind their selections, in which "selection criteria were identified" to serve it, and in which Consistently-Met-Expectations employees were permitted to be selected against a Meets-Most criteria. Dkt. No. 31 ¶¶ 4(b)–(c), 13; *see* Dkt. No. 18-3 ¶ 5(g).

The denials are also drawn to miss this: Ms. Doan's paragraphs 5(b) and 34 deny AI-assisted "scoring" and "ranking," Dkt. No. 31 ¶¶ 5(b), 34, terms that do not reach AI drafting the review text on which the scores were based, *see* § II.C.3, *supra*.

***Ms. Doan was not "in the rooms" either—but we have evidence from those who were.*** The Court observed that Plaintiffs "were not in the rooms where it happened." Dkt. No. 25 at 5.

Neither, it turns out, was Meta's witness. Her key denials rest on "my review of Meta's documentation" (which she has not specifically identified), Dkt. No. 18-3 ¶¶ 9, 11, 13, on "my familiarity with Meta's guidance" (also not identified), and on statements "[t]o my knowledge," again without informing the Court or Plaintiffs how she came to this knowledge, Dkt. No. 42-1 ¶¶ 8, 11–12, 16. Her account of the four visa-holder Plaintiffs asserts cohort compositions, co-workers' leave histories, and decision-makers' states of mind without ever saying how she knows any of it. Dkt. No. 31 ¶¶ 10–32. *See* O'Neil Decl. ¶ 12 (no one person has visibility into the entire layoff process "unless they have been directly asked to audit the process"). Plaintiffs do not move to strike—hearsay may be considered at this stage, *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988) (en banc); *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009)—but weight tracks foundation.

Meta-produced documents and Plaintiffs' declarations, by contrast, record what the people who *were* in the rooms said and wrote. One manager's year-end 2025 review records a Plaintiff's protected-leave status as his rating: in the field labeled "Rating," it reads "Leave of Absence," and every substantive field is blank—the only narrative being the director's suggestion that, "coupled with the recent AI improvements," the employee move out of management in 2026. Mazingo Decl. ¶ 12 & Ex. C-1. Another review evaluates a Plaintiff "during the entire year" and faults her nothing "despite being out on medical leave [redacted] in H2," crediting her for "[m]aintain[ing] momentum on strategic initiatives during and after medical leave"—leave named on the review's face, the full year assessed with no proration, and working through leave treated as the thing that saved the rating. *Id.* ¶ 13 & Ex. C-2. A third assigns "Meets Most Expectations"—the selection band—for "impact throughout the year," faulting the employee for a pilot that "stalled" and "lost momentum" during the very stretch

between two protected medical leaves in which he had asked for, and been denied, a disability accommodation. *Id.* ¶ 14 & Ex. C-3. A manager explained a lowered rating, in writing, by the employee's "broken time," told him the period "does not count as leave of absence," and offered that "unlucky leaves happen" and "it is what it is." Doe 6 Decl. ¶¶ 10–11. A manager warned that taking provider-approved leave meant senior leadership "will definitely" terminate the employee or nominate him for the coming layoffs, declined to put anything in writing to "avoid a paper trail," and, hours after the layoff notice, messaged that it came "just 1 month before we can mark your great performance into the system." Doe 15 Decl. ¶¶ 18–21, 25–27. A 2024 performance review states on its face that the employee's removal from management "occurred upon his return from medical leave." Doe 19 Decl. ¶¶ 7, 9–10. A director attests that Meta announced an AI-enabled performance program, "Checkpoint," under which "employee AI adoption was going to be a core assessment metric," that Meta withheld the details "until after the May 20, 2026 reduction in force," and that the dashboards he checked "almost daily" "failed to distinguish employees' leave from lack of engagement." Doe 18 Decl. ¶ 22.[2] These are not inferences from timing. They are Meta's own managers, in their own words, several of them in writing.

### 2. *Ms. Doan's Own Admissions Establish the Negative Factor*

The FMLA forbids using protected leave "as a negative factor" in employment decisions. 29 C.F.R. § 825.220(c); *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122–25 (9th Cir. 2001). Plaintiffs need not show leave was the reason anyone was selected, only that it entered the

---

[2] Further evidencing Meta's institutional attitude toward time away from work: at a July 2026 internal Q&A—weeks after the RIF took effect, and while this action was pending—an employee asked Meta's Chief Technology Officer, Andrew Bosworth, whether AI-driven productivity gains might be used to restore "Meta Days," a discontinued program of additional paid days off. Bosworth's answer, as reported by Business Insider: "Stop asking about Meta Days. It's very dumb." He continued, "I hope that what we do with our extra time is do even more and cooler stuff for the users who use our products every day. . . . I get an extra hour. You know what I do with it? I put it into that," and suggested the employee "[g]o to your parents and ask them . . . what they think of that as a career strategy." RJN Ex. J (Business Insider, Aug. 2026).

calculus at all. Mot. at 15–16. Ms. Doan's third declaration walks the Court through the violation step by step. It concedes, for the first time, that "AI-driven impact" was recognized in the 2025 performance cycle—an "Above and Beyond" factor that "could help, but not hurt, an employee." Dkt. No. 42-1 ¶¶ 5, 8. She concedes in the same breath that "performance ratings were one of the permissible selection criteria in certain decisional units." *Id.* ¶ 4; *see* Dkt. No. 18-3 ¶ 5(b)–(c); Dkt. No. 31 ¶¶ 12, 23, 29. Most importantly, she concedes how those assessments treated absence: they "were based only on the time when the employee was working." Dkt. No. 42-1 ¶ 6. Using AI raised a rating. A rating decided a job. And an employee on leave could not use AI. The chain runs through her own paragraphs.

An employee on twelve weeks of protected leave generates twelve weeks of nothing while her colleagues accumulate a ratings credit she cannot. *See* Doe 22 Decl. ¶ 10 (AI-usage scores "decline during periods when the employee was on leave or otherwise out of the office"); Doe 18 Decl. ¶ 22 (dashboards "failed to distinguish employees' leave from lack of engagement"). A factor co-workers can earn and leave-takers cannot is a penalty for those on leave by simple arithmetic. "Could help, but not hurt" describes the mechanism; it does not cure it. If the factor could lift a colleague's rating "Above and Beyond," then relative to that colleague, the leave-taker was rated down by operation of the criterion—without any manager knowing anyone's leave status, and without any manager deviating from guidance. This is particularly true given that rating managers were forced to rate on a curve: managers could only award limited numbers of each rating. Doe 18 Supp. Decl. ¶ 5 (people manager attesting to operation of forced curve); Dkt No. 3-25 ¶ 11. "Help, not hurt" is a description of the individual entry; in a ranked cohort, one employee's help is another's hurt.

Courts have long required that the metric itself be neutralized, so that protected absence is not booked as underperformance. *Pagel v. TIN, Inc.*, 695 F.3d 622, 629 (7th Cir. 2012); *Pecora v. ADP, LLC*, 232 F. Supp. 3d 1213, 1229 (M.D. Fla. 2017); *Gostola v. Charter Commc'ns*, LLC, 72 F. Supp. 3d 796, 802 (E.D. Mich. 2014); Mot. at 16. Ms. Doan never claims Meta neutralized these inputs for leave, and her assurance that employees were assessed "only" on the time they worked concedes Plaintiffs' allegations rather than denying them.

The performance review template corroborates her concession. Four Plaintiffs, across three organizations, attach the same before-and-after: the impact question on the year-end 2025 review form—the cycle that produced the selection-determinative ratings—expressly directs evaluation of contributions "which includes AI-driven impact," language absent from the 2025 mid-year and 2024 forms. Dkt. No. 34 ¶ 6 & Ex. H; Dkt. No. 35 ¶ 11 & Exs. E–G; Dkt. No. 36 ¶ 9 & Ex. D; Dkt. No. 39 ¶ 8 & Exs. B, D. This reflects a company-wide instrument change, not an anecdote. Indeed, Meta's CEO announced to investors in April 2026: "AI is transforming our work," Meta is *"building the next evolution of our company around" the people using it to outsized effect*, and the plan includes "streamlining our teams so they aren't bigger than they need to be" while "recognizing and rewarding the people who are having outsized impacts." RJN Ex. M, Earnings Transcript, at 3.

Doe 16's experience closes the loop from instrument to application: her review was written against the same prompt, her manager cited her AI use as a strength, and she appeared at or near the top of her team's token-usage dashboard, visible to her manager.[3] Dkt. No. 37 ¶¶ 4–5 & Ex. B. But the AI-driven impact assessment was not leave-neutral. Ms. Doan's assertion that any AI-driven-impact assessment "was based only on the time when the employee was

[3] Doe 16 requested a disability accommodation but did not take leave and hence her AI-use metrics were not depressed by leavetaking.

working," *Id.* ¶ 6, is coupled with no identified methodology, protocol, instruction, or document supporting proration—and none appears in the produced reviews or training records. Mazingo Decl. ¶¶ 10–11. Of the year-end 2025 performance reviews Meta has produced for these Plaintiffs, none references protected leave neutralization or proration; several expressly evaluate performance "throughout the year" for employees who were on leave for part of it, and some reference the leave itself—including one review that evaluates the employee "during the entire year" "despite being out on medical leave for 8 weeks," and another whose "Rating" field reads "Leave of Absence." Mazingo Decl. ¶¶ 11–15 & Exs. C-1–C-4.

Ms. Doan denies the performance-relevance of AI token usage by selectively highlighting aspects of the engineering leaders' internal post supplied by Doe 16, Dkt. No. 42-1 ¶¶ 9-13, but the same exhibit contains an engineer's reply—"Multiple orgs have built dashboards that rank engineers by token spend and flag those below a threshold. Managers are following up with reports who aren't 'using enough AI' . . . the official 'tokens ≠ performance' message becomes aspirational rather than descriptive"—which the post's author does not deny, answering only that "going into checkpoint@" Meta "will ask" managers to stop, Dkt. No. 37 Exs. D-1–D-4. Ms. Doan's paragraph 12 concedes that teams built AI-usage "dashboards"—but Doan can say only that "[t]o my knowledge" there was no *official, company-wide* one. Dkt. No. 42-1 ¶ 12. *But see* Doe 9 Decl. ¶ 11; Doe 4 Supp. Decl. (Dkt. 34) ¶ 13 (dashboard ranking individual employees by token usage, in use by December 2025). As for the anonymous employee post reporting that "low AI adoption" was cited for a "Meets Most" rating—the exact rating band paragraph 5(c) used for RIF selection—Meta's answer is that its guidance forbade it. Dkt. No. 42-1 ¶¶ 14–17. That is the point. A promise document is not a control; the question is compliance, and Meta has

produced no audit, no enforcement record, and, as shown below, no training suggesting anyone was ever taught the rule.

### *3. Meta Obtained Denial of the TRO on Representations It Has Since Abandoned*

The Court structured the TRO hearing so that there could be no mistake about what Meta was representing. It opened by saying it wanted "to confirm my understanding of what Meta's representations are," in "one-word answers, basically." Tr. 3:20–24. Meta answered, and its answers were exactly as categorical as the Court requested. None has survived Meta's own subsequent filings.

The four representations, and what became of them, fit into two different categories.

***First.*** On July 16, Meta told this Court that AI-token usage and AI-adoption metrics played no "role in the development of prior performance ratings or promotion history." "No." Tr. 4:6–18. On August 10, Meta swore that "AI-driven impact" was recognized in the 2025 performance cycle as a factor that "could help, but not hurt, an employee," Dkt. No. 42-1 ¶¶ 5, 8; that token usage was disfavored only as "a primary input for measuring performance," *id.* ¶ 10; and that managers "will [be] ask[ed]" not to cite token usage going forward, *id.* ¶ 11. A factor that could "help" a rating played a role in the rating—particularly where "helping" was in fact harming employees who were on leave. Meta's "No" was not accurate.

***Second.*** On July 16, Meta confirmed it was "representing that AI was not used in any way in the selection process for the RIF." Tr. 4:24–5:2. It made "abundantly clear" that the Model Capability Initiative "was not used at all in RIF selection." Tr. 17:10–12. The Court took Meta at its word, nearly verbatim: "Meta's declarations that it did not use AI in any way with respect to the RIF are unequivocal." Dkt. No. 25 at 5. Meta has since sworn to two facts that

cannot live with that representation. Performance ratings "were one of the permissible selection criteria" in the RIF, Dkt. No. 42-1 ¶ 4, and "AI-driven impact" was a recognized factor in those ratings. *Id.* ¶¶ 5, 8. AI helped shape the ratings, and the ratings helped decide the RIF. That is AI used in the selection process—the very thing Meta told this Court never happened. Nor does this require inference about how AI touched the ratings: by November 2025, employees were using Meta's AI tools to draft the performance reviews themselves, and Meta subsequently announced AI-generated first drafts as standard procedure for 2026 reviews. Doe 18 Supp. Decl. ¶ 5 (people manager attesting "By November 2025, some employees were using Meta's AI tools to draft performance reviews, something that was subsequently announced as standard procedure for first-draft reviews in 2026."); Dkt. No. 3-25 ¶ 14; RJN Ex. H. The reviews Meta calls the work of "human managers evaluating employee contributions," Dkt. No. 31 ¶ 5(b), were being written, in the first instance, by the AI Meta told this Court "was not used in any way."

As for the Model Capability Initiative, Meta's denial has the same shrinking quality as the rest. In July, Meta swore the MCI "was not used as an input for selection decisions" and that "Human Resources and business leaders do not have access" to it. Dkt. No. 18-3 ¶ 14; *accord* Dkt. No. 31 ¶ 35. Both formulations dodge the question the Court asked. "Was not used as an input" does not deny that decision-makers saw the data; and "do not have access"—present tense, sworn in July—says nothing about who had access in April and May 2026, when the selections were made and while the program was still running. Meta's public statements supply what its declarations avoid. On June 22, 2026, Engadget reported that Meta was "pausing" the MCI after the data it collected—keystroke and mouse activity, private conversations, transcriptions, and performance data—was left accessible to Meta's entire workforce. RJN Exs. C, G. That confirms what Ms. Doan waved off as "not accurate": workforce-wide monitoring,

launched April 22 and running throughout the selection window, until Meta paused it in June. Dkt. No. 18-3 ¶ 14; Compl. ¶¶ 50–52. And Meta's statement to the press was conspicuously more careful than its declarations here: the most Meta could say, before this action was filed, was that "we have no indication at this time that any data was improperly accessed by Meta employees, we're pausing it while we investigate." RJN Ex. C. A carefully hedged "no indication at this time" cannot coexist with a categorical sworn representation that no decision-maker accessed the data during the very months the selections were finalized. And Meta has said nothing about the MCI data since this case was filed. A company that cannot even rule out *improper* access to the very performance data it was collecting while it chose whom to lay off has not shown the Court that "AI was not used in any way in the selection process." Tr. 4:24–5:2; *infra* § II.C.5.

***Third.*** On July 16, Meta confirmed "that the leave and accommodation status of employees was not used as a negative factor in consideration of selection for the RIF." Tr. 5:6–9. On August 10, Meta swore that assessments of AI-driven impact "were based only on the time when the employee was working." Dkt. No. 42-1 ¶ 6. A ratings credit available only while an employee is present is a leave penalty in everything but name, and the ratings decided selections. *Supra* § II.C.2.

Meta's counsel also told the Court repeatedly at the TRO hearing that there was "no evidence" that AI was used in RIF selection or in making performance determinations. Tr. 15:7–20. There was. When Meta said it, the record already contained sworn testimony that Meta leadership used AI to draft performance reviews and ran no calibration process for this RIF, Doe 13 Decl. ¶¶ 11, 14; that a director monitored AI-adoption dashboards that could not distinguish leave from disengagement, under a program in which "employee AI adoption was going to be a

core assessment metric," Doe 18 Decl. ¶¶ 19–22; that employees' scores on Meta's AI-usage metrics declined during leave, Doe 22 Decl. ¶¶ 3, 10; Doe 25 Decl. ¶¶ 13–14; and Meta's own internal documents, filed as exhibits to Doe 16's declaration. The Court had discussed Doe 18's account that same morning. Tr. 11:4–8. Meta's claim that there was "no evidence" was, at best, a misrepresentation of the record before this Court. Meta likewise told the Court its "research on these issues w[as] thorough and we found no court that has enjoined an employer in the way that they are asking," Tr. 21:9–14—two weeks after *Whitfield* enjoined a noticed-but-not-final termination, a case Plaintiffs had cited, Dkt. 3, Mot. at 25, and to which Meta had no response even when directly asked. *See also, infra* §II.D.4. And Meta acknowledged that Plaintiffs were "still employed in order to comply with WARN," Tr. 20:15–16, which places the status quo where Plaintiffs have said it is all along: every Plaintiff was employed when this Court ruled. Meta ended that six days later, and now calls it a *fait accompli*. *See infra* § II.E.

The Court denied the TRO because it took Meta at its word. Meta has since taken the word back, piece by piece, in its own sworn filings. Its Opposition quotes the hearing transcript where helpful, Opp. at 21 (citing "Tr. of Proc., July 16, 2026, at 12"), but does not attach it, and none of the representations set out above and made by counsel in Court appears anywhere in Meta's Opposition. The full transcript accompanies this reply as Exhibit I to the Mazingo Declaration. A party that obtains the denial of emergency relief on representations it then abandons cannot ask the Court to keep relying on them. This Court reserved the power to "reconsider the determinations stated in this Order based on any additional evidence." Dkt. No. 25 at 8–9. The most important new evidence is Meta's own retreat.

### *4. The Court's Question Remains Unanswered: No Dates, No Denominators, No Ranking Artifact, and No Skills Assessment*

***Numerators without denominators.*** Meta supplied statistics that cannot be evaluated, in a form only Meta can complete: "13 employees within this cohort who were either on leave or had taken leave within the past 24 months who were not selected," Dkt. No. 31 ¶ 14; Doe 4 among "11 IC5 employees in that cohort . . . selected for impact," *id.* ¶ 15; Doe 15 "one of 10 employees in that cohort who were selected," *id.* ¶ 26; the "two other employees in Doe 26's cohort" were not leave-takers, *id.* ¶ 32. Missing from every one: the size of the cohort, the number of leave-takers in it, and the selection rate for leave-takers versus non-leave-takers. To write paragraph 14 at all, Meta had to join leave records to a cohort roster—conceding the data exists in linkable form, that Meta knows how to link them, and that Meta ran the computation and disclosed only the favorable half. *See* O'Neil Decl. ¶ 13 (provenance information "should exist and should be stored as a matter of course"). As Plaintiffs' labor economist explains, data fragments like this are meaningless without the comparison population, and the analysis that would answer the Court's question is standard, bounded, and runs on data categories large employers maintain in the ordinary course. Neumark Decl. ¶¶ 11–13, 17–19 (the affected employees "cannot by themselves answer that question"; aggregate summaries alone are insufficient). Other missing figures: the leave status of the eleven employees selected in Doe 4's cohort, Dkt. 34 ¶ 12, and which seven teams composed Doe 15's cohort, how they were chosen, and how many IC4 and IC5 engineers were in it, Dkt. 36 ¶¶ 18–19. Plaintiffs' declarations fill some of the gaps: [redacted] (significant where decisionmakers retroactively selected criteria to support a business rationale), Dkt. No. 31 ¶¶ 4(b)–(c)); [redacted]

[redacted] Dkt. No. 35 ¶¶ 13–14. [redacted]—leaving unexplained what "historical performance" comparison could even have existed, Dkt. No. 39 ¶¶ 9–12.

Meta treats Plaintiffs' candor as a concession, faulting them for acknowledging that they do not know how Meta defined its decisional units or who made the decisions. Opp. at 13-14 (*citing* Doe 4 Supp. Decl. ¶ 3; Doe 15 Suppl. Decl., ¶ 3). The point runs the other way. Plaintiffs do not know these facts because they live exclusively in records Meta withholds, *infra* § II.C.6, and no single Meta witness would know them either without doing what no one at Meta claims to have done: tracing the process end to end. O'Neil Decl. ¶ 12. As for Meta's observation that courts deny injunctions where the parties "fundamentally disagree on the facts underlying the case," Opp. at 6, the operative disagreement is no longer between the parties. It is between Meta's counsel at the (Zoom) podium and Meta's own declarant, and Meta holds every document that could resolve it.

***The ranking Meta denies.*** Doan's paragraph 5(c) fixes the most-recent-rating criterion at "Meets Most Expectations" or below. Dkt. No. 31 ¶ 5(c). Paragraph 13 concedes Doe 4's rating was "Consistently Met Expectations"—above Meta's own cutoff. *Id.* ¶ 13. Meta pivots to "historical performance lower than his cohort." But "lower than his cohort" is not an objective threshold applied uniformly, which is what paragraph 8 promises; it is an *ordering* of a cohort—a ranking. *Id.* ¶ 8, 13. Paragraphs 5(b) and 34 deny that any ranking was "AI-assisted"; nothing says how the ranking *was* produced, over what lookback period, with what weighting, or by whom. Dkt. No. 31 ¶¶ 5(b), 34. Doe 26 presents the identical anomaly—and one more: her

year-end 2025 rating was likewise "Consistently Met Expectations," above the threshold, on a two-cycle history that never dipped below the meets-expectations tier, Dkt. No. 39 ¶¶ 3, 6 & Exs. A–B, and unlike its treatment of the other Plaintiffs, the Doan declaration conspicuously never states what her ratings were—it says only that her "historical performance was lower," Dkt. No. 31 ¶ 30, an ordering it does not explain, over a "history" roughly six months of which she spent on protected leave with no stated methodology for how the leave was treated. Two of the four Plaintiffs the Court ordered Meta to explain were selected despite ratings above Meta's own stated cutoff; both required a ranking that no Meta document describes. Whatever ordered those cohorts exists as a document, a query, or an export. Meta has not produced it, has not dated it, and has not named its author. And the one percipient manager on this record contradicts the architecture itself: Doe 18, a [redacted] people manager through the RIF, attests that the only selection criterion ever communicated to him was the most recent rating—"Meets Most Expectations" or below—that no one ever communicated any of paragraph 5's other criteria, and he never received any document setting out pre-determined selection criteria, despite having participated in the calibration process that preceded Meta's *prior* layoffs. Dkt. No. 38 ¶¶ 3–5.

***The skills criterion applied without a skills assessment.*** The Doan declaration's account of Doe 9 breaks paragraph 8's promise a different way. *See* Dkt. No. 31 ¶ 8. Meta says she was selected under a "specialized skills" criterion—she "lacked the deep experience in fully immersive interactive product elements required for the high-priority project." Dkt. No. 31 ¶¶ 18–19. Meta's reviews, from its own production, document precisely that deep experience across her tenure: [redacted]

[redacted]. Dkt. No. 35 ¶¶ 4, 6 & Exs. A–G, J–L. Her ratings were "Exceeded Expectations" two years running—delivered after her leave with the assessment that she was "top of the game at [her] level." *Id.* ¶¶ 3, 9 & Ex. G. And here is what a skills-based selection would require that Meta's did not include: any assessment of skills. Before May 20, no one at Meta ever asked her about her immersive-design experience, her demos, or her portfolio—no skills survey, no portfolio review, no self-attestation. *Id.* ¶ 7. But the decision-maker Ms. Doan identifies for her unit, Dkt. No. 31 ¶ 17, had personally attended her executive demonstrations and, [redacted]—after asking her, through Meta's messaging system, to describe her work. Dkt. No. 35 ¶ 8 & Ex. M. A "specialized skills" criterion applied with no skills inquiry, to a twice-"Exceeded" designer whose skills the decision-maker had personally endorsed to the [redacted], is not an objective threshold; it is a label affixed after the fact.

### *5. Meta Tells Investors, Regulators, and the Department of Labor a Different Story*

What Meta tells this Court through Ms. Doan is also at odds with what Meta tells its investors under the federal securities laws, what it certifies to state and federal agencies, and what it told its own workforce when it believed no one else was listening. The Court may take judicial notice of Meta's SEC filings, agency records, and published press reports for the fact of their contents. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (judicial notice of matters of public record, but not of disputed facts in such records); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001); RJN, filed herewith, Exs. A–G. Meta's SEC filings are also its own statements, admissible against it. Fed. R. Evid. 801(d)(2).

**Investor and Department of Labor Representations.** Meta announced this RIF to investors as part of remaking itself into an "A.I.-first" company: roughly ten percent of the workforce laid off alongside record results—first-quarter revenue of $56.3 billion, up 33% year over year—to offset projected 2026 capital expenditures of $125 to $145 billion. Compl. ¶ 45; Mot. at 3 & n.1; RJN Exs. B, N. Internally, Meta's Chief Executive Officer told employees the company would deliberately withhold how layoff selections were made: "It is not strategically in your interest for us to communicate everything in all the detail that we normally would on this." Dkt. No. 3, Mot. at 4 & n.2.[4] A company confident that its selection criteria were eight neutral, documented factors does not strategize about concealing them from the people about to be selected. And Meta certified to New York's labor agency that the "Reason for Closure" for 1,160 of these separations was "Economic." RJN Ex. E. An "economic" reduction is a quota reduction—the question it poses is not *whether* to cut but *whom*, among employees doing comparable work—and a fixed headcount target cannot be met by threshold criteria alone: a threshold captures however many fall below it, while a quota requires ranking employees against one another until the number is reached. The unit-by-unit rationales describe how the quota was distributed; they do not answer how individuals were ordered within it. On that question—the one the Court asked—Meta's regulatory filings say "economic," its declarant says "lower than his cohort," and no document says how the cohort was ranked.

**Meta's 10-K.** Meta's Form 10-K, filed January 29, 2026, three months before the RIF was announced, describes the company Ms. Doan's declarations do not. In the same Human

[4] Meta's insistence on secrecy was not limited to withholding the criteria. In leaked audio from one of Meta's Chief Technology Officer's weekly internal meetings, published the week of the TRO hearing in this action, Mr. Bosworth told employees: "We fine and fire leakers all the time. We tend not to sue those people, but I'd like to . . . ." RJN Ex. K (Stephanie Cruz, *Meta CTO Says He'd Like to Sue Leakers, Then Audio From That Same Meeting Leaks*, IBTimes UK (July 16, 2026) (MSN syndication)). The remarks followed an internal employee petition—reportedly signed by more than 1,600 employees—opposing the Model Capability Initiative's monitoring. *Id.*

Capital section, Meta discloses that its "people processes and tooling, including our hiring processes and performance management systems," carry a risk of "potential bias" that Meta must "continue to implement ways to mitigate." RJN Ex. A at 10. A company that runs performance management on "tooling" whose bias it must actively mitigate has already told its investors what its witness will not tell this Court: the ratings that drove RIF selection are the product of systems, not merely of "human managers evaluating employee contributions." Dkt. No. 31 ¶¶ 5(b), 12.

***The compensation letters.*** The contemporaneous compensation records produced by Meta rewarded the very ratings Meta now recasts as the neutral bases for selection. Doe 9's 2025 Year-end Performance Letter, issued on her second consecutive "Exceeded Expectations" rating, awarded a salary increase to [redacted] a bonus at a [redacted] individual multiplier—[redacted] five days before her layoff notice. Dkt. No. 35 ¶ 5 & Ex. H. Doe 26's letter, issued on the "Consistently Met Expectations" rating the declaration relies on, awarded a salary increase, her full [redacted]—a new four-year equity commitment made weeks before Meta selected her based, it now says, on that same rating. Dkt. No. 39 ¶ 7 & Ex. C. Doe 15's letters show the same: a [redacted] recognition in the same month his selection-determinative rating was submitted. Dkt. No. 36 ¶ 4 & Exs. K, M, N. A company does not pay above-target bonuses on, refresh four-year equity for, promote on, and publicly celebrate performance records it contemporaneously regarded as documented deficiencies. Dkt. No. 31 ¶¶ 13, 19, 24, 30.

***The LCA data and the backfills.*** The Doan declaration says Meta "needed to reduce the number of [redacted] in these teams"—Doe 15's [redacted] engineering organization. Dkt. No. 31 ¶ 22. The Department of Labor's disclosure data shows that between January 29 and March 31, 2026, Meta obtained certification for 101 [redacted] Engineer positions at its [redacted] worksite with start dates May 25 through September 8, 2026—every one after Doe 15's notice date. Of those 101, 27 are designated as new employment; 72 are designated as changes to previously approved employment; 50 are certified at prevailing-wage level III or IV; and three bear the title "[redacted] Doe 15's exact title. RJN Ex. F; Mazingo Decl. ¶¶ 16-17, Ex. H (methodology). The pattern is not confined to Doe 15: following Doe 18's May 20 selection, Meta opened two [redacted]-level positions with substantially the same responsibilities as the role he held—postings he personally reviewed. Dkt. No. 38 ¶ 7. Meta was attesting to the federal government that it needed senior [redacted] engineers through 2029, and posting replacements for a [redacted] it had just selected for layoff, while telling this Court the roles were eliminated for documented business reasons.

In summary, Meta has told three different audiences three stories it cannot reconcile. To its investors and the Department of Labor, it described an economic, headcount-driven reduction—one that necessarily required ranking comparable employees against one another—while certifying to the SEC that the performance-management tooling behind those rankings carries a bias it must actively mitigate. To this Court, it swears the selections turned on eight neutral criteria that no ranking produced and no system touched. And in its own compensation records, it paid above-target bonuses, refreshed four-year equity, and promoted the very employees whose ratings it now calls deficiencies—while backfilling, through federal visa

filings and job postings, the senior roles it told this Court it needed to eliminate. Each account was crafted for its audience. Only the Doan account is a defensive narrative crafted for litigation.

### *6. Meta Withheld Critical Selection-Related Records Under § 1198.5, Has Never Represented That the Records Do Not Exist, and Its Own "Compromise" Production Shows No Leave-Neutralization Control*

Beginning June 1, 2026—six weeks before this action was filed—the Plaintiffs served records requests under Labor Code §§ 226, 432, and 1198.5,[5] with statutory response deadlines that lapsed as early as July 1. Mazingo Decl. ¶¶ 4-10, Ex. B (requests of June 1, 5, 16, 23, and July 3, 2026; July 23, 2026 notice of deficiencies; Meta's July 28, 2026 response; Plaintiffs' July 29, 2026 reply). Meta's productions included payroll / compensation records, some signed documents, and incomplete performance reviews. They uniformly excluded critical information bearing on layoff selections: calibration notes; peer reviews; self-reviews; manager pulse scores; employee surveillance records; keystroke, screen, and activity monitoring data and any § 432 consents; AI-use dashboards; and AI outputs. These are the standard categories of an algorithmic audit. O'Neil Decl. ¶ 16 (selection process records, performance records, scores and rankings, and AI-drafted reviews including prompts). The withholding is visible on the face of Meta's own production: the produced year-end reviews contain a "Calibration Notes" header with the content beneath it missing and state that each employee's "self-review and feedback about you can be

[5] Section 1198.5 reaches every record "the employer maintains relating to the employee's performance or to any grievance concerning the employee." Cal. Lab. Code § 1198.5(a). Records generated or consulted in evaluating performance are such records wherever they reside: compliance "mandates" an employee's "unconstrained" access to personnel records "wherever located," *Wellpoint Health Networks, Inc. v. Superior Court*, 59 Cal. App. 4th 110, 124–25 (1997), including performance records maintained by a supervisor rather than in the official file, *Cortez v. Chipotle Mexican Grill, Inc.*, 2018 U.S. Dist. LEXIS 227201, at *40–41 (C.D. Cal. Aug. 9, 2018), aff'd, 2021 U.S. App. LEXIS 22534, at *6 (9th Cir. July 29, 2021) (unpublished)(records in the supervisor's "possession" "were clearly created as part of his management duties" and "thus qualified as personnel records"). That the performance records here take the form of calibration notes, monitoring data, dashboards, or AI outputs changes nothing: California construes statutes that predate a technology or practice to reach it, rather than giving them a "wooden construction" that excludes it. *Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1071–72 (9th Cir. 2020) (applying *Apple Inc. v. Superior Court*, 56 Cal. 4th 128 (2013)).

downloaded," confirming the existence of the very documents absent from the production. *See, e.g.,* Doe 16 Supp. Decl. (Dkt. 37) Ex. B.

Plaintiffs' July 23 notice asked Meta to do one of two things for each category: (a) state that it was withholding responsive records and identify the specific basis, or (b) represent, after a diligent search, that no such records exist. Meta's July 28 written response, through counsel, did something in between—and the choice is telling. Meta refused to produce any category; refused to identify which custodians were asked about which systems (including Metamate, Checkpoint, Cali, and second-brain agent configurations) or what repositories and logs were searched and when; and invoked § 1198.5(n)'s pendency provision—which cannot excuse statutory deadlines that passed on pre-suit requests served weeks before this action was filed. What Meta's response conspicuously never says, for any category, is that the records do not exist. A party that will not represent, after diligent search, that calibration content, ranking outputs, and AI-usage dashboards do not exist—while its own filings concede that team-level dashboards did exist, *supra* § II.C.2—is a party electing to withhold. And it is the same party asking this Court to credit half-statistics, *supra* § II.C.4, drawn from the very repositories it declines to open.

The single category Meta agreed to produce—"in the spirit of compromise," and only "to the extent they exist"—was education and training records. Mazingo Decl. ¶¶ 8, Ex. D. The records produced reflect a total absence of relevant training: zero entries covering the FMLA, leave neutrality in performance evaluations or workforce reductions, or the treatment of employees on protected leave; no specialized training on conducting performance evaluations; no dedicated reasonable-accommodations module; and the only even arguably relevant courses—"Managing Performance at Meta" and "Managing Bias" are elective. Mazingo Decl. ¶¶ 9-10, Ex. G (produced training records). The gap matters because Meta's litigation position

assumes a control no one was trained to apply, AI-driven-impact assessments "based only on the time when the employee was working," Dkt. No. 42-1 ¶ 6, yet identifies no proration protocol, and Meta's own training records show no manager was ever taught one.

Meta's selective disclosure is telling and significant. Meta has been on notice since the June 1 requests and litigation hold; the withheld materials are in its exclusive control; its statutory production obligations lapsed, mostly pre-suit; and the relevance of each category is established by Meta's own papers—the calibration content Meta excised sits beneath a header in reviews it produced, and is the natural home of the cohort ordering its account of Does 4 and 26 requires, *supra* § II.C.4; and the AI-usage dashboards it withholds are ones its declarant concedes existed, *supra* § II.C.2. The Court may infer, for purposes of this motion, that (1) the withheld calibration content, ranking outputs, and dashboard data would show leave-correlated inputs in the selection process, and (2) the absence of any leave-neutralization training confirms that no such control existed—or at the very least, decline to credit the partial statistics Meta has extracted from the same records it refuses to produce.

#### *7. The Expert Declarations Show the Requested Audit Is Bounded, Conventional, and Feasible—Not a "Fishing Expedition"*

Meta derides the audit remedy as "discovery disguised as injunctive relief." Opp. at 18. Dr. David Neumark—among the country's leading empirical scholars of labor-market discrimination—explains that whether leave-takers were selected at higher rates than otherwise comparable employees is answerable through standard statistical methods routinely used in employment matters; that if activity- or performance-based measures entered the process, the analysis can test whether those measures were leave-correlated and whether they were normalized for time actually available to work; and that the data categories required are ones large employers maintain in the ordinary course. Neumark Decl. ¶¶ 8–16, 19. Critically, the

analysis "would not require an assumption that an artificial-intelligence system itself made the layoff decision." *Id.* ¶ 16. Dr. Cathy O'Neil separately explains why an independent audit—rather than the internal review Meta invokes—is the accepted mechanism for making algorithmic selection systems legible to a tribunal. O'Neil Decl. ¶¶ 10, 14-16, 21-24.[6]

Nor is a court-appointed neutral[7] examining one party's systems before any liability determination novel; it is routine machinery wherever the material facts live inside systems only one party can inspect. In this District, in *WeRide Corp. v. Kun Huang*, the court granted a preliminary injunction on an incomplete record, 379 F. Supp. 3d 834 (N.D. Cal. 2019), and when the defendants' conduct compromised the evidentiary record, appointed a neutral forensic inspector—engaged and paid by the defendant, bound by the protective order, and expressly "not . . . an agent, representative, or expert of any Party"—to quantify what the systems showed, alongside a special master under Fed. R. Civ. P. 53(a)(1)(C). No. 5:18-cv-07233-EJD (NC) (N.D. Cal. Aug. 27, 2019), ECF No. 266 at 2–3, 6. Trade-secret courts go further at the *ex parte* stage following statute-specific procedures, routing all access to seized systems exclusively through a

---

[6] Meta's invocation of internal review, Dkt. No. 18-3 ¶¶ 4–6, carries a history. Following a two-year independent civil-rights audit, Meta in 2019 formalized a senior-executive Civil Rights Task Force, chaired by its COO, as permanent accountability infrastructure; a July 2020 EEOC charge then placed Meta on notice that its subjective evaluation practices were alleged to operate as a vector for discrimination in evaluations, promotions, and pay. RJN Ex. H (Charge of Discrimination, *Veneszee, Jr. et al. v. Facebook, Inc.* (EEOC, filed July 2, 2020)) (cited for its allegations and the notice it provided, not for any agency finding). In January 2025, Meta dismantled that infrastructure while promising employees it would "apply fair and consistent practices that mitigate bias for all, no matter your background," RJN Ex. I (Meta Ends Its DEI Programs as Zuckerberg Blasts Biden on Joe Rogan, CNN Business (Jan. 10, 2025) (reporting memo of Janelle Gale, Meta VP of Human Resources, whose contents a Meta spokesperson confirmed))—and sixteen months later ran an 8,000-employee RIF through performance systems no internal civil-rights function remained to audit. The oversight Meta invokes is oversight it abolished; the bias mitigation it promised—and represents to the SEC that it performs on its "people processes and tooling," *supra* § II.C.5—it has never documented performing here. That is why the tailored remedy is an *independent* audit: no internal mechanism remains to perform the check.

[7] Dr. O'Neil is offered on methodology, not as the proposed neutral. The proposed protocol requires an auditor not previously retained by either party, bound by the protective order, with examination separated from the disclosure. *See* O'Neil Decl. ¶¶ 3-4 (disclosure and scope of opinions).

third-party forensic examiner. *E.g., Blue Star Land Servs., LLC v. Coleman*, 2017 U.S. Dist. LEXIS 232012, at *5–7 (W.D. Okla. Aug. 30, 2017). And courts have paired interim injunctive relief with a pre-hearing audit of the records in dispute, resolving only who conducts it—holding that it "would be meaningless to conduct the preliminary injunction hearing without first having the results of the audit." *Hallmark Ins. Adm'rs, Inc. v. Colonial Penn Life Ins. Co.*, 1987 U.S. Dist. LEXIS 6587, at *4–5 (N.D. Ill. June 19, 1987). The logic is the privilege-review special master's: where neither the tribunal nor the opposing party can lawfully or practically read the disputed material, a neutral reads it and reports. Plaintiffs' proposed order follows the protocol courts have refined: a neutral not previously retained by either party, bound by the protective order, working on a closed system with examination separated from disclosure, reporting to the Court and the arbitrators, at Meta's cost. If anything, the case for a neutral is stronger here than in the trade-secret line—there, the neutral inspects the *movant's* property in the enjoined party's hands; here, the opaque system belongs to the party refusing inspection, *supra* § II.C.6.

The same machinery is familiar at every level of generality. Section 706(g) authorizes courts to "order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay . . . , or any other equitable relief as the court deems appropriate," 42 U.S.C. § 2000e-5(g)(1), and courts have "not merely the power but the duty" to fashion decrees that eliminate discrimination's effects. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 (1975) (quoting *Louisiana v. United States*, 380 U.S. 145, 154 (1965)). The Supreme Court has affirmed remedial machinery far more intrusive than a bounded audit. *Local 28, Sheet Metal Workers v. EEOC*, 478 U.S. 421 (1986) (court-appointed administrator to monitor compliance). In this District, the preliminary injunction in *Waymo LLC v. Uber Technologies, Inc.*, *2017 U.S. Dist. LEXIS 73843,* *46 (N.D.

Cal. May 11, 2017) directed a special master to "promptly develop proposed monitoring and verification protocols," including facility visits and expedited inspection. *Waymo* was a trade secret case, but the power does not depend on trade-secret statutes: in *OOO Brunswick Rail Management v. Sultanov*, 2017 U.S. Dist. LEXIS 2343, *4-5 (N.D. Cal. Jan. 6, 2017), the court declined the DTSA's *ex parte* seizure remedy and ordered pre-merits device custody under ordinary Rule 65. Courts have entered decrees over discriminatory selection algorithms specifically, *EEOC v. iTutorGroup, Inc.*, No. 1:22-cv-02565 (E.D.N.Y. 2023) (consent decree with monitoring of automated screening); *Louis v. SafeRent Solutions, LLC*, No. 1:22-cv-10800 (D. Mass. 2024) (court-approved settlement requiring independent third-party validation of scoring models). What the auditor would examine is not unusual either: the adverse-impact records and validation documentation the Uniform Guidelines have required employers to maintain since 1978, 29 C.F.R. §§ 1607.4, 1607.15, and the testing categories California's regulations now make relevant evidence.

California's newly effective automated-decision-system regulations provide that "[r]elevant to any such claim or available defense [of aiding and abetting discrimination] is evidence, or the lack of evidence, of anti-bias testing or similar proactive efforts to avoid unlawful discrimination, including the quality, efficacy, recency, and scope of such effort, the results of such testing or other effort, and the response to the results." 2 Cal. Code Regs. § 11020(b)(i); 2 Cal. Code Regs. § 11008.1 (defining "Automated-Decision System" as "[a] computational process that makes a decision or facilitates human decision making regarding an employment benefit . . . [it] may be derived from and/or use artificial intelligence, machine-learning, algorithms, statistics, and/or other data processing techniques."). The regulation does not mandate an audit, but it does make the *absence* of proactive testing itself

relevant evidence on the claim—and across three declarations and an opposition, Meta has identified no anti-bias or disparate-impact testing of its selection instrument anywhere in the record. Under the Civil Rights Council's framework, that silence weighs on the merits now. Also, the regulation defines the precise evidentiary categories on which these claims will turn—testing quality, efficacy, recency, scope, results, and the response to results—and every one of them is evidence that only an examination of the system can generate.

The requested audit is therefore not "discovery disguised as injunctive relief," Opp. at 18; it is ancillary equitable machinery of the kind the Ninth Circuit routinely approves, *Johnson v. Couturier*, 572 F.3d 1067, 1084–85 (9th Cir. 2009), that produces exactly the evidence California law makes central—through a neutral, because Meta withholds the underlying records.

### *8. "Unequivocal" Has Not Survived the Month*

The Court's merits ruling rested on a credibility judgment made on a one-declaration record: unequivocal corporate denials on one side, employee declarations discounted for lack of inside knowledge on the other. Dkt. No. 25 at 5. That record is overwritten. The one-word answers the Court solicited precisely so that it could rely on them have been qualified out of existence by the party that gave them. Meta's witness has contradicted herself on the dashboards, the timing, the visibility of leave, and the role of AI in the ratings that drove selection. She has conceded the mechanism at the heart of the FMLA claim. What denials remain are propped up by "guidance," "to my knowledge," and "even if a single manager deviated." The Court anticipated that discovery would be needed to test the credibility of Meta's declarants. No discovery was needed. Declarations that shift with the litigation wind are entitled to little weight. *Cf. Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998 (9th Cir. 2009) (a party cannot manufacture or defeat an issue by contradicting its own prior sworn testimony); *Kennedy v.*

*Allied Mut. Ins. Co.*, 952 F.2d 262, 266–67 (9th Cir. 1991); *World Fin. Grp. Ins. Agency v. Olson*, 2024 WL 730356, at *4 (N.D. Cal. Feb. 22, 2024) (Meta's own authority, discounting "allegations and conclusory affidavits").

The Court invited exactly this reassessment: "I may reconsider the determinations stated in this Order based on any additional evidence the parties provide regarding whether and how AI was used in an improper manner to cause the RIF of the plaintiffs." Dkt. No. 25 at 8–9. On the record as it now stands, Plaintiffs have shown a likelihood of success on the FMLA and CFRA negative-factor claims, established in the main through Meta's own witness. At minimum, the "serious questions" this Court has already found, Dkt. No. 25 at 4, joined with a balance of hardships that tips sharply in Plaintiffs' favor, *see infra* § II.F, satisfy *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–35 (9th Cir. 2011). Meta asks the Court to resolve the parties' factual dispute on the strength of Ms. Doan's say-so. Her say-so now points the other way.

### D. The Six Plaintiffs at Issue Face Irreparable Harm That Money Cannot Remedy

#### *1. The Harm Is Loss of Lawful Status and Work Authorization—Not "Imminent Removal"—and Courts Uniformly Hold That Harm Irreparable*

Meta answers an argument Plaintiffs do not make. Plaintiffs' showing has never depended on pending removal proceedings; the injury is the extinguishment of lawful status and work authorization itself—the loss of the legal capacity to remain and to work—which begins running the moment employment ends and is complete when the 60-day grace period lapses. Every case Meta cites on this factor is a removal-enforcement case asking whether *deportation* was imminent: *Carlsson* (no pending removal proceedings), *Collada* (expedited-removal order, no imminent removal), *Pymanee* and *Ta* (speculative removal to a third country). Opp. at 22–23.

None involves an employee whose lawful status is terminating by operation of law because of the challenged employment action.

On the question actually presented, the authority is one-way. Just five weeks ago, a court in this District collected the cases: "courts have recognized that the loss of work authorization itself . . . goes beyond ordinary economic injury and constitutes irreparable injury weighing in favor of preliminary injunctive relief," and "[m]ultiple courts have held that loss of or delay in obtaining employment authorization is an irreparable harm." *Hedayati v. Edlow*, 2026 U.S. Dist. LEXIS 150071, at *17 (N.D. Cal. July 7, 2026); *accord Casa de Maryland, Inc. v. Wolf*, 486 F. Supp. 3d 928, 968 (D. Md. 2020); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 434 (E.D.N.Y. 2018); *Doe v. Noem*, 778 F. Supp. 3d 1151, 1164 (W.D. Wash. 2025) (collecting cases); *Doe v. Noem*, 2026 U.S. Dist. LEXIS 97078, at *42–46 (S.D.N.Y. May 1, 2026). In *Karakozova v. University of Pittsburgh*, 2009 WL 1652469, at *4 (W.D. Pa. June 11, 2009), a research assistant allegedly terminated on a discriminatory basis showed irreparable harm because the termination would cost her the H-1B status tied to the position, forcing her voluntary departure from the U.S., or be subject to immediate deportation. The court rejected defendant's argument that there were other visa applications available, finding it could not make such conclusion on the record before it. This case is directly analogous. Under *Winter*, Plaintiffs must show irreparable harm is *likely*—and it is not merely likely but arithmetically certain that, absent relief or an intervening petition, each visa-dependent Plaintiff's authorization terminates on a date already on the calendar. A harm with a date is not speculative. Meta's "grace period" argument mistakes the mechanism of the harm for its cure: the 60-day clock is not a safety net; it is the fuse Meta lit. A job search in the interim confers no status.

***2. The Windows Are Concrete, Plaintiff by Plaintiff***

The supplemental declarations make the window concrete. [redacted]

[redacted]

### 3. *The Health-Coverage and Statutory-Leave Showings Meta Says Are Missing Are in the Record*

The record contains exactly the health-coverage showing Meta's own authority requires. *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 491 (3d Cir. 2000), found irreparable harm for plaintiffs who demonstrated they could not afford needed care. Doe 16 makes that showing and more, because for her the harm has already begun. [redacted]

[redacted][8]

[8] Nor is the statutory-leave forfeiture Meta waves off as compensable, Opp. at 20, abstract or monetary. [redacted] when Meta notified him of his selection on May 20. Doe 4 Decl. ISO PI (Dkt. 3-4) ¶¶ 2, 6, 8. His termination did not merely end a paycheck; it extinguished the statutory right to reinstatement at the conclusion of his bonding leave, 29 U.S.C. § 2614(a)(1); Cal. Gov't Code § 12945.2, and converted the weeks Congress and California reserved for him to spend with his newborn into a forced, grace-period-driven job search. *Id.* ¶¶ 15–17. Protected time with a three-month-old is not banked and does not accrue; no later damages award restores it. [redacted]—so separation extinguishes both the accommodation leave he had already flagged and the baby-bonding entitlement that would attach at his child's birth. And Meta's all-purpose answer—COBRA—is itself conditioned: the premium subsidy Meta offers requires signing a release of the very claims at issue here, leaving Plaintiffs to carry the full premium while, [redacted] Doe 4 Decl. ISO PI ¶ 14; Doe 6 Decl. ISO PI ¶ 23. Because every one of these separations was completed after this motion was filed, an order restoring these entitlements is restoration of the status quo ante litem, *infra* § II.E—Meta cannot recast it as mandatory relief by having finished the very act the motion challenged. *Porter v. Lee*, 328 U.S. 246, 251 (1946).

#### *4. Whitfield Remains Undistinguished*

In *Whitfield v. Noem*, 2026 WL 1965094 (C.D. Cal. July 2, 2026), the court enjoined an employer from effectuating a disabled employee's termination upon a showing of "serious questions" on accommodation claims, because losing "all his income, healthcare, and other benefits" before adjudication was "imminent and irreparable harm" and the balance of equities tipped sharply toward the employee. *Id.* at *2–3. The Opposition's after-the-fact distinctions fail. Meta's first—that *Whitfield's* claims would have been "mooted by termination"—applies with greater force here: separation extinguishes the visa-dependent Plaintiffs' lawful status, and no arbitral award entered months or years from now can restore a status that lapsed, recall a Plaintiff forced to depart, or resurrect a spouse's adjudicated application. Meta's second—that Plaintiffs "have already been terminated"—is a circumstance of Meta's own making, accomplished with full notice of this motion and during the expedited schedule this Court set: Plaintiffs sought this precise relief on July 13, while every Plaintiff remained employed; Meta effectuated the majority of the separations on July 22 and will complete the New York Plaintiffs' separations on August 20—four days before the hearing on the motion asking that they be enjoined. Opp. at 4 n.3. "[W]here a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo." *Porter*, 328 U.S. at 251. Meta's third—the availability of another forum—proves too much: Whitfield, a federal employee, had an administrative remedial scheme, and the court enjoined anyway, because interim relief was necessary to preserve a meaningful remedy. So here, *supra* § II.A.

### E. The Requested Order Preserves the Last Uncontested Status Quo; Even Under the Mandatory-Injunction Standard, the Facts and Law Clearly Favor the Six Plaintiffs at Issue Here

Meta argues the "actual status quo is that Plaintiffs have been terminated." Opp. at 25. That is not the legal test, and it measures the status quo at the wrong moment. The status quo for injunction purposes is not whatever state of affairs the defendant has managed to bring about by the hearing date; it is "the last uncontested status which preceded the pending controversy." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000); *accord Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1061 (9th Cir. 2014) ("status quo ante litem" refers "to the the legally relevant relationship *between the parties* before the controversy arose")(quotation omitted); *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 809 (9th Cir. 1963); *see Boardman v. Pacific Seafood Grp.*, 822 F.3d 1011, 1024 (9th Cir. 2016). The last uncontested status here is employment—as Meta itself acknowledged at the hearing: Plaintiffs were "still employed in order to comply with WARN" when the Court ruled. Tr. 20:15–16. Every Plaintiff was employed when this Court denied the TRO; Meta ended that six days later, after this Court's July 17 Order and in the middle of the expedited schedule the Court set, and now calls it a *fait accompli*. The character of the requested relief is fixed by the status quo when relief was sought, not by the defendant's intervening self-help: "[i]t has long been established doctrine that where a defendant with notice in an injunction proceeding completes the acts sought to be enjoined the court may by mandatory injunction restore the status quo." *Porter v. Lee*, 328 U.S. 246, 251 (1946). Measured against the last uncontested status, the requested order is prohibitory—it forbids Meta from giving effect to challenged separations that post-date the motion—and even if the Court instead treats the relief as mandatory because Meta has now completed the challenged acts, *Porter* confirms the Court's undiminished power to order restoration precisely because

Meta completed them with notice. Any other rule would hand every enjoinable defendant a heightened-scrutiny defense as a reward for outrunning the briefing schedule.[9]

The proposed order is correspondingly modest: as to Does 4, 6, 9, 15, 16 and 26, reinstatement to payroll and benefits (or, at Meta's election, continuation of pay, benefits, and visa sponsorship status without active duties), and, as applicable, maintenance of the immigration-sponsorship status quo, pending completion of an independent audit under a court-approved protocol, with the auditor's report submitted to the Court and the arbitrators. That is preservation in aid of arbitration—not a judicial takeover of Meta's personnel decisions.

**F. In the Alternative, Audit and Preservation Relief Should be Ordered Even If the Court Declines to Restore Any of the Plaintiffs to the Status Quo.**

The forms of relief Plaintiffs request are severable, and the least of them should not fall with the greatest. If the Court concludes that reinstatement or pay continuation is a step too far on this record, it should nonetheless (1) order the independent audit under the court-approved protocol described above, with the report submitted to this Court and to the arbitrators, and (2) order Meta to preserve, in auditable form, the records the audit would examine: selection and calibration records, cohort rosters and any ordering or ranking artifacts, performance inputs, AI-adoption and token-usage dashboards and their underlying data, Model Capability Initiative data, and AI-drafted or AI-assisted review content, including prompts. O'Neil Decl. ¶¶ 14–16. Neither order disturbs a single employment decision, so neither is "mandatory," and the heightened standard Meta invokes has no purchase on this relief. *Cf. Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). Both are ancillary equitable machinery of the kind the Ninth

[9] In any event, as to the visa-affected Plaintiffs the record satisfies even *Garcia*'s "clearly favor" standard for mandatory relief. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015). It is undisputed that their lawful status terminates by operation of law absent intervention; Meta's court-ordered explanation of their selection supplies no dates, no percipient witnesses, and no denominators, supra § II.C.4; and Meta's own filings and hearing representations contradict the account it now gives, *supra* §§ II.C.3, II.C.5.

Circuit routinely approves, *Johnson v. Couturier*, 572 F.3d 1067, 1084–85 (9th Cir. 2009), and the Court may implement them through a neutral expert under Federal Rule of Evidence 706 or a master under Federal Rule of Civil Procedure 53(a)(1)(C). Pre-merits preservation in discrimination cases is settled practice. *See EEOC v. Recruit U.S.A., Inc.*, 939 F.2d 746, 754-756 (9th Cir. 1991) (affirming preservation relief where records were at risk). And preservation asks Meta to do for this case only what California law already requires of every employer using an automated-decision system: keep the data for four years. 2 Cal. Code Regs. § 11013(c). If Meta's account is accurate, the audit will confirm it. O'Neil Decl. ¶ 23. If Meta answers that the material cannot be preserved or examined, that answer will tell the Court more than the briefing has.

### G. The Balance of Hardships Tips Sharply Toward Plaintiffs, and the Public Interest Favors Relief

Meta has quantified its own hardship: approximately $600,000 per month in salary and benefits—for all 25 Plaintiffs. Opp. at 24. For the six Plaintiffs at issue here, the figure is a fraction, borne by a company reporting first-quarter revenue of $56.3 billion and raising capital-expenditure guidance to $125–145 billion in the same week it announced this RIF. RJN Exs. B, D. On the other side of the scale: the extinguishment of four families' lawful status, the forced departure of senior engineers and designers from the country in which their careers and households are built, a spouse's adjudication imperiled fifteen days after separation, a surgery scheduled for the week this reply is filed, and the elimination of a meaningful remedy before an arbitrator is appointed. As for RSU vesting, Opp. at 23–24, equity that vests during a period of court-ordered continuation is not a cognizable hardship if Plaintiffs prevail—it is compensation owed—and if Meta prevails, the order can condition, escrow, or claw back interim vesting.

The public interest Meta invokes—enforcement of arbitration agreements—favors Plaintiffs: enforcing the carve-out Meta drafted *is* enforcing the agreement. *Supra* § II.A. Beyond it, Congress and California have declared the public's interest in leave rights that employees can take without forfeiting their jobs, 29 U.S.C. § 2601 *et seq.*; Cal. Gov't Code § 12945.2, and no public interest is served by allowing the statutory grace-period clock to convert contested terminations into faits accomplis. Plaintiffs do not ask this Court to sit as a "super-personnel department"; they ask it to preserve six employees' status while a neutral verifies—through standard methods, on ordinary business records, Neumark Decl. ¶¶ 11–13, 17–19, O'Neil Decl. ¶¶ 21-23—whether the selection instrument Meta cannot date, cannot document, and describes only through a thrice-revised, non-percipient declarant operated neutrally toward protected leave.

**H. Any Bond Should Be Nominal**

Rule 65(c) vests the amount of security in the Court's discretion, and district courts may require only a nominal bond—or none—where the movants are individuals of limited means enforcing employment and civil-rights protections and the feared monetary harm is speculative. *See Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003); *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999); *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). Meta's demanded $10 million is built on the arithmetic of all 25 Plaintiffs plus RSU vesting it mischaracterizes as a loss, *supra* § II.F. A tailored order as to six Plaintiffs, with interim vesting escrowed, reduces Meta's claimed exposure to a few months of salary continuation for six employees—an amount Meta concedes it can compute to the dollar and that a company of Meta's resources does not need secured[10] by individuals it has just rendered

[10] For comparison, Meta's most recent disclosures confirm the scale of the layoff—"$1.18 billion of severance expenses," "approximately 8,000 employees impacted." RJN Ex. D. *See infra* § II.E.

jobless. Requiring a substantial bond here would accomplish indirectly what Meta cannot justify directly: pricing families out of the preservation of their legal status.

Moreover, the alternative relief requires no bond at all. An audit conducted at Meta's cost under a protocol Meta helps shape, and a preservation order coextensive with Meta's existing retention obligations under 2 CCR § 11013(c), transfer no compensation and threaten no cognizable monetary loss. Rule 65(c) security exists to cover damages from a wrongful injunction; for this relief there is nothing to cover.

## III. CONCLUSION

The Court asked Meta how and why these four Plaintiffs were selected. A month later, the record answers in ways Meta did not intend: categorical denials from the podium that no witness will adopt under oath; a review instrument rewritten company-wide to reward what leave-takers categorically could not earn; above-target bonuses and fresh equity granted on the ratings now recast as deficiencies; above-cutoff employees whose selection only an undisclosed ranking can explain; and a records response that withholds everything while never saying the records do not exist. What is certain are the dates: the grace periods Meta started expire before any arbitrator will exist to hear these claims. Plaintiffs respectfully request that the Court grant the motion and enter the proposed order: (1) as to Does 4, 9, 15, and 26, requiring reinstatement to payroll and benefits (or continuation of pay, benefits, and visa-sponsorship status), and preservation of the immigration-sponsorship status quo, pending completion of an independent audit under a court-approved protocol; (2) as to Does 6 and 16, pay and benefits continuation, pending completion of such an audit; (3) in the alternative, if the Court declines to restore any Plaintiff, ordering the independent audit and requiring Meta to preserve the auditable records, *supra* § II.G; and (4) granting such further relief as the Court deems just.

DATED: August 17, 2026

Respectfully submitted,

LUMEN LAW CENTER, P.C.
WORKPLACE ADVOCATES, P.C.
HOULDING LAW PC

Andrea Mazingo
Barbara E. Cowan
Rebecca Houlding (admitted pro hac vice)
*Attorneys for Plaintiffs*